168 May 5, 2016 No. 26

IN THE SUPREME COURT OF THE
STATE OF OREGON

Lori HORTON,
as guardian *ad litem* and
Conservator of and for
T. H., a Minor,
*Plaintiff-Respondent,*
*and*

Lori HORTON,
individually;
and Steve Horton,
*Plaintiffs,*

*v.*

OREGON HEALTH
AND SCIENCE UNIVERSITY,
a Public Corporation,
*Defendant,*
*and*

Marvin HARRISON, M.D.,
*Defendant-Appellant,*
*and*

PEDIATRIC SURGICAL ASSOCIATES, P.C.,
an Oregon Professional Corporation;
and Audrey Durrant, M.D.,
*Defendants.*

(CC 1108-11209; SC S061992)

On direct appeal from the judgment of the Multnomah County Circuit Court.*

Argued and submitted November 6, 2014.

Roy Pulvers, Holland & Knight, LLP, Portland, argued the cause and filed the briefs on behalf of appellant.

_____

* On appeal from a limited judgment, Jerry B. Hodson, Judge. Multnomah County Circuit Court, January 6, 2014.

Maureen Leonard, Portland, argued the cause and filed the brief on behalf of respondent. With her on the brief were David K. Miller and Robert S. Wagner, Miller & Wagner LLP, Portland.

Kimberley Sewell, Tri-County Metropolitan Transportation District of Oregon, Portland, filed the brief for *amicus curiae* Tri-County Metropolitan Transportation District of Oregon.

Keith M. Garza, Oak Grove, filed the brief for *amicus curiae* Governor John Kitzhaber, M.D.

Harry Auerbach, Chief Deputy City Attorney, Portland, filed the brief for *amici curiae* League of Oregon Cities and Association of Oregon Counties.

Lindsey H. Hughes, Keating Jones Hughes, P.C., Portland, filed the brief for *amicus curiae* Oregon Medical Association. With her on the brief were Hillary A. Taylor and Tamara X. Arthur.

Thomas W. McPherson, Mersereau Shannon, LLP, Portland, filed the brief for *amici curiae* Oregon School Boards Association, Citycounty Insurance Services, Special Districts Association of Oregon, University of Oregon, Oregon State University, and Portland State University.

Travis Eiva, The Corson & Johnson Law Firm, Eugene, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, and Brewer, Justices, and Linder, Senior Justice *pro tempore*.**

KISTLER, J.

The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Landau, J., concurred and filed an opinion.

Walters, J., dissented and filed an opinion, in which Baldwin, J., joined.

_____
** Nakamoto, J., did not participate in the consideration or decision of this case.

**KISTLER, J.**

The question that this case presents is whether a statute limiting a state employee's tort liability violates either the remedy clause of Article I, section 10, of the Oregon Constitution or the jury trial clauses of Article I, section 17, and Article VII (Amended), section 3, of the Oregon Constitution. The trial court held that the statute, as applied to the state employee, violated each of those provisions and entered a limited judgment against the employee for the full amount of the jury's verdict. On direct appeal, we reverse the trial court's limited judgment and remand this case to the trial court for entry of a judgment consistent with this decision.

Plaintiff's six-month-old son developed a cancerous mass on his liver. Two doctors at Oregon Health & Science University (OHSU) participated in an operation to remove the mass: Dr. Harrison, a specialist in pediatric surgery, and Dr. Durant, a pediatric surgical fellow in training. During the operation, the doctors inadvertently transected blood vessels going to the child's liver. That act has resulted in the child having to undergo a liver transplant, removal of his spleen, additional surgeries, and lifetime monitoring due to the risks resulting from the doctors' act.

Plaintiff brought this action on her son's behalf against Harrison, Durant, OHSU, and Pediatric Surgical Associates, P.C. The trial court granted Pediatric Surgical Associates' motion for summary judgment, and it dismissed Durant as a result of an agreement among plaintiff, OHSU, and Harrison. Pursuant to that agreement, Harrison and OHSU admitted liability for the child's injuries and plaintiff's case against Harrison and OHSU went to the jury to determine the amount of the child's damages. The jury found that plaintiff's son had sustained and will sustain economic damages of $6,071,190.38 and noneconomic damages of $6,000,000.

After the jury returned its verdict, OHSU and Harrison filed a motion to reduce the jury's verdict to $3,000,000 based on the Oregon Tort Claims Act. The trial court granted the motion as to OHSU. It ruled that, because sovereign immunity applies to OHSU, the legislature

constitutionally may limit the damages for which OHSU is liable. *See [Clarke v. OHSU](#)*, 343 Or 581, 600, 175 P3d 418 (2007) (so holding). The trial court, however, denied the motion as to Harrison. Harrison had argued that, in 1857, he would have been entitled to discretionary immunity for errors occurring during surgery. It followed, he reasoned, that, because he would not have been liable for any damages in 1857 for his negligence, the Tort Claims Act limit may be applied constitutionally to him. The trial court disagreed with that argument. It then ruled that the Tort Claims Act limit, as applied to Harrison, violated the remedy clause of Article I, section 10, and the jury trial clauses of Article I, section 17, and Article VII (Amended), section 3. The court accordingly entered a limited judgment against Harrison for all the damages that the jury had awarded.

Harrison (defendant) filed a direct appeal to this court from the limited judgment. *See* ORS 30.274(3) (providing for direct appeals to this court from limited judgments arising from application of tort claims limitations).[1] On appeal, he assigns error to the trial court's post-verdict ruling denying his motion to limit the jury's verdict against him pursuant to the Tort Claims Act. He raises three arguments in support of that assignment. Initially, he reasserts the discretionary immunity argument that the trial court rejected. Alternatively, he asks us to reexamine our cases interpreting the remedy clause and the jury trial clauses. He raises separate arguments regarding each clause, but essentially he contends that our cases interpreting those clauses rest on a faulty understanding of history, are inconsistent with later cases, and should be overruled.

Having considered defendant's discretionary immunity argument, we agree with the trial court's ruling on that issue. Explaining why we agree would be of little value to anyone other than the parties. We accordingly uphold the trial court's ruling on that issue without further discussion and turn to the question whether the limit that the Tort Claims Act places on a state employee's damages violates

---

[1] The trial court's limited judgment arises from its ruling on the Tort Claims Act limitation but does not encompass its other rulings regarding plaintiffs' claims. *See [Horton v. OHSU](#)*, 277 Or App 821, ___ P3d ___ (2016) (addressing plaintiffs' appeal from other trial court rulings).

either the remedy clause of Article I, section 10, or the jury trial clauses of Article I, section 17, and Article VII (Amended), section 3.

As explained below, we conclude that the right to a remedy protected by Article I, section 10, and the right to a jury trial protected by Article I, section 17, address related but separate issues. Article I, section 10, limits the legislature's substantive authority to alter or adjust a person's remedy for injuries to person, property, and reputation. Article I, section 17, guarantees a jury trial in those classes of cases in which the right to a jury trial was customary at the time the Oregon Constitution was adopted and in cases of like nature. However, Article I, section 17, places no additional substantive limit on the legislature's authority to alter or adjust remedies beyond that found in Article I, section 10. Accordingly, we begin with the question whether the Tort Claims Act limit violates the remedy clause of Article I, section 10.

## I.   ARTICLE I, SECTION 10

The Tort Claims Act both waives the state's sovereign immunity and, as applicable here, limits the tort liability of the state and its employees to $3,000,000. ORS 30.265(1); ORS 30.271(3)(a).[2] The act imposes, as a matter of Oregon law, a legal limit on the amount of damages that a plaintiff may recover against the state and its employees. Following *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), the trial court ruled that, as applied to defendant, the Tort Claims Act limit violated the remedy clause of Article I, section 10.[3] On appeal, defendant argues that we should overrule *Smothers*, as well as our other remedy clause cases, and hold that Article I, section 10, is not "a substantive guarantee of a remedy *** [but] rather, guarantees access to the courts [only] for such remedies as the law may provide." Defendant and his *amici* argue that *Smothers*

---

[2] The Tort Claims Act imposes a different monetary limit on tort claims against a local public body and its employees. ORS 30.272.

[3] As discussed below, Article I, section 10, contains three independent clauses. The parties' arguments focus on the third of those clauses, the remedy clause. That clause provides that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." Or Const, Art I, § 10.

based its holding on an incomplete view of the historical circumstances surrounding Oregon's remedy clause and drew inferences that even its doubtful premises cannot support. *See generally* Jonathan M. Hoffman, *Questions Before Answers: The Ongoing Search to Understand the Origins of the Open Courts Clause*, 32 Rutgers LJ 1005 (2001) (detailing some of the historical assumptions in *Smothers* that may have been faulty); *see also* <u>*Klutschkowski v. PeaceHealth*</u>, 354 Or 150, 178-96, 311 P3d 461 (2013) (Landau, J., concurring) (describing problems with the historical analysis in *Smothers*). Alternatively, defendant argues that, even if *Smothers* is good law, the damages available under the Tort Claims Act are "substantial" and thus constitutional. *See* <u>*Howell v. Boyle*</u>, 353 Or 359, 298 P3d 1 (2013).

Plaintiff responds that *Smothers* "was a correct interpretation of the remedy clause," although she does not question the history on which defendant relies. Plaintiff relies instead on an earlier line of this court's cases interpreting the remedy clause, which consistently have held that the remedy clause imposes a substantive limit on the legislature's authority to alter or adjust remedies for certain kinds of injuries. As plaintiff interprets *Smothers*, that decision did not tie the protections of the remedy clause to Oregon common law as it existed in 1857. Rather, plaintiff contends that *Smothers* requires a remedy that "'either restores the status quo or compensates the injured party for the loss.'" (Quoting *Holden v. Pioneer Broadcasting Co.*, 228 Or 405, 365 P2d 845 (1961) (Goodwin, J., dissenting), *cert den*, 370 US 157 (1962)).

Plaintiff's argument appears to rest on the proposition that the legislature may not limit either the nature or extent of common-law remedies but that it may extend those remedies to new subjects, expand the scope of available damages, and abrogate common-law defenses. In plaintiff's view, this court's decisions in *Howell* and <u>*Lawson v. Hoke*</u>, 339 Or 253, 119 P3d 210 (2005), departed from a correct understanding of the remedy clause because *Howell* and *Lawson* (but not *Smothers*) "'froz[e] common law' by reducing the protections of Article I, section 10 to the claims that might have been successfully litigated in 1857."

As we understand the parties' arguments, they agree that the remedy clause should not be tied strictly to Oregon common law as it existed in 1857. They disagree, however, whether the remedy clause places any substantive limit on the legislature's authority. It follows that the parties' arguments present two related but separate issues. The first is whether *Smothers* tied the meaning of the remedy clause to Oregon common law as it existed in 1857 and, if it did, whether it erred in doing so. The second is whether our other remedy clause cases erred in holding that the remedy clause places a substantive limit on the legislature's ability to modify remedies. In considering those issues, we first describe our decision in *Smothers*. We then explain why we conclude that *Smothers* clearly erred in tying the remedy clause to the common law in 1857 and should be overruled. We next explain why we disagree with defendant that we should overrule our other cases holding that the remedy clause places a substantive limit on legislative authority. Finally, we explain why the limitation on damages against state employees does not violate the remedy clause.

A.   *Smothers*

In *Smothers*, the court stated that our cases interpreting the remedy clause have not been consistent, and it sought to provide a definitive interpretation of that clause. 332 Or at 90. Using the methodology set out in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), the court considered the text of Article I, section 10, its history, and our cases interpreting the remedy clause. *Smothers*, 332 Or at 91-123. After surveying Magna Carta, Coke's *Second Institute*, Blackstone's *Commentaries*, and decisions from other states interpreting their remedy clauses, *Smothers* concluded that the historical purpose of the remedy clause was "to mandate the availability of a remedy by due course of law for injury to absolute rights respecting person, property, and reputation." *Id.* at 114.

*Smothers* explained that, to give effect to that purpose, Oregon courts should ask two questions. The first is "whether the plaintiff has alleged an injury to one of the absolute rights that Article I, section 10 protects." *Id.* at 124.

Because *Smothers* concluded that an "injury," as that term is used in the remedy clause, is a "wrong or harm for which a cause of action existed when the drafters wrote the Oregon Constitution in 1857," it restated the first question as follows: "[W]hen the drafters wrote the Oregon Constitution in 1857, did the common law of Oregon recognize a cause of action for the alleged injury?" *Id.*

*Smothers* stated that, if the answer to that question is "yes," then the remedy clause mandates that a constitutionally adequate remedy for that injury be available. *Id.* The court observed that "[a] common-law cause of action is a constitutionally adequate remedy for seeking redress for injury to protected rights." *Id. Smothers* also recognized, however, that the remedy clause "does not freeze in place common-law causes of action that existed when the drafters wrote the Oregon Constitution in 1857." *Id.* The legislature may modify or abolish a common-law remedy "so long as it provides a substitute remedial process" for injuries to "absolute rights that the remedy clause protects." *Id.* Because the legislature may provide a substitute remedial process for common-law injuries to absolute rights, the court formulated a second question to implement the remedy clause: If the legislature has abolished a common-law cause of action for protected injuries, has the legislature "provided a constitutionally adequate substitute remedy for the common-law cause of action for that injury?" *Id.*

Applying that framework to the claim in *Smothers*, the court explained that, in 1857, the plaintiff in *Smothers* would have had a cause of action against his employer for negligently exposing him to dangerous fumes that were "a contributing cause" of his injuries. *Id.* at 129-33. The legislature, however, made workers' compensation the plaintiff's exclusive remedy, and it required that the plaintiff prove that his employer's negligence was "the major contributing cause" of his injury to recover under workers' compensation. *Id.* at 133. Because the plaintiff could not make that showing, *Smothers* held that the workers' compensation statute, as applied, violated the remedy clause; that is, the workers' compensation statute violated the remedy clause because it denied the plaintiff any remedy for an injury—bodily harm

for which the defendant's negligence was a contributing cause—that would have been actionable under the common law of Oregon in 1857. *Id.* at 133-36.

*Smothers* did not reach the question of when a modified remedy for an injury that was actionable in 1857 will be "constitutionally adequate." *Id.* at 120 n 19. The court explained:

> "[T]he only question in this case is whether the legislature has deprived plaintiff of a *means* for seeking redress for the injury [that was recognized at common law in 1857 and] that he alleges that he suffered at work. Accordingly, it is beyond the scope of this opinion to address issues relating to the adequacy of the amount of damages that may be available under a legislatively substituted process for a common-law cause of action for injury to one of the rights that is protected by the remedy clause."

*Id.* (emphasis in original). The court noted that other cases had stated that a remedy will be constitutionally adequate if it is "substantial." *Id.* For instance, in *Hale*, this court concluded that, in determining the adequacy of a remedy, "the remedy need not be precisely of the same type or extent; it is enough that the remedy is a substantial one." *Hale v. Port of Portland*, 308 Or 508, 523, 783 P2d 506 (1989). *See also Neher v. Chartier,* 319 Or 417, 426, 879 P2d 156 (1994) (citing rule from *Hale*); *Greist v. Phillips*, 322 Or 281, 291, 906 P2d 789 (1995) (same).

As we read *Smothers*, it tied the meaning of the remedy clause to Oregon common law in 1857 in two ways. First, if the common law of Oregon provided a cause of action for an injury to person, property, or reputation in 1857, then the law must continue to provide some remedy for that historically defined injury. Not only did *Smothers* say so explicitly, but it held the workers' compensation statute unconstitutional, as applied, because an actionable injury under that statute (bodily harm for which the employer's negligence was the major contributing cause) was different from and narrower than the injury for which a cause of action existed in 1857 (bodily harm for which the employer's negligence was a contributing cause). *See Smothers*, 332 Or at 124,

133-36. Second, in determining whether the law provides a constitutionally adequate remedy, the court looked to the common law in 1857 as a model. It noted that common-law remedies for historically defined injuries would be constitutionally adequate but that the remedy clause does not prevent the legislature from modifying a remedy for those injuries as long as the remedy remains a substantial one. *Id.* at 124.

We accordingly disagree with plaintiff that *Smothers* did not tie the remedy clause to the common law as it existed in 1857. We also disagree with plaintiff that the court departed from *Smothers* in *Howell* and *Lawson* by looking to the common law in 1857 to determine whether the plaintiffs in those cases had suffered a constitutionally protected injury and whether, if they had, the legislature had provided a constitutionally adequate remedy. We agree, however, with both plaintiff and defendant that tying the remedy clause to the common law in 1857 can produce (and has produced) anomalous results. As others have noted, the common law often turned on a patchwork of confusing and unworkable distinctions. *See* Edwin M. Borchard, *Government Liability in Tort*, 34 Yale LJ 229, 233 (1925) (discussing confusion engendered by common-law distinctions). The standard that *Smothers* announced gives constitutional effect to those common-law anomalies. Moreover, as the dissent recognized in *Howell* and the majority did not dispute, strict adherence to *Smothers* can result in the further anomaly of trying two claims to a jury—one under the current law and the other under the law as it existed in 1857. Finally, defendant has raised substantial questions regarding *Smothers*' interpretation of the sources on which it relied.

In those circumstances, we conclude that it is appropriate to consider whether *Smothers* was correctly decided by reexamining the text of Article I, section 10, its history, and our cases. *See State v. Reinke*, 354 Or 98, 105, 309 P3d 1059, *adh'd to as modified on recons*, 354 Or 570, 316 P3d 286 (2013) (undertaking similar reexamination). In doing so, we focus initially (and solely) on *Smothers*' holding that Oregon common law in 1857 defines the injuries for which the law must provide a remedy. Because we overrule

*Smothers*, we also consider the related issue that defendant raises—whether our other remedy clause cases should be overruled as well.

B.   *The remedy clause and Oregon common law*

Article I, section 10, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Textually, Article I, section 10, differs from other sections included in Oregon's bill of rights. It is not a protection against the exercise of governmental power. *State ex rel Oregonian Pub. Co. v. Deiz*, 289 Or 277, 288, 613 P2d 23 (1980) (Linde, J., concurring). Rather, "[i]t is one of those provisions of the constitution that prescribe how the functions of government shall be conducted."[4] *Id.* Specifically, "[s]ection 10 as a whole is plainly concerned with the administration of justice." Hans A. Linde, *Without "Due Process": Unconstitutional Law in Oregon*, 49 Or L Rev 125, 136 (1970). Each of the three independent clauses that comprise Article I, section 10, addresses that topic.[5]

The first independent clause prohibits secret courts while the second provides that justice shall be administered "openly and without purchase, completely and without delay." The third independent clause provides that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." Textually, the third independent clause can be read in two ways. On the one hand, the clause can be seen as a guarantee that courts will provide "every" person a "remedy by due course of law" for

---

[4] The issue in *Deiz* was whether closing a juvenile adjudication to the public violated the open courts clause of Article I, section 10. 289 Or at 279. In distinguishing Article I, section 10, from other provisions in the Oregon Constitution, Justice Linde did not limit his discussion to the open courts clause of that section but wrote more broadly.

[5] Article I, section 10, consists of three independent clauses ("No court shall," "justice shall be administered," and "every man shall have"), which are joined by two conjunctions. Although *Smothers* stated that Article I, section 10, consists of two independent clauses, 332 Or at 91, *Smothers* may not have been using the phrase "independent clause" in its grammatical sense.

certain kinds of injuries. As Professor Linde observed, the clause could be nothing "more than a procedural guarantee that the 'due course of law' will be open to 'every man' who is entitled to a remedy under the substantive law, whatever that might be at any time." Linde, *Without "Due Process,"* 49 Or L Rev at 136.

On the other hand, characterizing the remedy clause solely as a guarantee of equal access to the courts fails to account for all the clause's text. The text provides that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." Focusing on the phrase "by due course of law" can obscure the remainder of the text, which provides that, when a person has had "injury done him in his person, property, or reputation," he "shall have remedy." The text is as much about the availability of a remedy as it is about the "due course of law" by which the remedy is to be administered. In a related vein, this court had held that the remedy clause does not apply to every injury a person sustains to a legally protected interest. *Juarez v. Windsor Rock Products, Inc.,* 341 Or 160, 173, 144 P3d 211 (2006) (loss of deceased's society, guidance, and emotional support did not constitute injury to person, property, or reputation within meaning of remedy clause). Rather, the clause applies only to remedies for three specified types of injuries. *Id.* The clause's focus on providing remedies for specified types of injuries implies that it was intended to guarantee some remedy for those injuries, and not merely be a guarantee of procedural regularity for whatever injuries may, at the moment, enjoy legal protection.

To the extent that the text guarantees that some remedy will be available for injuries done to persons in their person, property, and reputation, the question that the text leaves unanswered is what the content of that remedy is. Certainly, nothing in the text of the remedy clause says that its protections are limited to the common law as it existed at a particular point in time. The clause lacks words used elsewhere in the constitution that connect a constitutional guarantee to a single point in time. *Compare* Or Const, Art VII, § 3 ("thereafter"); Or Const, Art I, § 31 (1857) ("hereafter"); Or Const, Art IV, § 24 ("at the time of the adoption of this constitution").

Not only does the text of the remedy clause not provide express support for the historical limitation that *Smothers* perceived, but the context of the remedy clause is also at odds with that limitation. Both Article I, section 10, and Article XVIII, section 7, were adopted as part of the original Oregon Constitution. *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 402, 431 (Charles Henry Carey ed., 1926). Article XVIII, section 7, provides that "[a]ll laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered, or repealed."

As this court explained in *Land Bd. v. Corvallis Sand & Gravel*, 283 Or 147, 156, 582 P2d 1352 (1978), Article XVIII, section 7, "continued in force the substantive principles of the common law which were adopted by the provisional government and sanctioned by the federal act establishing the territorial government." However, "[t]he common law, as it existed in England at the time of the settlement of the American colonies, has never been in force in all of its provisions in any colony or state of the United States." *Peery v. Fletcher*, 93 Or 43, 52, 183 P 143 (1919). Rather, "[i]t has been adopted so far only as its general principles were suited to the habits and conditions of the colonies, and in harmony with the genius, spirit and objects of American institutions." *Id*. Oregon accordingly departed from the "old common law [rule]" that defendants would be liable in trespass for damages caused by their cattle straying onto another person's land. *Perozzi v. Ganiere*, 149 Or 330, 348, 40 P2d 1009 (1935). Similarly, in the arid west, the common-law riparian right of property owners to use water appurtenant to their land gave way to a more limited property right to use water based on a system of prior appropriation. *Re Water Rights of Hood River*, 114 Or 112, 166-81, 227 P 1065 (1924), *cert dismissed sub nom Pac. Power & Light Co. v. Bayer*, 273 US 647, 47 S Ct 245, 71 L Ed 821 (1926).

In modifying common-law rights to meet conditions unique to this state, Oregon continued a process that began when the original colonies first adopted and then modified English common law. As one author has explained, "[b]y

1820 the legal landscape in America bore only the faintest resemblance to what existed forty years earlier" when the original colonies first adopted English common law. Morton J. Horwitz, *The Transformation of American Law, 1780-1860* at 30 (1977). As Horwitz describes, from 1780 to 1860, state legislatures modified property and other common-law rights to accommodate both the differing conditions in this country and the industrial growth that the country was experiencing. It follows that, when the framers drafted Oregon's constitution in 1857, they would not have viewed the common law as static or unchanging—a proposition that is apparent from Article XVIII, section 7, which both continued the common law, as modified to meet Oregon's needs, and recognized that the common law remained subject to change. *See Peery*, 93 Or at 52-53 (recognizing that common law can be "altered" or "repealed").

Consistent with that recognition, the common law has continued to evolve as the premises on which it rests have changed. *See Buchler v. Oregon Corrections Div.*, 316 Or 499, 518, 853 P2d 798 (1993) (Peterson, J., concurring) (explaining that the "beauty and strength of the common-law system is its infinite adaptability to societal change"). For example, this court has held that the common-law doctrine of interspousal immunity no longer bars negligence actions by one spouse against another, *Heino v. Harper*, 306 Or 347, 374-76, 759 P2d 253 (1988), and it has rejected the doctrine of parental immunity, *Winn v. Gilroy*, 296 Or 718, 733-34, 681 P2d 776 (1984). In 1975, the legislature abolished the common-law torts of criminal conversation and alienation of affections because those "actions for invasion of the family relationship were considered outmoded by changing views of marriage, divorce, and sexual relations, as reflected in the repeal in 1971 of criminal laws against adultery and enactment of no-fault divorce laws." *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 563, 652 P2d 318 (1982). More recently, we explained that, in light of legislative changes to joint defendants' liability, "common-law indemnity" is no longer "necessary or justified" for civil claims that are subject to the comparative fault statute. *Eclectic Investment, LLC v. Patterson*, 357 Or 25, 38, 346 P3d 468 (2015).

Contrary to the premise that underlies *Smothers*, when the framers drafted the Oregon Constitution in 1857, they would have understood that the common law was not tied to a particular point in time but instead continued to evolve to meet changing needs. *See [State v. Supanchick](#)*, 354 Or 737, 765, 323 P3d 231 (2014) (looking to common law as it evolved in America to determine scope of state confrontation clause). Put differently, nothing suggests that, when the framers drafted the remedy clause, they would have sought to tie the protections of that clause to the common law as it existed at a single point in time. We find no basis in the text of the remedy clause, its context, or its history from which we can conclude that the framers intended to limit the meaning of that clause to the concept of injury as it was defined in 1857.

In reaching a contrary conclusion, *Smothers* relied on *dicta* from a federal district court decision, *Eastman v. Clackamas Cnty.*, 32 F 24 (CCD Or 1887). *See Smothers*, 332 Or at 122. We accordingly discuss that decision briefly. The plaintiff in *Eastman* had been injured in 1886 as a result of Clackamas County's negligence in maintaining one of its bridges, and he sued the county to recover his damages. *Eastman*, 32 F at 26. Under the common law, a county was not liable for an injury resulting from a defect in one of its highways or roads. *Rankin v. Buckman*, 9 Or 253, 256 (1881).[6] Before the adoption of the Oregon Constitution, the Oregon territorial legislature changed that common-law rule and permitted tort and breach-of-contract actions against counties. *Eastman*, 32 F at 30-31.

In 1887, 30 years after the constitution had been drafted and one year after the plaintiff in *Eastman* had been injured, the legislature amended the territorial statute that had permitted counties to be sued. *Id.* at 31. It deleted the part of the statute allowing tort actions against counties,

---

[6] In *Eastman*, the court explained that the county's common-law immunity derived from *Russell v. Devon Co.*, 2 Term R 667 (1788), which had held that an unincorporated county was immune from liability for its negligence, primarily to avoid the prospect of a judgment "be[ing] satisfied out of the property of any one of the men of Devon, [with] the result [that there] would be 'an infinity of actions' among the defendants for contribution." *Eastman*, 32 F at 28-29.

with the result that the statute, as amended, permitted actions against counties only for breach of contract. *Id.*

Before the federal district court, the county argued that the plaintiff's action should be dismissed. The county explained that it was not liable for its torts at common law, and it noted that the territorial statute permitting tort actions against counties had been repealed. In considering the county's argument, the district court first observed in *dicta* that the remedy clause froze in place both the common-law and statutory remedies that existed when the Oregon Constitution was enacted. *Id.* at 32. The district court reasoned:

> "To begin with, it may be admitted that the remedy guaranteed by [the state remedy clause] is not intended for the redress of any novel, indefinite, or remote injury that was not then regarded as within the pale of legal redress. But whatever injury the law, as it then stood, took cognizance of and furnished a remedy for, every man shall continue to have a remedy for by due course of law. When [the Oregon] constitution was formed and adopted, it was and had been the law of the land, from comparatively an early day, that a person should have an action for damages against a county for an injury caused by its act or omission. If this then known and accustomed remedy can be taken away in the face of this constitutional provision, what other may not?"

*Id.*

Having raised the remedy clause as a possible answer to the county's defense, the federal district court decided the case on a narrower ground. It held that the plaintiff had been injured before the legislature had repealed the statute permitting actions against counties for their torts, that the plaintiff's cause of action had "vested" when he had been injured, and that nothing in the 1887 amendment suggested that the legislature had intended the amendment to apply retroactively and take away a vested right. *Id.* at 34. Because the federal court held only that the 1887 amendment did not apply retroactively, its discussion of the remedy clause was *dicta* and had no binding effect in federal district court, much less in Oregon state courts.[7]

---

[7] Of course, even if the federal district court's interpretation of state law had been part of its holding, a federal court's interpretation of state law would not bind a state court faced with the same question.

Five years later, a plaintiff brought a negligence action in state court against a county to recover for an injury that occurred after the legislature had repealed the statute making counties liable for their torts. *Templeton v. Linn County*, 22 Or 314, 316-17 (1892). Although the plaintiff relied on the *dicta* in *Eastman* to argue that the remedy clause barred the legislature from repealing the statute giving him a right to sue the county for its torts, this court rejected that argument, describing it as "startling." *Id.* at 316. This court reaffirmed that the legislature cannot take away a party's "[v]ested rights" (the right to recover for injuries that had occurred while the statutory remedy was in place), but it held that the same limitation did not apply to "expectancies and possibilities in which the party has no present interest." *Id.* at 318. Not only did *Templeton* reject the *dicta* in *Eastman*, but this court later explained that it had never adopted that *dicta*. *Noonan v. City of Portland*, 161 Or 213, 249, 88 P2d 808 (1939); *Gearin v. Marion County*, 110 Or 390, 400-01, 223 P 929 (1924).

*Smothers* based its holding tying the meaning of the remedy clause to Oregon common law in 1857 on federal *dicta* that this court described in *Templeton* as "startling" and that the court explained in *Noonan* and *Gearin* that it had never adopted.[8] It follows that the central premise of *Smothers*' holding finds no support in the text of the remedy clause, and it is at odds with the text of Article XVIII, section 7, and the history underlying that section and Article I, section 10. As Professor Linde observed more than 30 years before *Smothers* was decided, "one doubts

---

[8] *Smothers* stated that *Theiler v. Tillamook County*, 75 Or 214, 146 P 828 (1915), had adopted the *dicta* in *Eastman*. 332 Or at 122. *Smothers* misperceived what *Theiler* held. In *Theiler*, the construction of a county highway caused a creek to change its course and, as a result, periodically "flo[w] over and upon the plaintiff's premises, destroying the trees, shrubs, and grass growing thereon, and washing away the soil." 75 Or at 215. In deciding whether the landowner could bring a claim against the county, *Theiler* quoted the *dicta* from *Eastman* and also discussed the holdings in *Templeton* and two other state supreme court cases. *Id.* at 217-18. This court then held that the plaintiff could sue the county, a holding that rested on the court's conclusion that causing water to invade the plaintiff's land "practically amount[ed] to a taking of *** part of the premises without condemnation." *Id.* at 218. Government liability for taking property follows from the state takings clause. *See* Or Const, Art I, § 18. Recognizing that constitutional liability is not the same thing as adopting the *dicta* in *Eastman*.

that by the words 'remedy by due course of law,' Oregon's constitution meant to freeze tort law as it stood either in 1859, or when this guarantee first entered state constitutions almost 200 years ago." Linde, *"Without Due Process,"* 49 Or L Rev at 136. Indeed, both Justice O'Connell's majority opinion and Justice Goodwin's dissent in *Holden* expressly rejected the proposition that *Smothers* later embraced—that Article I, section 10, requires that every injury the common law recognized in 1857 be remedied in substantially the same form as that recognized when the constitution was first adopted. *See Holden*, 228 Or at 411-12 (majority); *id.* at 422 (Goodwin, J., dissenting).

We do not overrule our precedents lightly. *See Farmers Ins. Co. v. Mowry*, 350 Or 686, 261 P3d 1 (2011). As the court explained in *Mowry*, our "decisions 'should be stable and reliable,' because the Oregon Constitution is 'the fundamental document of this state.'" *Id.* at 693-94 (quoting *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 53, 11 P3d 228 (2000)). However, as the court also recognized in *Mowry*, "there is a 'similarly important need to be able to correct past errors' because '[t]his court is the body with the ultimate responsibility for construing our constitution, and if we err, no other reviewing body can remedy that error.'" *Id.* at 694 (quoting *Stranahan*, 331 Or at 53) (bracket in *Mowry*). The considerations that bear on when we should exercise that authority are difficult to reduce to a simple formula. *Couey v. Atkins*, 357 Or 460, 485, 355 P3d 866 (2015). Rather, as the court explained in *Mowry*, *"stare decisis* is a prudential doctrine that is defined by the competing needs for stability and flexibility in Oregon law." 350 Or at 697-98.

In *Couey*, we identified "at least three categories [of error]" that will justify reconsidering a prior constitutional decision. 357 Or at 485. We observed:

"First, there are cases in which a prior pronouncement amounted to *dictum* or was adopted without analysis or explanation. *** Second, there are cases in which the analysis that does exist was clearly incorrect—that is, it finds no support in the text or the history of the relevant constitutional provision. *** Third, there are cases that

cannot be fairly reconciled with other decisions of this court on the same constitutional provision."

*Id.* at 485-86 (citations omitted). Placing a decision in one of those three categories does not exhaust consideration of other factors that can bear on whether to adhere to or overrule that decision. As *Mowry* explained, a significant consideration can be whether others have "rel[ied] on the rules of law announced by this court to structure their transactions." 350 Or at 700-01 (insurance policies drafted and underwritten in reliance on judicial decision); *see State v. Cuevas*, 358 Or 147, 154, 361 P3d 581 (2015) (declining to overrule two decisions interpreting sentencing guidelines rules, in part, because those decisions had "been applied repeatedly in calculating innumerable sentences"). Moreover, the age of the decisions and the extent to which the issues have been fully litigated can matter. *Compare Mowry*, 350 Or at 700-01 (declining to overrule relatively recent decision where issue had been fully litigated), *with State v. Mills*, 354 Or 350, 366-71, 312 P3d 515 (2013) (overruling holding in 1923 case that had been adopted without discussion and cited without explanation in ensuing 90 years). The answer to the question whether a case should be overruled cannot be reduced to the mechanical application of a formula but requires instead an exercise of judgment that takes all appropriate factors into consideration. *See Mowry*, 350 Or at 697-98 (describing *stare decisis* as a prudential doctrine).

With that background in mind, we turn to the question whether we should overrule *Smothers*. As explained above, the central premise of *Smothers* finds no support in the text and history of Article I, section 10; it is at odds with the context found in Article XVIII, section 7; and it is squarely inconsistent with a series of this court's cases holding that Article I, section 10, did not freeze rights and remedies as they existed in 1857. Additionally, *Smothers* is of relatively recent vintage, and it has not given rise to the sort of reliance interests that persuaded this court in *Mowry* to adhere to a prior statutory interpretation. Although the text and history of the remedy clause were considered at some length in *Smothers*, that factor, standing alone, does not persuade us to adhere to a case that was at odds with the text, history, and case law when it was decided and that

continues to prove problematic. For the reasons explained above, we overrule *Smothers*.[9]

## C.    *This Court's Other Remedy Clause Cases*

The question that remains is whether, as defendant argues, our other remedy clause cases also should be overruled to the extent that they place a substantive limit on the legislature's authority to alter or adjust remedies; that is, is defendant correct that the remedy clause provides only procedural protection? In considering that issue, we begin by summarizing our remedy clause cases that preceded and followed *Smothers*. We then turn to whether those cases are consistent with the text and history of the remedy clause.

### 1.    *Oregon remedy clause decisions*

This court's remedy clause decisions divide roughly into two groups. The first group arose out of claims against counties and cities for injuries caused by defects in their roads and streets. Those cases started from a premise that was familiar to the courts in the late nineteenth and early twentieth century, which Justice Bean summarized in his concurring opinion in *Templeton*: "By the decided weight of authority, a county is not liable for an injury received from a defective highway, unless by statute; while the courts seem equally agreed that such liability exists as against a municipal corporation." *Templeton*, 22 Or at 320 (Bean, J., concurring).[10]

Following *Templeton*, this court routinely rejected the argument that the remedy clause entitled a plaintiff

---

[9]   Because we overrule *Smothers*, it follows that its conclusion—that the workers' compensation statute was unconstitutional as applied—cannot stand. We express no opinion on whether our remedy clause cases that preceded *Smothers*, which we reaffirm today, would lead to the same conclusion.

[10]   That distinction did not derive from the nature of the governmental activity. It was the same for both counties and cities—maintaining their streets in good repair. Rather, the distinction derived from the proposition that cities were created by a special charter, which imposed a duty on cities to maintain their streets. *Rankin*, 9 Or at 256-57. The basis for holding that counties could not be sued rested variously on the lack of a corporate identity, which the English courts had identified in *Russell* and the federal district court had noted in *Eastman*, and the proposition that counties were created by general law rather than a special charter. *See* John F. Dillon, 2 *The Law of Municipal Corporations* §§ 961, 965 (3d ed 1881) (recognizing that distinction but questioning its validity).

to bring a negligence action against a county for failing to maintain its roads, in the absence of a statute authorizing the action. *See, e.g.*, *Schroeder v. Multnomah County*, 45 Or 92, 96, 76 P 772 (1904). Negligence claims against cities presented a more complex issue. This court explained that cities were created by special charters, which imposed a duty on cities to maintain their streets in good repair. *Rankin*, 9 Or at 256-57. As a result, cities could be sued for negligently failing to satisfy that duty, unless the legislature exempted them from liability. *Id.*; *see O'Harra v. The City of Portland*, 3 Or 525, 526 (1870) (upholding provision in city charter exempting city from tort liability); *cf. Mattson v. Astoria*, 39 Or 577, 65 P 1066 (1901) (citing *O'Harra* for that proposition in the context of an Article I, section 10, case).

In *Mattson*, this court considered a statute that sought to exempt both a city and its officials from liability for negligently maintaining its streets. 39 Or at 578-79. The court held that, although the legislature could exempt a city from liability for breaching that duty, the remedy clause prevented the legislature from exempting both the city and its officials from all liability. 39 Or at 579-80. The court reasoned:

> "[The remedy clause] was intended to preserve the common-law right of action for injury to person or property, and while the legislature may change the remedy or the form of procedure, attach conditions precedent to its exercise, and perhaps abolish old and substitute new remedies, \*\*\* it cannot deny a remedy entirely."

*Id.* at 580 (citations omitted); *see* Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 289, 361-62 (1st ed 1868, *reprinted* 1972) (summarizing earlier cases).[11]

Over the next 40 years, this court considered a series of cases brought by persons injured as a result of defects in city streets. *See Noonan*, 161 Or at 223-35 (reviewing decisions). It adhered to the rule that the legislature can immunize a city from tort liability if the city officials or employees remain liable, but it reaffirmed that the legislature cannot

---

[11] The quoted paragraph from *Mattson* combines and repeats, almost verbatim, the cited parts of Cooley's 1868 treatise, which summarized cases deciding contract clause and due process claims.

eliminate all or practically all liability for breach of a city's duty by immunizing both the city and its employees. *See id.* at 237-38; *Pullen v. Eugene*, 77 Or 320, 328, 146 P 822 (1915) (upholding city charter provision providing a cause of action against city officials when damages exceeded $100); *Batdorff v. Oregon City*, 53 Or 402, 408-09, 100 P 937 (1909) (exonerating city from liability and permitting an action against city officials for gross negligence "practically denies a remedy to any person injured"). During that time, some judges expressed the view that leaving an injured plaintiff with a remedy only against a city employee was a poor substitute for a remedy against the city. *See Colby v. City of Portland*, 85 Or 359, 374, 166 P 537 (1917).[12] However, this court's cases adhered, with some backing and filling, to the principle that the court first announced in *Mattson*—as long as legislation left the injured person with a remedy against either the city or a city employee, it did not violate Article I, section 10. *See Noonan*, 161 Or at 2223-35 (discussing decisions).[13]

In *Mattson* and the cases following it, the legislature had not altered the duty imposed on cities and their officials to maintain streets in good repair, but it had denied plaintiffs injured by a breach of that duty any remedy. Those cases recognized that a remedy against a city employee could be substituted for a remedy against the city, but those cases did not require this court to decide whether or on what terms the legislature could alter a common-law duty. That question began to arise in the second group of remedy clause cases that this court decided, which found their genesis in the opinion denying rehearing in *Stewart v. Houk*, 127 Or 589, 271 P 998, 272 P 893 (1928).

---

[12] In *Eastman*, the federal district court had rejected an argument that the plaintiff had an adequate remedy because he could sue the county employees for negligence. The district court explained that pursuing a negligence claim against a county employee was like "threshing empty straw." *Eastman*, 32 F at 34. The court reasoned: "If travelers and others who sustain injuries by reason of defective highways can have no remedy against any one except these officers personally, they might as well have none." *Id.* As noted above, *Mattson* and the cases following it did not accept that reasoning.

[13] In reviewing those decisions, the court observed in *Noonan* that the cities could not and did not invoke the doctrine of sovereign immunity because the task of maintaining city streets was regarded, perhaps illogically, as a corporate rather than a governmental function. 161 Or at 221-22; *see id.* at 237 (describing that function as ministerial rather than governmental).

The statute at issue in *Stewart* paralleled, in many respects, the statutes at issue in *Mattson* and its progeny. Like the statute in *Mattson*, the statute in *Stewart* provided that a guest injured while in a vehicle driven on Oregon public highways "'shall have no right of recovery against the owner or driver of such motor vehicle.'" *Id.* at 591 (quoting statute). The statute did not affect the owner or driver's duty to exercise due care, but it deprived an injured guest of any remedy for a breach of that duty. *Id.* at 595. This court accordingly concluded that the statute "withh[e]ld jural significance from a breach of duty which previously was regarded as a cause of action" in violation of the remedy clause. *Id.*

The defendant in *Stewart* petitioned for rehearing, arguing that the court's decision was inconsistent with the Connecticut Supreme Court's decision in *Silver v. Silver*, 108 Conn 371, 143 A 240 (1928). This court denied rehearing after explaining why the guest-passenger statute at issue in *Silver* differed from Oregon's guest-passenger statute. This court noted that the Connecticut statute provided that a host was not liable to a guest for injuries caused by ordinary negligence but preserved liability in instances "where the injury was inflicted intentionally, heedlessly or through reckless disregard of the rights of others." *Id.* at 597 (on rehearing). The court explained that the Connecticut legislature had sought "to fix the measure of care a host owed to his guest." *Id.* at 598. It viewed the Oregon statute, by contrast, as not being an effort "to regulate the operation of automobiles by prescribing the duty of host to guest, but as one wherein this element of the situation remains untouched, and the sole change effected is the denial of the remedy to an injured guest." *Id.* Having identified that distinction, the court denied the petition for rehearing.

After the court issued its decision in *Stewart*, the Oregon legislature enacted a statute that tracked Connecticut's guest-passenger statute. The new statute provided that an owner or operator of a motor vehicle was liable to a guest for injuries sustained in an accident if the accident were intentional on the part of owner or operator or "'caused by [the owner or operator's] gross negligence or intoxication or reckless disregard of the rights of others.'" *Perozzi*, 149

Or at 331 (quoting Or Laws 1929, ch 401, § 1). In holding that the new statute did not violate Article I, section 10, this court noted the United States Supreme Court's decision in *Silver* upholding Connecticut's statute against an equal protection challenge. *Id.* at 332-33. This court observed that, in upholding the distinction that Connecticut had drawn, the United States Supreme Court had relied on two state cases holding that, as a matter of state common law, "'a lower standard of care should be exacted where the carriage in any type of vehicle is gratuitous.'" *Id.* at 333 (quoting *Silver v. Silver*, 280 US 117, 50 S Ct 57, 74 L Ed 221 (1929)).

This court looked to the state common-law decisions cited in *Silver* in holding that Oregon's new guest-passenger statute did not violate Article I, section 10. *Perozzi*, 149 Or at 334-37. Specifically, this court relied on three state court decisions that held, as a matter of common law, that to "'make out liability in case of a gratuitous undertaking the plaintiff ought to prove a materially greater degree of negligence than he has to prove where the defendant is to be paid for doing the same thing.'" *Id.* at 334 (quoting *Heiman v. Kloizner*, 139 Wash 655, 247 P 1034 (1926)); *accord Massaletti v. Fitzroy*, 228 Mass 487, 118 NE 168 (1917); *Epps v. Parrish*, 26 Ga App 399, 106 SE 297 (1921). In *Massaletti*, for example, the Massachusetts Supreme Judicial Court reasoned that a driver who gratuitously gave a guest a ride owed the same common-law duty that a gratuitous bailee would, with the result that both were liable only for gross negligence or bad faith. *See Massaletti*, 228 Mass at 489 (citing *West v. Poor*, 196 Mass 183, 81 NE 960 (1907)).

To be sure, the common-law position that Massachusetts, Washington, and Georgia adopted reflected a minority view, and this court considered whether a legislative enactment based on a minority view of the common law complied with Article I, section 10. In considering that question, the court focused on cases from other state courts with similar remedy clauses. For example, the court noted that the Florida Supreme Court had held that its remedy clause did not lock its legislature into a fixed version of the common law but left it free either to expand a plaintiff's remedies against a deceased tortfeasor or to uphold a statute

permitting cattle to roam free, contrary to a landowner's common-law property rights. 149 Or at 343-44. Consistently with the Florida decision, this court noted in *Perozzi* that Article XVIII, section 7, of the Oregon Constitution expressly recognized that the legislature may alter or repeal the common law and that Article I, section 10, lacked terms that would demonstrate an intent to freeze in place the common law as it existed in 1857. *Id.* at 346-47.

This court accordingly declined to tie the legislature to a conception of the common law that would prevent it from amending the law to meet the "existing conditions and circumstances" of a given time. *Id.* at 348. It reasoned that, to hold otherwise, would fix into place doctrines such as the fellow-servant doctrine, contributory negligence, and assumption of risk. *Id.* As we read *Perozzi*, it held that, as a matter of state constitutional law, Article I, section 10, does not deny the legislature latitude to adjust the duties that one person owes another, based on the extent of the change and the reasons for the adjustment. *Perozzi* thus answered the question that *Mattson* and the cases that followed it had no occasion to decide—to what extent and on what grounds may the legislature modify common-law duties.

Cases following *Perozzi* have interpreted it as standing for the proposition that Article I, section 10, does not deny the legislature latitude to modify and sometimes eliminate common-law duties where changing conditions warrant it. *See Noonan*, 161 Or at 249 ("Article I, § 10, Oregon Constitution, was not intended to give anyone a vested right in the law either statutory or common; nor was it intended to render the law static.") Throughout the twentieth century, our cases have adhered to that proposition, while recognizing that the remedy clause places a substantive limit on the legislature. That is, within constitutional limits, the legislature has authority to alter a common-law duty or condition the procedural means of recovering for a common-law injury. For instance, in *Josephs v. Burns & Bear*, 260 Or 493, 491 P2d 203 (1971), this court upheld statutes of limitations on causes of action as having "always been considered a proper function of the legislatures *** so long as it is done for the purpose of protecting a recognized public interest." *Id.* at

503. Similarly, in *Sealey v. Hicks*, 309 Or 387, 788 P2d 435, *cert den*, 498 US 819 (1990), this court upheld a statute of repose for products liability actions, reasoning that the "legislature has the authority to determine what constitutes a legally cognizable injury." *Id.* at 394.

In *Hale*, *Clarke*, and *Howell*, this court addressed a different question, which *Smothers* had noted but not reached: On what terms may the legislature, consistently with the remedy clause, alter a remedy for the breach of a recognized duty? In *Hale*, the court summarized prior cases in concluding that "it is enough [for the purposes of the remedy clause] that the remedy is a substantial one." 308 Or at 523. In upholding a $100,000 cap on more than $600,000 in damages, the court focused on what later cases have referred to as a *quid pro quo*. *Id.* The court reasoned:

> "The class of plaintiffs [who can seek a remedy under the Tort Claims Act] has been widened by the legislature by removing the requirement that an injured party show that the municipal corporation's activity that led to the injury was a proprietary one. At the same time, however, a limit has been placed on the size of the award that may be recovered. A benefit has been conferred, but a counterbalancing burden has been imposed. This may work to the disadvantage of some, while it will work to the advantage of others. But all who had a remedy continue to have one."

*Id.* In holding that the Tort Claims Act limitation constitutionally could be applied to the plaintiff in *Hale*, the court compared that statute to the workers' compensation act, which expanded the class of plaintiffs eligible for a remedy but limited the extent of the remedy available for individual plaintiffs. *Id.* at 521-23.[14]

This court considered a similar issue in *Clarke*. *Clarke*, however, differed from *Hale* in three respects. First, in *Clarke*, the legislature had eliminated a cause of action against state employees for injuries resulting from their negligence and substituted a cause of action solely against

―――――――――

[14] This court considered the constitutionality of an early version of the workers' compensation statute in *Evanoff v. State Industrial Acc. Com.*, 78 Or 503, 154 P 106 (1915). As the court noted in *Hale*, *Evanoff* upheld the statute against an Article I, section 10, challenge because it allowed workers to opt out of coverage. *See* 308 Or at 522-23 (quoting law review article noting that proposition).

the state with capped damages of $200,000. 343 Or at 608. Second, the plaintiff in *Clarke* had sustained over $12 million in economic damages, compared to the $600,000 in damages that the plaintiff in *Hale* had sustained. *See id.* at 586. Finally, the court decided *Clarke* after it decided *Smothers*. *See id.* at 593. *Smothers* had disavowed the reasoning in *Hale*, 332 Or at 118, and *Clarke* accordingly followed *Smothers* in resolving the plaintiff's Article I, section 10, challenge. *See Clarke*, 343 Or at 591-93, 605-07 (discussing and following *Smothers*). That is, *Clarke* focused solely on whether capped damages of $200,000 was a "substantial" remedy in light of the economic damages that the plaintiff had suffered. *See id.* at 607 (framing the issue in light of *Smothers*). The court held that it was not. *Id.* at 610; *see id.* at 611 (Balmer, J., concurring) ("The arbitrarily low cap on damages for medical malpractice claims against OHSU and its employees is a problem that has long called for a legislative solution.").

By contrast, the court held in *Howell* that capped damages of $200,000 was a substantial remedy when the plaintiff had sustained $507,500 in total damages. 353 Or at 376. The court explained that the damage limitation "does not leave plaintiff 'wholly without a remedy,' as was the case for the parents of the plaintiff in *Neher*. And it represents a far more substantial remedy than the paltry fraction that remained after the imposition of the limitation in *Clarke*." *Id.*

*Smothers* characterized this court's remedy clause cases as consisting of two phases, one of which lived up to the historical purposes of the remedy clause, the other of which grossly failed to realize them. In the first phase, *Smothers* explained, courts consistently reasoned that the purpose of the remedy clause was to mandate that a remedy be available to repair injuries recognized at common law to "absolute" rights. Those cases included *Mattson*, *Stewart*, and others holding that the complete elimination of all liability would violate the remedy clause. *Smothers* explained that, in the second phase, *Perozzi* and the cases that followed it strayed from the remedy clause's historical purposes. *Smothers* reasoned that "[u]ntil 1935, this court's case law was consistent with" the purpose of protecting "absolute common-law

rights." *Smothers*, 332 Or at 118-19. In *Perozzi*, according to *Smothers*, this court erroneously imported federal equal protection analysis into Oregon's remedy clause. *Id.* at 119. It followed, *Smothers* concluded, that any case that relied on *Perozzi* either directly or indirectly had erred, and *Smothers* disavowed them.[15]

In reviewing our remedy clause decisions, we view their development differently. *Perozzi* did not rely on federal equal protection analysis as *Smothers* perceived. Rather, as explained above, the reasoning in *Perozzi* consisted of an extensive analysis of the Oregon Constitution, the text of the remedy clause, the text of Article XVIII, section 7, and common-law decisions from other states. Only in explaining the development of guest-passenger statutes similar to the one at issue in *Perozzi* did this court discuss *Silver* and, even then, to recognize, as the common law decisions it cited had done, that a state could find that a gratuitous host owed the same degree of care to his or her passengers that a gratuitous bailee owed at common law. *See Perozzi*, 149 Or at 332-35. *Perozzi*'s ground for decision was its analysis of Article I, section 10, of the Oregon Constitution. *See id.* at 348-50. For that reason, the cases relying on *Perozzi* were not sipping from a poisoned wellspring. Rather, they were relying on a case that took a considered view of the text, context, and purposes of Oregon's remedy clause.

As we view the two phases of our remedy clause cases, the first phase dealt with statutes in which the legislature had imposed a duty of care but eliminated any remedy for a breach of that duty. As legislative enactments grew more complex, the second phase of our remedy clause cases focused on statutes that modified either a duty or a remedy, but they did not retain a duty while eliminating any remedy for its breach, as the earlier statutes had done. In considering those later statutes, our cases recognized that the legislature was not precluded from altering the duty that one person owes another or even eliminating common-law causes of action and defenses, such as alienation of affections and

---

[15] *Smothers* disavowed all or part of five cases on the ground that they relied on *Silver* or on a case that itself relied on *Silver*. Those cases were *Noonan*, *Josephs*, *Holden*, *Sealey*, and *Hale*. 332 Or at 118.

contributory negligence, when the premises for recognizing the cause of action or defense had changed. Another group of our second-phase remedy clause cases recognized that the legislature could modify remedies for a recognized duty as long as the remedy that remained was substantial. Far from reflecting an aberrant view of state constitutional law, as *Smothers* concluded, the second phase of our remedy clause cases considered differing statutory schemes and, in doing so, complemented and refined the principles recognized in *Mattson* and its progeny.

We accordingly disagree with *Smothers* that we either can or should disregard *Perozzi* and the cases that followed it. We also disagree with *Smothers* that the two phases of our remedy clause cases are unalterably in conflict. Rather, the conflict that *Smothers* perceived appears to have derived primarily from its conclusion that our early remedy clause cases reflected its view of Article I, section 10. That is, *Smothers* viewed our early remedy clause cases as preventing the legislature from modifying Oregon common law as it existed in 1857, and it concluded that our early cases, viewed that way, were in conflict with the cases that followed. As explained above, however, the difficulty with *Smothers*' conclusion lies in its premise. Our early remedy clause cases looked to the common law as a guide, not as a procrustean template. Moreover, those cases considered statutes that either imposed or recognized a duty but denied any remedy, while the cases that followed considered statutes that altered the duty one person owes another or the remedy for the breach of that duty, sometimes as part of a *quid pro quo*. Properly viewed, the second phase of our remedy clause cases complements the first.[16]

With our remedy clause cases (other than *Smothers*) in mind, we return to defendant's argument that we should overrule those cases because Article I, section 10, is not "a substantive guarantee of a remedy *** [but] rather,

---

[16] This is not to say that there are no stray threads in our remedy clause cases. *See Noonan*, 161 Or at 242-43 (discussing some statements in remedy clause opinions that were incorrect even while following the larger principles recognized in those decisions). However, with the exception of *Smothers*, the larger principles that underlie and inform our remedy clause cases can be read consistently.

guarantees access to the courts [only] for such remedies as the law may provide." We begin, as usual, with the text of the remedy clause and then turn to its history.

### 2. *Text*

We discussed the text of the remedy clause earlier and concluded that the text does not provide a clear answer as to the clause's meaning. As explained above, the text could be merely a guarantee of equal access to the remedies that the legislature has provided. The text, however, could be as much about the availability of a remedy for injuries to person, property, or reputation as it is about the due course of the law by which the remedy will be administered. We accordingly look to the history of the remedy clause for guidance in determining whether our remedy clause cases are clearly incorrect. We consider the English sources for the remedy clause, the early American charters and constitutions, the early and mid-nineteenth century cases from other states interpreting their remedy clauses, and the enactment history of the Indiana and Oregon remedy clauses.

### 3. *English sources of the remedy clause*

Oregon's remedy clause stems from Lord Coke's interpretation of Chapter 29 of the 1225 version of Magna Carta, which combined Chapters 39 and 40 of the 1215 version of Magna Carta. Linde, *Without "Due Process,"* 49 Or L Rev at 138. Chapter 29 of Magna Carta provides:

> "No freeman shall be taken or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any other wise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land. We will sell to no man, we will not deny or defer to any man either justice or right."

Edward Coke, *The Second Part of the Institutes of the Laws of England* 45 (1797 ed) (setting out Chapter 29). Coke explained that this "Chapter containeth nine severall branches." *Id.* at 46. He identified the "sense" or nature of each branch, and then explained how "the same hath been declared and interpreted. 1. By authority of Parliament. 2. By our books. 3. By Precedent." *Id.* As Coke's stated methodology makes clear, he viewed both the acts of parliament and the common law as

implementing the larger principles stated in Magna Carta. That is, Coke viewed the common law and the acts of parliament as a continuation of the principles stated in Magna Carta that checked the king's arbitrary exercise of power.

The first six branches of Chapter 29 that Coke identified derived from Chapter 39 of the 1215 version of Magna Carta and limited the king's authority to deprive a person of his land, liberty, livelihood, and benefit of the law except "by the law of the land," which Coke explained meant "(that is to speak it once for all) by the due course, and processe of law." *Id.* After explaining how the courts and parliament had implemented the first six branches of Chapter 29, Coke turned to the remaining three branches, which derived from Chapter 40 of the 1215 version of Magna Carta. He listed the "sense" of those three branches as follows:

  "7.   We shall sell to no man justice or right.

  "8.   We shall deny to no man justice or right.

  "9.   We shall defer to no man justice or right."

*Id.* In discussing the last three branches of Chapter 29, Coke analyzed the seventh branch separately from the eighth and ninth branches, which he grouped together. *See id.* at 55-56 (analyzing the seventh branch); *id.* at 56 (analyzing the eighth and ninth branches).

Coke explained that the eighth and ninth branches focused on protecting the common law courts from royal interference. He stated that those branches "have been excellently expounded by latter acts of parliament, that by no meanes common right, or common law be disturbed, or delayed" by the king's exercise of the "great seale, or privie seale, order, writ, letters, message, or commandement whatsoever." *Id.* at 56. Coke recognized that the king may stay suits in his own courts, but he viewed the king's efforts to stay or interfere with the common law courts as contrary to the acts of parliament and Magna Carta. *Id.*

The seventh branch reflects a separate guarantee. Because Oregon's remedy clause derives from Coke's discussion of that branch, we quote his discussion in full:

"*Nulli vendemus,*[17] *&c.*

"This is spoken in the person of the King, who in judgment of Law, in all his Courts of Justice is present, and repeating these words, *nulli vendemus, &c.*

"And therefore, every subject of this realme, for injury done to him in *bonis, terres, vel persona,*[18] by any other subject, be he ecclesiasticall, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay.

"Hereby it appeareth, that justice must have three qualities, it must be *libera, quia nihil iniquius venali justitia; plena, quia justititia non debet claudicare; et celeris, quia dilatio et quaedam negatio*;[19] and then it is both Justice and Right."

*Id.* at 55-56.

Three propositions follow from Coke's text. First, the second paragraph quoted above focuses on ensuring that "every subject" has access to a remedy, without regard to the subject's age, status, or gender. The emphasis is on equal access to the courts. The second proposition is consistent with the first. After stating in the first paragraph that the king is present in the courts and promising that he will sell no man justice and right, Coke begins the next paragraph with the phrase "And therefore." The phrase "And therefore" implies that the passage that follows flows from the king's promise that justice will not be limited only to those persons who can afford it. Put differently, because a person's access to justice will not turn on the person's ability to buy a more expeditious or effective writ, every person "may take" a remedy for injuries without regard to wealth, age, status, or gender.

---

[17] The phrase means "We will sell to no man."

[18] The phrase means "in goods, in lands, or in person."

[19] The clauses mean "Free, because nothing is more iniquitous than saleable justice; full, because justice ought not to limp; and speedy, because delay is in effect a denial."

Coke's text also suggests a third proposition—that the promise of a remedy for injuries to specific interests is not limited to equal access. The text recognizes that, in gaining access to the courts and the common law, every man shall "have justice, and right for the injury done to him." That is, Coke assumed that access to the common-law courts and the common law carried with it access to justice and right for injuries. Coke had little occasion to consider the extent to which parliament could alter the common law or the limits on its authority to do so. For the most part, he viewed the acts of parliament as supplementing and confirming the common law. *See* Nathan S. Chapman & Michael W. McConnell*, Due Process as Separation of Powers*, 121 Yale LJ 1672, 1685 (2012) ("The common law, [Coke] maintained, had developed organically through the adjudication of the courts since time immemorial, as well as through certain declaratory acts of Parliament, which themselves were believed to articulate principles with an ancient origin."). It is thus difficult to find in Coke an answer to the question whether a promise of equal access to the common-law courts imposed a substantive limit on parliament's ability to depart from the common law. That question was largely foreign to Coke's view.[20]

Sir William Blackstone, as other commentators have noted, largely agreed with Coke's interpretation of Chapter 40 of Magna Carta. *See* Thomas R. Phillips, *The Constitutional Right to a Remedy*, 78 NYU L Rev 1309, 1322 (2003) (describing Blackstone's approach). In his *Commentaries on the Laws of England*, Blackstone paraphrased Coke's explanation of that chapter while adding his own gloss. William Blackstone, 1 *Commentaries on the Laws of England* 137-38 (1st ed 1765). Blackstone viewed Chapter 40 as directed both at the king and judges—specifically, as telling the king that he cannot issue commands or letters that override common-law procedures and

---

[20] In discussing Chapter 39 of Magna Carta, Coke explained that, even though parliament had given the king more leeway than the common law had provided to bring prosecutions, parliament had corrected its error when the harmful effect of its procedure became apparent. Coke, *Second Part of the Institutes* at 51. He thus recognized that parliament might depart from the common law and the principles expressed in Magna Carta but believed that parliament eventually would correct its error. *See id.*

telling the courts that if they receive such things they should disregard them:

> "[I]t is enacted, that no commands or letters shall be sent under the great seal, or the little seal, the signet, or privy seal, in disturbance of the law; or to disturb or delay common right: and, though such commandments should come, the judges shall not cease to do right."

*Id.* at 138. Blackstone agreed with Coke that the general purpose of Chapter 40 was to prevent royal interference with the common-law courts.

Blackstone's *Commentaries* also shed light on parliament's ability to alter the common law. In commenting on Coke's explication of Chapter 40—that "every Subject \*\*\* for injury done to him *in bonis, in terres, vel persona* \*\*\* may take his remedy by the course of the Law," Blackstone explained:

> "It were endless to enumerate all the *affirmative* acts of parliament wherein justice is directed to be done according to the law of the land: and what that law is, every subject knows; or may know if he pleases; for it depends not upon the arbitrary will of any judge; but is permanent, fixed and unchangeable, *unless by authority of parliament.*"

*Id.* at 137 (second emphasis added). Blackstone made the point clearer in the next paragraph. He explained that "[n]ot only the substantial part, or judicial decisions, of the law, but also the formal part, or method of proceeding, cannot be altered *but by parliament." Id.* at 138 (emphasis added). Blackstone's gloss on Coke thus explicitly recognized parliament's authority to alter the "substantial part, or judicial decisions, of the law."

In analyzing the effect of Blackstone's *Commentaries* on the meaning of Oregon's remedy clause, *Smothers* did not discuss Blackstone's analysis of Coke's commentary on Chapter 40. *See* 332 Or at 98-99. *Smothers* focused instead on a distinction that Blackstone drew between absolute and relative rights. *See id.* To the extent that *Smothers* viewed Blackstone's reference to absolute rights as simply identifying the three rights (property, person, and reputation) that

the remedy clause protects, *Smothers*' discussion of absolute rights adds little to the analysis. The text of the clause specifies the types of rights to which it applies. *See Juarez*, 341 Or at 173 (explaining that loss of deceased's society, guidance, and emotional support did not constitute injury to person, property, or reputation within the meaning of the remedy clause).

To the extent that *Smothers* found in the word "absolute" the idea that Blackstone viewed absolute rights as immune from alteration, *Smothers* appears to have misperceived what Blackstone said. Blackstone used the phrase "absolute rights" to refer to a person's rights in a state of nature. Blackstone, 1 *Commentaries* at 121. He explained, however, that absolute rights are not absolute. Rather, "every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish." *Id.* Blackstone explained that laws could limit a person's natural rights if those laws were "necessary and expedient for the general advantage of the publick" while also recognizing that "wanton and causeless restraint of the will of the subject, whether practiced by a monarch, a nobility, or a popular assembly, is a degree of tyranny." *Id.* at 121-22.

Having established that general framework for legislation, Blackstone explored the contours of what he described as "the three great and primary rights, of personal security, personal liberty, and private property." *Id.* at 136. He then identified five "other auxiliary subordinate rights of the subject, which serve principally as barriers to protect and maintain" those "three great and primary rights." *Id.* at 136. Those were (1) the "constitution, powers, and privileges of parliament"; (2) the limitation of the king's prerogative; (3) the right of "every Englishman * * * of applying to the courts of justice for redress of injuries"; (4) the right to petition the king or either house of parliament for the redress of "any uncommon injury"; and (5) the right "of having arms for their defence, suitable to their condition and degree, and such as are allowed by law." *Id.* at 136-39.

In describing the third subordinate right, Blackstone paraphrased Coke's discussion of Chapter 40 of Magna Carta and, as discussed above, expressly recognized parliament's authority to alter "[n]ot only the substantial part, or judicial decisions, of the law, but also the formal part, or method of proceeding." *Id.* at 138. Although Blackstone recognized that parliament had authority to alter the common law, he did not examine the limits of that authority. Like Coke, he appears to have assumed that the English government was framed in such a way that, in altering the common law, parliament would adhere to the natural law principles that informed its ability to add to and supplement the common law. *See id.* at 122 (explaining that legislation that advances a public purpose, "when prudently framed, [is] by no means subversive but rather introductive of liberty"). Far from stating that the legislature lacks authority to alter the common law, Blackstone's discussion of both Coke and absolute rights demonstrates that he viewed the legislature as having greater authority to adjust absolute rights than *Smothers* recognized. As Justice Landau explained in his concurring opinion in *Klutschkowski*, "[t]o say *** that Blackstone asserted a common-law right to a remedy superior to legislative authority is quite at odds with what Blackstone actually said." 354 Or at 184 (Landau, J., concurring).

Having considered Coke's *Institutes* and Blackstone's *Commentaries*, we cannot say that they demonstrate conclusively that our remedy clause cases (with the exception of *Smothers*) were clearly wrong. It is true that Coke's explication of Chapter 40 of Magna Carta focused on access to the courts, as did Blackstone's gloss on Coke. However, for Coke and Blackstone, access to the courts carried with it access to a set of common-law remedies for injuries to person, liberty, and property. Both Coke and Blackstone assumed, in differing degrees, access to a "permanent, fixed, and unchangeable" body of common law that followed from access to the courts. Blackstone, 1 *Commentaries* at 137. Blackstone, more than Coke, recognized parliament's authority to vary to the common law as far as was "necessary and expedient for the general advantage of the publick." *Id.* at 121. Blackstone is thus consistent with our remedy clause cases that have

recognized the legislature's authority to alter the common law.

We recognize that Coke and Blackstone were concerned with the king's interference with access to the common law courts and the protections those courts provided. We also recognize that both writers typically viewed parliament as confirming or supplementing the common law. However, in *Dr. Bonham's Case*, 77 Eng Rep 646, 652 (CP 1610), Coke explained in *dicta* that "[W]hen an Act of Parliament is against common right and reason, or repugnant, or impossible to be performed, the common law will controul it, and adjudge such Act to be void." Precisely what Coke meant by that statement has been the subject of scholarly debate. *See* Chapman & McConnell, *Due Process as Separation of Powers*, 121 Yale LJ at 1689-92 (summarizing debate). Some scholars view that statement as a recognition that the common law would trump conflicting statutes. *Id.* Others view it as giving substantial leeway to courts to interpret statutes so that they conform to common law. *Id.* Chapman and McConnell conclude that the latter understanding is the better one. *Id.* Even if that is the better understanding, the ambiguity inherent in Coke's statement makes it more difficult to say that this court's decisions finding in the remedy clause a substantive limit on legislative authority are clearly at odds with the source of our remedy clause.

4. *American authorities*

Early American charters or legal compacts contained provisions with striking resemblances to modern remedy clauses. For instance, the "Laws Agreed Upon in England" written by William Penn and adopted in 1682 provided that "all courts shall be open, and justice shall neither be sold, denied nor delayed." *See* William Penn, "Laws Agreed Upon in England," in 1 *The Federal and State Constitutions, Colonial Charters, and other Organic Laws of the States, Territories, and Colonies* 3060 (Francis N. Thorpe ed., U.S. Gov't Printing Office 1909). Similar provisions appeared in Chapter XXIII of "The Charter or Fundamental Laws, of West New Jersey, Agreed Upon – 1676" and Chapter XIX of "The Fundamental Constitutions for the Province of East New Jersey in America, Anno Domini 1683." *See* 5

*The Federal and State Constitutions, Colonial Charters, and other Organic Laws of the States, Territories, and Colonies* at 2551, 2580.

The clauses found in those early charters may have been responding to the same royal interference with access to the courts that afflicted sixteenth and seventeenth century English courts. However, it is difficult to draw much significance from the inclusion of those clauses in early American charters and compacts. Not every charter or compact contained a provision that resembled what we know as a remedy or open-courts clause, and those charters that did contain one did not necessarily emphasize the same concepts that Coke's interpretation emphasized. Additionally, no reported contemporaneous case reveals the problems those clauses were intended to address. *See* Hoffman, *Questions Before Answers*, 32 Rutgers LJ at 1027-29. Finally, the American founders found inspiration in more than just the writings of Coke or Blackstone. *See* James R. Stoner, Jr., *Common Law and Liberal Theory: Coke, Hobbes, and the Origins of American Constitutionalism* 137-61 (1992) (describing the influence of Locke and Montesquieu). For those reasons, it is difficult to tell what meaning the remedy clause would have had to an early American audience.

What can be said more confidently is that, over a century later, Blackstone and Coke's ideas resonated with early American thinkers. In the mid-eighteenth century, American colonists grew increasingly disgruntled about the dependence of local judges and magistrates on the British crown. *See* John Dickinson, Letter IX, 1768, *in* 1 *The Political Writings of John Dickinson* 228 (1801). Dickinson's main concern was that local judges would depend too much on the views and prerogative of the British crown if the crown paid their salaries. *Id.* at 228-29. Unlike in Britain, where the 1701 Act of Settlement ensured that judges no longer depended on the crown for their salaries, the Act of Settlement did not apply in America, raising the same anxiety about arbitrary decision-making based on favoritism or royal willfulness that had worried Coke in seventeenth-century England. Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1279, 1300 (1995).

The concern about corruption through the payment of salaries gave way to larger concerns about arbitrary, unreasonable interference into colonial courts by the British parliament. The Stamp Act in 1765, for instance, required that every official document, including legal documents, have on it an official stamp, or otherwise the courts would be closed to claimants. Edward S. Morgan & Helen M. Morgan, *The Stamp Act Crisis: Prologue to Revolution* 120, 130-31 (1953). In response, revolutionary leaders petitioned to reopen the courts.[21]

Eventually, as the Revolutionary War started, the concern about an independent judiciary in the form of open courts available to all litigants took root in early state constitutions. The 1776 Declaration of Rights in Delaware provided:

> "That every Freeman for every Injury done him in his Goods, Lands or Person, by any other Person, ought to have Remedy by the Course of the Law of the Land, and ought to have Justice and Right for the Injury done to him freely without Sale, fully without any Denial, and speedily without Delay, according to the Law of the Land."

A Declaration of Rights and Fundamental Rules of the Delaware State, in 2 *Sources and Documents of United States Constitutions* 197, 198 (William F. Swindler ed., 1973). By 1787, Maryland, Massachusetts, New Hampshire, and North Carolina had adopted similar provisions in their state constitutions, and by 1857, a remedy clause appeared in over 30 state constitutions.

Between the end of the War for Independence and the adoption of the Constitution of the United States, distrust of state legislatures grew. Gordon S. Wood, *The Creation of the American Republic 1776-1787,* 403-29 (1969). Problems included "[t]he confiscation of property, the paper money schemes, the tender laws, and the various

---

[21] For instance, John Adams stepped forward to plead that the courts reopen, explaining, "[i]nnumerable are the Calamities which flow from an Interruption of Justice. Necessity requires that the Doors of Justice should ever be open to hear the Complaints of the Injured and Oppressed." *See* "Argument before Governor Bernard and the Council in Favor of Opening the Courts, Dec 20, 1765," *in* 1 *Papers of John Adams, September 1755 - October 1773* (Robert J. Taylor ed., 1977).

devices suspending the ordinary means for the recovery of debts." *Id.* at 404. It is difficult to tell, however, whether the states that adopted remedy clauses adopted them because of a concern about legislative overreaching, primarily for two reasons. The earliest remedy clauses predated the period during which legislatures were most abusive. *See* Hoffman, *Questions Before Answers*, 32 Rutgers LJ at 1038. Moreover, the sources describing popular distrust of the legislatures do not describe, much more mention, state remedy clauses as a potential solution. *See* Wood, *The Creation of the American Republic* at 430-67. The circumstances surrounding the adoption of those state remedy clauses do not suggest that they were intended to limit legislative authority. However, the early and mid-nineteenth century cases interpreting those clauses point in a different direction.

### 5.  *Early and mid-nineteenth century cases*

The early and mid-nineteenth century cases, with a fair amount of uniformity, interpreted their state remedy clauses as placing some substantive limit on legislative action. The cases are not uniform, however, in identifying the extent to which remedy clauses limit legislative choices. The earliest case to interpret a remedy clause provision was *Stowell v. Flagg*, 11 Mass 364 (1814).[22] In *Stowell*, the issue was whether a landowner could bring a common-law action for trespass on the case against a mill owner for causing water to periodically flow over his land when a statute provided a more limited remedy.[23] The Supreme Judicial Court initially concluded that the legislature had intended to substitute the statutory for the common-law remedy to prevent "burden[ing] the owner of a mill with continual lawsuits and expenses." *Id.* at 366. In response to the argument that displacing the common-law action violated that state's remedy

----

[22] At the time, the Massachusetts Constitution provided: "Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character." Mass Const, Pt 1, Art XI.

[23] Among other things, the statute at issue in *Stowell* "cut off the traditional action for trespass to land, in which a plaintiff was not required to prove actual injury in order to recover." Horwitz, *The Transformation of American Law* at 48 (footnote omitted). Moreover, the act prevented the landowner from seeking to enjoin the nuisance and self-help, both of which remedies would have been available at common law. *Id.*

clause, the Supreme Judicial Court held that the legislature has "a right to substitute one process for another; as for instance, they may declare that, for an assault and battery, an action of the case shall be brought, instead of an action of trespass; or that the process shall be by complaint, and not by writ." *Id.* at 365-66.

Although the Massachusetts Supreme Judicial Court recognized in *Stowell* that the remedy clause did not prohibit a legislature from substituting one remedy for another, it recognized, in a related context, that the complete denial of a remedy could violate a party's rights. *Call v. Hagger*, 8 Mass 423, 430 (1812) (explaining that complete denial of a remedy could impair the obligations of contract in violation of the federal contract clause). In making that observation, the Supreme Judicial Court of Massachusetts contrasted a complete denial of a remedy with a "limitation of suits at law, [which] when enacted with a due discretion, and a reasonable time allowed for the commencement of suits on existing demands, are wholesome and useful regulations." *Id.* The court thus recognized that the reasonableness of the legislature's limitation of a party's remedy could affect its constitutionality.

The Maine Supreme Court reached a similar conclusion under its state remedy clause in *Gooch v. Stephenson*, 13 Me 371 (1836). At common law, a property owner could bring a trespass action if another person's cattle strayed onto his or her property. *Id.* at 375. Initially, the Maine legislature eliminated a trespass action if cattle were on the highway and the property owner's fence was not sufficient to keep them out. *Id.* Later, the legislature extended the law to apply to cattle that strayed from adjoining lands onto a neighbor's property. Under the statute, a property owner who failed to maintain a "sufficient" fence could not bring a trespass action if the cattle strayed onto his or her land but could bring a trespass action if the owner had constructed a sufficient fence and the cattle broke through. *Id.* The statutes departed from the common law by placing the burden on the property owner to take reasonable steps to keep cattle out of his or her property as a condition of maintaining a trespass action.

In holding that the legislature could constitutionally alter the common law, the Maine Supreme Judicial Court explained:

> "It was for the legislature to determine what protection should be thrown around this species of property; what vigilance and what safeguards should be required at the hands of the owner; and where he might invoke the aid of courts of justice. They have no power to take away vested rights; but they may regulate their enjoyment. Lands in this country cannot profitably be cultivated, if at all, without good and sufficient fences. To encourage their erection, it is undoubtedly competent for the legislature to give to the owners of lands thus secured, additional remedies and immunities."

*Id.* at 376-77.[24] *Stowell* and *Gooch* sound two themes that are fairly consistent in mid-nineteenth century cases. First, legislatures may not enact laws that apply retroactively, a concept expressed in the phrase "vested rights." Second, legislatures possess authority to make reasonable adjustments in common-law rights, either by substituting one remedy for another or by altering the terms on which a common-law cause of action may be brought. That is true even when the legislature limits the common-law property rights and remedies that a landowner otherwise would have enjoyed.

Some courts interpreted their remedy clauses as checks on arbitrary interference into court procedures. As the Pennsylvania Supreme Court explained, the remedy clause was intended to prohibit "legislative and executive interference" with "judicial proceedings," just as Magna Carta prevented such interference by royal officials or magistrates. *Menges v. Dentler*, 33 Pa 495, 498 (1859); *see also Sharpless v. Mayor of Philadelphia*, 21 Pa 147, 166 (1853) (noting that state remedy clause was "clearly intended to insure the constant and regular administration of justice between man and man"). Often, that consideration was reflected in

---

[24] Then, as now, the Maine Constitution provided:

"Every person, for an injury done him in his person, reputation, property, or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial, promptly and without delay."

Me Const, Art I, § 19 (1820).

cases holding that statutory changes could not be applied retroactively to "vested rights." *See, e.g., Kay v. Pennsylvania R.R. Co.*, 65 Pa 269, 277 (1870) ("The law of the case at the time when it became complete is an inherent element in it, and if changed or annulled the right is annulled, justice is denied, and the due course of law violated."); *Townsend v. Townsend*, 7 Tenn 1, 15 (1821) (invalidating statute that suspended right to execute on contract judgments "where the law, operating upon the contract when first made, held out to the creditor the promise of immediate execution after judgment"); *Fisher's Negroes v. Dabbs*, 14 Tenn 119, 136 (1834) (invalidating statute that required court to dismiss pending case from its docket).

Some mid-nineteenth century cases assumed that remedy clauses would prevent the total elimination of a common-law tort remedy. However, most of those cases used the remedy clause as a ground for interpreting statutes narrowly to avoid a construction that would deny a plaintiff a common-law remedy for an injury. For example, in *Schuylkill Navigation Co. v. Loose*, 19 Pa 15 (1852), a statute provided for compensation when a canal company's dam caused another person's land to be flooded. *Id.* at 16. When a company's embankment (but not its dam) caused the plaintiff's land to flood, the company defended against the plaintiff's damages action on the ground that the statute displaced the common law and authorized a remedy only for flooding caused by the construction of a dam. After quoting Pennsylvania's remedy clause, the court concluded that the statutory remedy did not displace the plaintiff's common-law remedies. The court explained:

> "It is impossible, in the face of principles of justice so clearly and solemnly announced [in that state's remedy clause], to suppose that the Legislature, when providing for a remedy for an acknowledged injury, mean[t] to take it away unless the injury arise in one specified form."

*Id.* at 18.

Other courts similarly looked to their remedy clauses in limiting, by means of interpretation, the reach of legislative enactments. In *Thornton v. Turner*, 11 Minn 336 (1866), a statute provided that an "'action for damages,

occasioned by the erection and maintenance of a milldam,'"
must brought within "'two years after the erection of such
dam.'" *Id.* at 339 (quoting statute). The court observed
that, if a dam were erected but not used for more than two
years, the statute would prohibit a landowner whose land
was flooded from recovering his or her damages. *Id.* at
339-40. Reasoning that such a result would be contrary to
Minnesota's remedy clause, the court held that the two-year
limitations period would run not from the date of the "erec-
tion of such dam" but from the date on which the erection of
the dam caused water to flood the plaintiff's land. *Id.* at 340;
*accord Hotchkiss v. Porter*, 30 Conn 414, 421 (1862) (holding
that statute did not cause constitutional difficulties because
the statute, properly interpreted, did not shift burden to
prove malice in libel cases to recover actual damages).

Finally, some courts relied on their remedy clauses
to invalidate statutes imposing a burden on litigants. *Riggs,
Peabody & Co. v. Martin*, 5 Ark 506, 509 (1844) (striking
down statute that required parties to swear in open court
that estate owed them money, permitting claimants to sub-
mit affidavits in lieu of appearing personally). *See also Weller
v. City of St. Paul*, 5 Minn 95, 101 (1860) (requiring payment
of all unpaid property taxes as condition of bringing suit to
set aside assessment violated state remedy clause); *Wilson v.
McKenna*, 52 Ill 43, 49 (1869) (same).[25]

Those early and mid-nineteenth-century cases
reflect a diverse understanding of state remedy clauses. At
least two common themes can be identified, however. First,
most early and mid-nineteenth century cases started from
the proposition that state remedy clauses limit legislative as

---

[25] At the other extreme, some jurisdictions viewed the remedy clause as
directed solely at the judiciary, having no bearing on legislation. In *Barkley v.
Glover*, 61 Ky 44 (1862), for instance, a case about a statute forbidding the issu-
ance of judgments for debts arising within a certain period, the court expressly
rejected the claim that the remedy clause applied to the legislature:

"The doctrine that the [remedy clause] applies alike to the legislative and
judicial branches of government is, in our judgment, directly opposed to the
meaning and language of the section. This, we think, is rendered perfectly
obvious by reading it. The courts form its sole subject matter, and every part
and parcel of the section relates directly to some duty of that branch of the
government."

*Id.* at 45-46.

well as executive acts. With the exception of the Kentucky case noted in the above footnote, the cases recognized that legislative interference with the courts and legislative action could violate a litigant's constitutionally protected right to a remedy. That was so even though the state remedy clauses found their source in Coke and Blackstone's concern about executive interference with the courts, even though there is little enactment history to suggest that states adopted remedy clauses in response to legislative overreaching, and even though the state cases do not reflect agreement on the extent to which state remedy clauses limit legislative authority.

Second, and consistently with our initial conclusion regarding *Smothers*, we can find little evidence that the cases viewed remedy clauses as locking common-law rights in place. Rather, they reflected the proposition that legislatures may adjust the parties' common-law rights and remedies as long as the legislation did not apply retroactively and thus interfere with a party's vested rights. They also recognized that the legislature may substitute one remedy for another, even though the new remedy effectively limited common-law rights. And they were consistent with the generally accepted nineteenth century proposition that, although the legislature could substitute one remedy for another, it could not deny a remedy completely. Finally, some mid-nineteenth century cases relied on their states' remedy clauses to interpret statutes to avoid denying a party any remedy for an injury to property, person, or reputation.

The mid-nineteenth century cases that are contemporaneous with the adoption of Oregon's constitution are consistent with our remedy clause cases, with the exception of *Smothers*. Some of the cases from other states assume, as *Mattson* and its progeny held, that recognizing a duty while denying a remedy entirely would raise constitutional problems. *Thornton*, 11 Minn at 340; *see Call*, 8 Mass at 430 (contract clause). Other cases recognize, however, as *Perrozi* and later Oregon cases have, that common law remedies are not unalterable. *Stowell*, 11 Mass at 365-66. Rather, the legislature may adjust common law causes of action and substitute one remedy for another. *Id.* Perhaps our early cases interpreted Oregon's remedy clause more robustly than other courts did. However, there is sufficient diversity among the

remedy clause decisions from other states that we find it difficult to say that, with the exception of *Smothers*, our cases interpreting Oregon's remedy clause were clearly incorrect.

6.  *Later nineteenth-century damage cap cases*

Towards the end of the nineteenth century, courts considered the kind of remedial limitations at issue in this case. The earliest cases came from Pennsylvania and were issued at least a decade after Oregon adopted Article I, section 10. *See Kay*, 65 Pa at 269. In *Kay*, the Pennsylvania Supreme Court held that a damages cap could not be applied to an injury that had occurred before the legislature enacted the cap. *See id.* at 277. The court explained that "a right to recover full compensation to the extent of the damage suffered vested in the plaintiff" when the injury occurred and that the legislature could not retroactively alter that vested right. *Id.* The court expressly declined to address the constitutionality of the law imposing a cap on damages "[a]s to cases happening after the passage of the law." *Id.*

In 1874, the people of Pennsylvania amended their constitution by adding a new section that expressly prohibited limitations on damages. *See* Pa Const, Art III, § 21 (providing that "[n]o act of the general assembly shall limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property"). After that, the Pennsylvania Supreme Court struck down a statute limiting the maximum amount of damages an injured plaintiff could recover against railroad companies. *Cent. Ry. of N.J. v. Cook*, 1 WNC 319 (Pa 1875). The opinion was per curiam, and it is not possible to tell from either the supreme court or the trial court's opinions the basis on which the Pennsylvania Supreme Court concluded that "the learned Judge below did not err in holding that the plaintiff could recover more than [the capped damages]." *Id.* The court could have relied on the remedy clause or on the 1874 constitutional amendment prohibiting any limit on the amount that could be recovered for injuries to persons. *See* Phillips, *Constitutional Right to a Remedy*, 78 NYU L Rev at 1329 (noting that ambiguity).

Five years later, in *Thirteenth and Fifteenth Streets Passenger Ry. Co. v. Boudrou*, 92 Pa 475 (1880), the Pennsylvania Supreme Court revisited the issue. In

reaffirming that a damages cap violated the Pennsylvania Constitution, the court appears to have relied "on the right to remedy by due course of law." *Id.* at 482. However, the decision also can be read to rely on both the remedy clause and the later damage-limitation clause. *See id.* ("The people have withheld power from the legislature and the courts to deprive them of that remedy, or to circumscribe it so that a jury can only give a pitiful fraction of the damage sustained.").

The 1874 amendment to Pennsylvania's constitution and the decisions in *Cook* and *Boudrou* can be read more than one way. On the one hand, they suggest that ideas about a plaintiff's right to a remedy were beginning to evolve in the later part of the nineteenth century. On the other, they could signal that the remedy clause, standing alone, was not viewed as sufficient protection against damage caps and that additional constitutional limitations on legislative authority were necessary. Read either way, those events occurred after Oregon's framers drafted Article I, section 10. No early Oregon case cited *Cook* or *Boudrou*, and the influence of those Pennsylvania cases outside of that state is not clear. While those cases may be helpful in illuminating the issues that later arose as legislatures began to limit remedies, they are less significant in determining the purpose and meaning of Oregon's remedy clause.

### 7.  *Indiana and Oregon Constitutional Conventions*

The other primary sources shedding light on the meaning of our remedy clause are the 1851 Indiana Constitutional Convention, which produced Article I, section 12, of the 1851 Indiana Constitution, the basis of Article I, section 10, of the Oregon Constitution, and the debates and proceedings of Oregon's own convention in 1857.

We have no record of debates among the Indiana framers that would show how they viewed the meaning or scope of their remedy clause. We do know, as this court in *Smothers* observed, that as they amended parts of the 1816 Indiana Constitution, the Indiana framers generally sought to limit the powers of the legislature. *Smothers*, 332 Or at 106. But we cannot tell whether the remedy clause

in Article I, section 12—largely unchanged from its previous version in 1816—was part of that project. Without more specific evidence, we can draw no conclusion about whether the 1851 revisions to Article I, section 12, of the Indiana Constitution substantially changed its meaning.

The same is true of the changes that the Oregon framers made in adopting Article I, section 10. The Oregon framers did not debate Article I, section 10, and, except for a minor change, adopted it wholesale from the 1851 Indiana Constitution. That minor change deserves some mention, however. It helps to put the two provisions side by side:

| Article I, section 12, of the 1851 Indiana Constitution | Article I, section 10, of the 1857 Oregon Constitution |
| --- | --- |
| "All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely and without purchase; completely, and without denial; speedily, and without delay." | "No court shall be secret, but justice shall be administered openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation." |

This court in *Smothers* found it significant that the Oregon framers decided to "express in one clause how justice is to be administered," while the 1851 Indiana Constitution used two separate sentences. *Smothers*, 332 Or at 114. This court also found it telling that Oregon framers decided "to reserve for a separate, independent clause the requirement of remedy by due course of law for injury to person, property, or reputation." *Id*. As this court reasoned, the decision to use a "separate, independent clause" implied that the Oregon framers "regarded the remedy clause as providing substantive protection to those absolute common-law rights." *Id*. at 114-15.

On reviewing the changes that Oregon framers made to the version of the remedy clause that they borrowed from the 1851 Indiana Constitution, we find that they prove

little about the meaning of Oregon's remedy clause, primarily for two reasons. The first is that the Oregon framers did not change Indiana's remedy clause by putting it into a "separate, independent clause." The remedy clause in the 1851 Indiana Constitution already appeared in a separate, independent clause; the only deviation by the Oregon framers was that they put the clause in a different part of the sentence: in the Indiana version, it came in the middle of two sentences; in the Oregon version, it came at the end of a single sentence. Second, we doubt that the Oregon framers would transform the meaning of the clause *merely* by changing its location. To be clear, we are not saying that our remedy clause cases erred in concluding that the Oregon framers intended that the remedy clause would guarantee some remedial process for certain injuries. We cannot, however, infer that intent from the placement of the clause in a sentence.

8.  *Our remedy clause decisions*

With that background in mind, we return to defendant's argument that Article I, section 10, is merely a guarantee of equal access to the courts for whatever remedy the legislature has provided. In defendant's view, all our remedy clause cases should be overruled because the premises on which this court based those decisions were clearly incorrect. *See [State v. Savastano](#)*, 354 Or 64, 95-96, 309 P3d 1083 (2013) (overruling prior cases in similar circumstances). As explained above, however, the text and the history of the remedy clause do not yield a clear answer regarding the clause's meaning. Although state remedy clauses find their earliest source in limitations on royal authority, the state cases that preceded the adoption of Oregon's Constitution consistently viewed their state remedy clauses as placing some substantive limit on legislative authority.

Admittedly, the substantive limits that those cases found in their remedy clauses varied. Many courts viewed their remedy clauses as prohibitions on retroactive legislation that interfered with "vested rights," an amorphous concept that often reflects a conclusion rather than a rationale. Some but not all those courts also recognized that the remedy clause permitted their legislatures to substitute a

less-protective remedy for the common-law one and thus, in effect, adjust the parties' common-law rights. *See Gooch*, 13 Me at 376-77; *Stowell*, 11 Mass at 365-66. Finally, some state courts interpreted statutes to avoid a complete denial of a common-law remedy, which could have run afoul of their remedy clauses, and others explicitly stated that conclusion in the context of contract clause claims. *Thorton*, 11 Minn at 340; *see Call*, 8 Mass at 430 (explaining that, under contract clause, legislature may not deny remedy completely).

Given the cases that preceded and were contemporaneous with the adoption of Oregon's remedy clause cases, we cannot say that our decisions, with the exception of *Smothers*, find no support in the text and history of that provision and should be overruled. In reaching that conclusion, we need not decide how we would interpret Oregon's remedy clause if we were considering it for the first time. Rather, for over 100 years, this court has debated the meaning of the clause, the latitude it gives the legislature, and the rights it protects. Distilled from that debate are a series of decisions that evolved as the legislation they considered evolved. We may not toss that considered body of decisions aside, as defendant urges, nor can we conclude that the remedy clause is effectively a null set that merely replicates in a judicial context what the privileges and immunities clause guarantees more broadly. Although we overrule *Smothers*, we reaffirm our remedy clause decisions that preceded *Smothers*, including the cases that *Smothers* disavowed. We draw the following conclusions from those cases.

As our early cases recognized, common-law causes of action and remedies provide a baseline for measuring the extent to which subsequent legislation conforms to the basic principles of the remedy clause—ensuring the availability of a remedy for persons injured in their person, property, and reputation. As our early cases also recognized, however, the common law is not inflexible but changes to meet the changing needs of the state. *Perozzi*, 149 Or at 348; *Re Water Rights of Hood River*, 114 Or at 180-81; *Peery*, 93 Or at 52. For that reason, *Smothers* clearly erred in holding that the remedy clause locks courts and the legislature

into a static conception of the common law as it existed in 1857. Put differently, the remedy clause does not protect only those causes of action that pre-existed 1857, nor does it preclude the legislature from altering either common-law duties or the remedies available for a breach of those duties.

In determining the limits that the remedy clause places on the legislature, our cases have considered three general categories of legislation. First, when the legislature has not altered a duty but has denied a person injured as a result of a breach of that duty any remedy, our cases have held that the complete denial of a remedy violates the remedy clause. *See Noonan*, 161 Or at 222-35 (summarizing *Mattson* and cases following it). Similarly, our cases have held that providing an insubstantial remedy for a breach of a recognized duty also violates the remedy clause. *Compare Clarke*, 343 Or at 608, 610 ($200,000 capped damages not substantial in light of $12,000,000 in economic damages and $17,000,000 in total damages), *with Howell*, 353 Or at 376 ($200,000 capped damages substantial in light of $507,500 in total damages).

Second, the court has recognized that the reasons for the legislature's actions can matter. For example, when the legislature has sought to adjust a person's rights and remedies as part of a larger statutory scheme that extends benefits to some while limiting benefits to others, we have considered that *quid pro quo* in determining whether the reduced benefit that the legislature has provided an individual plaintiff is "substantial" in light of the overall statutory scheme. *Hale*, 308 Or at 523.

Third, the legislature has modified common-law duties and, on occasion, has eliminated common-law causes of action when the premises underlying those duties and causes of action have changed. In those instances, what has mattered in determining the constitutionality of the legislature's action is the reason for the legislative change measured against the extent to which the legislature has departed from the common law. *See Perozzi*, 149 Or at 348. That is, we have considered, among other things, whether the common-law cause of action that was modified continues

to protect core interests against injury to persons, property, or reputation or whether, in light of changed conditions, the legislature permissibly could conclude that those interests no longer require the protection formerly afforded them. *See Norwest*, 293 Or at 563 (discussing legislative abolition of common-law torts of criminal conversation and alienation of affections).

It is difficult to reduce our remedy clause decisions to a simple formula, as *Smothers* sought to do, in part because the statutes that have given rise to those decisions do not reflect a single legislative goal or method of achieving that goal. In that respect, our remedy clause cases are not unlike our takings clause cases. Attempts to articulate a single unifying principle fail to comprehend the varied ways that the legislature can and has gone about achieving its goals. *See Coast Range Conifers v. Board of Forestry*, 339 Or 136, 146, 117 P3d 990 (2005) (rejecting plaintiff's unified theory of takings because it failed to take account of the differing "nature of the government action that gives rise to the [takings] claim"). The same is true here. As Article XVIII, section 7, recognizes, one of the functions of the legislature is to adjust the duties that one person owes another and the remedies for a breach of that duty as societal conditions change. It follows from our cases that, in deciding whether the legislature's actions impair a person's right to a remedy under Article I, section 10, we must consider the extent to which the legislature has departed from the common-law model measured against its reasons for doing so.

We note one final consideration regarding our remedy clause cases that have come after *Smothers*. To the extent that those cases turn on the bright line rule that *Smothers* drew (all injuries for which common-law causes of action existed in 1857 require a remedy while injures for which no cause of action existed in 1857 are entitled to no protection), then those cases must be taken with a grain of salt. That said, we agree with *Clarke* and *Howell* that the substantiality of the legislative remedy can matter in determining whether the remedy is consistent with the remedy clause. When the legislature does not limit the duty that a

defendant owes a plaintiff but does limit the size or nature of the remedy, the legislative remedy need not restore all the damages that the plaintiff sustained to pass constitutional muster, *see Howell*, 353 Or at 376, but a remedy that is only a paltry fraction of the damages that the plaintiff sustained will unlikely be sufficient, *see Clarke*, 343 Or at 610. It is worth noting, however, that both *Clarke* and *Howell* evaluated the plaintiffs' Article I, section 10, claims in those cases through the lens that *Smothers* provided. As explained above, and as this court recognized in *Hale*, other factors, such as the existence of a *quid pro quo*, can bear on the determination.

D.  *Application*

With that background in mind, we turn to the circumstances of this case. We note that this case falls into the second category of cases identified above; that is, the legislature did not alter the duty that OHSU doctors owe their patients to exercise due care. However, the Tort Claims Act, as amended, limits a plaintiff's remedy for a breach of that duty as part of a comprehensive statutory scheme intended to extend benefits to some persons while adjusting the benefits to others. Moreover, as explained below, the Tort Claims Act seeks to accommodate the state's constitutionally recognized interest in sovereign immunity with a plaintiff's right to a remedy. Those factors bear on our evaluation of the substantiality of the remedy that the Tort Claims Act provides.

As the trial court held and as plaintiff does not dispute, OHSU is an arm of the state and, for that reason, may invoke the doctrine of sovereign immunity. *See Clarke*, 343 Or at 600. This court recognized in *Hale* that the doctrine of sovereign immunity has constitutional underpinnings. *See* 308 Or at 515; *Vendrell v. School District No. 26C*, 226 Or 263, 278, 360 P2d 282 (1961) ("Our Constitution is framed on the premise that the state is immune from suit ***."). Article IV, section 24, of the Oregon Constitution assumes that the state is immune from liability for its torts, and it authorizes the state to waive that immunity by general law. *Hale*, 308 Or at 515. Without a valid waiver, the state may not be sued. *Id.* at 514 & n 5. Sovereign immunity, however, does not extend to the state's employees. *See Gearin*, 110 Or

at 396-97 (county employees). State employees are subject to suit for their torts even though they are acting on the state's behalf. *Id*.

That distinction leaves the state on the horns of a dilemma. The state acts through its employees, and many of the functions that the state undertakes on behalf of its citizens entail risks of liability that few private entities would choose to bear—guarding prisoners, policing the streets, and intervening in families to protect children from abuse, to name only a few. If the state indemnified its employees for all the liability that they incurred while acting on the state's behalf, the state's sovereign immunity effectively would be eviscerated. Conversely, if the state chose not to indemnify its employees for any liability that they incurred while acting on its behalf and shifted all the risk to its employees, few qualified persons would choose to work for the state.

The Tort Claims Act avoids that dilemma by waiving the state's immunity for its torts but capping the amount for which the state can be held liable—in this case, $3,000,000. ORS 30.265(1) (waiving immunity from tort actions subject to certain limitations); ORS 30.271(3) (listing graduated limits on state liability). The Tort Claims Act indemnifies state employees for liability in tort for acts occurring in the performance of their public duty but caps the amount of their liability at the amount for which the state has waived its sovereign immunity. ORS 30.285(1), (6). In so doing, the Tort Claims Act accommodates the state's constitutionally recognized interest in asserting its sovereign immunity with the need to indemnify its employees for liability that they incur in carrying out state functions.

Moreover, the Tort Claims Act gives plaintiffs something that they would not have had if the state had not partially waived its immunity. The act ensures that a solvent defendant will be available to pay any damages up to $3,000,000—an assurance that would not be present if the only person left to pay an injured person's damages were an uninsured, judgment-proof state employee. *Compare Mattson*, 39 Or at 580 (recognizing that legislature could immunize cities consistently with Article I, section 10, as long as the injured plaintiff has a remedy against a city

employee), *with Eastman*, 32 F at 34 ("If travelers and others who sustain injuries by reason of defective highways can have no remedy against any one except these officers personally, they might as well have none.") There is, in short, a *quid pro quo*.

In setting the cap on state liability, the 2009 Legislature recognized that the then-existing tort claims limit of $200,000 was vastly inadequate. In determining a more equitable limit, the legislature considered actuarial data about the impact of unlimited recoveries on public bodies and the impact of different levels of caps. Testimony, Senate Committee on Judiciary, SB 311, Jan 22, 2009, Ex 5 (statement of Kris Kautz). It also studied tort claims caps in other states. *Id.* And it considered data from the last few decades of claims brought under the Oregon Tort Claims Act. After considering that data, the legislature set new limits for claims against state and local government bodies, increasing the single-claim cap for claims against the state and OHSU from $200,000 to $1.5 million and the aggregate cap to $3 million.[26] Or Laws 2009, ch 67, §§ 3, 4. It provided for yearly increases to the caps according to a fixed percentage indexed to inflation. In 2011, the legislature amended the Tort Claims Act to allow plaintiffs to proceed directly against a named individual when the complaint alleged damages in excess of the Tort Claims Act limit. Or Laws 2011, ch 270, § 1. The public body, however, would still be obligated to indemnify the individual employee, although the overall Tort Claims Act limit would apply to the amount of recovery. *Id.*

The legislature recognized that the increased damages available under the revised Tort Claims Act would not provide a complete recovery to everyone injured as a result of the state's tortious acts. However, those increased limits provide a complete recovery in many cases, greatly expand the state's liability in the most egregious cases, and advance the purposes underlying the doctrine of sovereign immunity

---

[26] The legislature designed a two-tier approach to Tort Claims Act damage limitations. One set of limits would govern claims against local government bodies, and another set would govern claims against the state and OHSU. *See* Ex 1, Senate Committee on the Judiciary, SB 311, January 22, 2009 "Recommendations of the Oregon Tort Claims Task Force."

while ensuring that a solvent defendant is available to pay a plaintiff's damages up to the amount of the Tort Claims Act limit. Given the legislature's efforts to accommodate the state's constitutionally recognized interest in sovereign immunity and a plaintiff's constitutional right to a remedy, we cannot say that the $3,000,000 tort claims limit on damages against state employees is insubstantial in light of the overall statutory scheme, which extends an assurance of benefits to some while limiting benefits to others. *See Hale*, 308 Or at 523,[27] *cf. Davidson v. Rogers*, 281 Or 219, 224-25, 574 P2d 624 (1978) (Linde, J., concurring) (construing Article I, sections 8 and 10, together in determining whether right to demand retraction permissibly limits damages in defamation action).

We recognize that the damages available under the Tort Claims Act are not sufficient in this case to compensate plaintiff for the full extent of the injuries that her son suffered. However, our remedy clause cases do not deny the legislature authority to adjust, within constitutional limits, the duties and remedies that one person owes another. That is particularly true when the legislature seeks to accommodate the state's constitutionally recognized interest in sovereign immunity and a plaintiff's constitutionally protected right to a remedy and when the remedy that the legislature has provided "represents a far more substantial remedy than the paltry fraction that remained after the imposition of the limitation in *Clarke*." *Howell*, 353 Or at 376.[28]

---

[27] Plaintiff reasons that the holding in *Hale* turned on (or should be limited to) the fact that the plaintiff's claim in that case was only against the city, and not a city employee. *Cf. Mattson*, 39 Or at 580 (recognizing that the legislature could immunize a city as long as the injured plaintiff had a remedy against a city employee). However, the limitation that plaintiff perceives in *Hale* is not found in the majority opinion. Rather, the limited reading of *Hale* that plaintiff and the dissent urge reflects the view of a single judge expressed in a concurring opinion in which no other judge joined. Although the court in *Clarke* read *Hale* consistently with the concurring opinion in that case, *Clarke* did so under the press of *Smothers*, which we have overruled.

[28] Two considerations distinguish our holding today from the holding in *Clarke*. The first is the size of the award, in relation to the damages awarded. The second is the *quid pro quo* that the Tort Claims Act provides and its accommodation of the state's interest in sovereign immunity and the plaintiff's right to remedy. Perhaps as a result of *Smothers* and its disavowal of *Hale*, the parties did not argue in *Clarke* that those considerations mattered, and this court did

Our holding today is limited to the circumstances that this case presents, and it turns on the presence of the state's constitutionally recognized interest in sovereign immunity, the *quid pro quo* that the Tort Claims Act provides, and the tort claims limits in this case. We express no opinion on whether other types of damages caps, which do not implicate the state's constitutionally recognized interest in sovereign immunity and which are not part of a similar *quid pro quo*, comply with Article I, section 10. Those cases are not before us, and we leave their resolution to the customary process of case-by-case adjudication.

## II.   ARTICLE I, SECTION 17

Following *Lakin v. Senco Products, Inc.*, 329 Or 62, 987 P2d 463, *modified*, 329 Or 369, 987 P2d 476 (1999), the trial court held that applying the Tort Claims Act limit to the jury's damages award violated Article I, section 17. On appeal, defendant does not dispute that, if *Lakin* is good law, the trial court's judgment should be affirmed. He argues, however, that subsequent cases have undercut the premises on which *Lakin* rests, and he contends that a reexamination of the text of Article I, section 17, its history, and the cases interpreting it demonstrates that *Lakin* was wrongly decided and should be overruled. Plaintiff responds that "*Lakin* is built on a solid foundation of constitutional history and analysis, and well-established precedent."[29] She observes that, since it was decided in 1999, "*Lakin* has been applied in several cases, most recently by this court in *Klutschkowski*," and she reasons that defendant has not met the difficult task of persuading this court that it should overrule one of its precedents. In evaluating the parties' arguments, we begin with defendant's argument that our cases since *Lakin* have eroded the premises on which that decision rests.

---

not factor those considerations into its holding. Even if it had, we doubt highly that the "paltry fraction" that previously was available under the Tort Claims Act would have been sufficient to constitute a substantial remedy under our cases that preceded *Smothers*.

[29]  Plaintiff does not provide any additional authority to support *Lakin*'s holding, but relies on *Lakin*'s discussion of the text of Article I, section 17, the history that preceded the adoption of that provision, and cases interpreting it.

A.   Lakin *and subsequent Article I, section 17, cases*

Article I, section 17, provides: "In all civil cases the right of Trial by Jury shall remain inviolate." In interpreting that section, most of this court's cases have sought to determine, as a procedural matter, which claims or defenses will entitle a party to a jury trial. *See, e.g.*, *McDowell Welding & Pipefitting v. US Gypsum Co.*, 345 Or 272, 279, 193 P3d 9 (2008); *Deane v. Willamette Bridge Co.*, 22 Or 167 (1892); *Tribou v. Strowbridge*, 7 Or 156 (1879). On that procedural issue, the court consistently has held that Article I, section 17, does not give a party a right to a jury trial for claims or defenses that would have been tried to a court of equity in 1857 when the Oregon Constitution was adopted. *McDowell*, 345 Or at 279; *Deane*, 22 Or at 169-70; *Tribou*, 7 Or at 158. Conversely, the court consistently has recognized that Article I, section 17, guarantees a jury trial in those cases in which the right to a jury trial was customary at the time the Oregon Constitution was adopted and in cases of like nature. *See* *M. K. F. v. Miramontes*, 352 Or 401, 413, 287 P3d 1045 (2012) (state constitutional jury trial right extends to new causes of action that are "of like nature" to claims and defenses that would have been tried to a jury in 1857).

In 1995, this court addressed, for the first time, whether Article I, section 17, guarantees a substantive as well as a procedural right; that is, this court addressed whether, in addition to guaranteeing a procedural right to have a jury rather than a judge decide the facts in certain kinds of civil cases, Article I, section 17, also restricts the legislature's ability to limit the type or amount of damages that a jury awards. *See Greist v. Phillips*, 322 Or 281, 293-95, 906 P2d 789 (1995). *Greist* held that it does not; more specifically, *Greist* held that the legislature may limit a jury's damages award in wrongful death actions. The court based that holding on two separate grounds.

The court explained initially that, because the common law did not recognize a claim for wrongful death in 1857, Article I, section 17, did not apply to that claim. *Id.* at 294. Alternatively, the court explained that, before 1910, Oregon trial courts applied the doctrine of *remittitur*

to reduce jury damages awards if they were excessive. *Id.* at 294-95. Relying on that practice, this court rejected the plaintiff's argument that, in 1857, a party would have had "a right to have a judge enter judgment on a jury's award of damages—without judicial alteration—in a personal injury action." *Id.* at 295. As a consequence, the court declined to find that Article I, section 17, included a substantive limit on the legislature's authority to cap noneconomic damages.

Four years later, this court took a different course in *Lakin*. It viewed *Greist*'s resolution of the plaintiff's Article I, section 17, claim as resting on the first ground identified in *Greist*—that Article I, section 17, does not apply to wrongful death actions because that action was not recognized by the common law in 1857. *Lakin*, 329 Or at 77. *Lakin* described the alternative ground in *Greist*—that the practice of *remittitur* before 1910 established that Article I, section 17, does not impose a substantive limitation on the legislature—as *dicta*, which "require[d] correction." *Id.* at 76. We discuss *Lakin*'s reasoning in greater detail below, but essentially *Lakin* held that *Greist*'s discussion of *remittitur* was erroneous because "Oregon trial courts never have had the power to reduce a jury's verdict or enter judgment for a lesser amount of damages over the objection of the prevailing party, who always could reject a judicial *remittitur* and demand a new jury trial." *Id. Lakin* concluded that, because a trial court could not unilaterally reduce a jury's damages award, neither could the legislature. *Id.* at 78-79.

Since *Lakin*, we have distinguished or limited *Lakin*'s holding in four decisions: *Jensen v. Whitlow*, 334 Or 412, 51 P3d 599 (2002); *DeMendoza v. Huffman*, 334 Or 425, 51 P3d 1232 (2002), *Lawson v. Hoke*, 339 Or 253, 119 P3d 210 (2005), and *Hughes v. PeaceHealth*, 344 Or 142, 178 P3d 225 (2008). We followed *Lakin* once in *Klutschkowski*.[30]

---

[30] The court did not discuss Article I, section 17, in *Clarke* or *Howell*. In *Clarke*, the court resolved the plaintiff's claim solely on the basis of Article I, section 10, and found it unnecessary to reach his Article I, section 17, claim. 343 Or at 610 n 19. In *Howell*, the two questions that the Ninth Circuit certified to this court asked only about Article I, section 10. *See* 353 Or at 361 (setting out the certified questions). The certified questions did not ask about Article I, section 17, perhaps because the Seventh Amendment governs the right to jury trials in federal courts.

We discuss those decisions briefly in considering whether our cases have eroded the premises on which *Lakin* rested and whether, as a result, it is appropriate to reexamine the sources on which *Lakin* based its holding. *See Couey*, 357 Or at 486-87 (reconsidering decisions that cannot be fairly reconciled with each other).

1.   *Jensen*

In *Jensen*, the court rejected the plaintiff's claim that eliminating a cause of action against a public employee who had injured the plaintiff's child violated Article I, section 17. The court reasoned:

> "Article I, section 17, is not a source of law that creates or retains a substantive claim or theory of recovery in favor of any party. Instead, as this court previously has held, Article I, section 17, simply 'guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857.'"

*Jensen*, 334 Or at 422 (quoting *Lakin*, 329 Or at 82). *Jensen* distinguished *Lakin* on the ground that Article I, section 17, does not put a substantive limit on the legislature's authority to eliminate a cause of action. The court explained that, if the plaintiff had a remedy for eliminating a cause of action, it arose from some constitutional provision other than Article I, section 17.

2.   *DeMendoza*

The court extended its reasoning in *Jensen* to a related but separate issue in *DeMendoza*. The statute at issue in *DeMendoza* directed that 60 percent of the punitive damages that the jury awarded to a party be distributed to the state. The plaintiffs in *DeMendoza* argued that the statute violated both Article I, section 10, and Article I, section 17. This court first held that the plaintiffs had no substantive right under Article I, section 10, to recover punitive damages. *DeMendoza*, 334 Or at 446. It then turned to the plaintiffs' argument that, under *Lakin*, the statute redistributing part of their punitive damages award was no different from a damages cap because it prevented the plaintiffs from receiving the full amount of the punitive damages that the jury had awarded them.

In analyzing the plaintiffs' Article I, section 17, claim, the court first quoted *Jensen* for the proposition that "'Article I, section 17, is not a source of law that creates or retains a substantive claim or a theory of recovery in favor or any party.'" *Id.* (quoting *Jensen*, 334 Or at 422) (emphasis deleted). It then explained, "[l]ikewise, if a 'right' to receive an award that reflects the jury's determination of the [full] amount of punitive damages exists, then it must arise from some source other than Article I, section 17."[31] *Id.* at 447. *DeMendoza* thus held that, if the plaintiffs' right to receive the full amount of the punitive damages that the jury awarded did not arise from some other state or federal constitutional provision, such as Article I, section 10, then the plaintiffs had no additional right under Article I, section 17, to receive the full amount of the jury's punitive damages award.

*DeMendoza* possibly can be reconciled with *Lakin* in one of two ways. *DeMendoza* may have sought to distinguish *Lakin* on the ground that *Lakin* involved a reduction in compensatory damages while *DeMendoza* involved a reduction in punitive damages. *See id.* (noting *Lakin*'s statement that the noneconomic damages cap in that case interfered with the plaintiffs' right to receive the full amount of compensatory damages awarded). We hesitate, however, to conclude that *DeMendoza* sought to distinguish *Lakin* on

---

[31] We quote, in full, *DeMendoza*'s resolution of the plaintiff's Article I, section 17, claim:

"Likewise, if a 'right' to receive an award that reflects the jury's determination of the amount of punitive damages exists, then it must arise from some source other than Article I, section 17. For example, in *Lakin*, the plaintiffs' rights under Article I, section 17, were violated, because the cap on noneconomic compensatory damages interfered with the plaintiffs' 'right to receive an award that reflect[ed] the jury's factual determination of the amount of the damages' that would '"*** fully compensate [plaintiffs] for all loss and injury to [them].'" 329 Or at 81 (quoting *Oliver v. N.P.T. Co.,* 3 Or 84, 87-88 (1869)). Here, in contrast, plaintiffs have no underlying 'right to receive an award' that reflects the jury's determination of the amount of punitive damages, nor are those damages necessary to 'compensate' plaintiffs for a 'loss or injury [to them].' [*DeMendoza*,] 334 Or at 446 (no right to punitive damages as remedy under Article I, section 10). Because plaintiffs lack that right, the legislature's allocation of a portion of the punitive damages award to the state does not implicate Article I, section 17."

*DeMendoza*, 334 Or at 447 (last bracket added; all other brackets and ellipses in *DeMendoza*).

that ground. This court has long recognized that, for the purposes of the state constitutional right to a jury trial, "no valid distinction \*\*\* can be drawn between compensatory and exemplary damages." *Van Lom v. Schneiderman*, 187 Or 89, 110, 210 P2d 461 (1949). As a matter of state constitutional law, both are factual issues for the jury. *Oberg v. Honda Motor Co.*, 316 Or 263, 275 n 7, 851 P2d 1084 (1993), *rev'd and remanded on other grounds*, *Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994); *Van Lom*, 187 Or at 110-13.

Beyond that, *Lakin* posed the question before it broadly as "whether the assessment of damages was a function of a common-law jury in 1857." 329 Or at 72. Phrasing the issue that way suggests that, consistently with *Van Lom* and *Oberg*, the court in *Lakin* did not intend to limit its holding to legislative reductions in compensatory damages awarded by the jury. It follows, we think, that *Lakin* cannot fairly be reconciled with *DeMendoza* on the ground that the former involved a reduction in an award of compensatory damages while the latter involved a reduction in an award of punitive damages.

Perhaps *DeMendoza* can be reconciled with *Lakin* another way. As noted, *DeMendoza* first held that the remedy clause of Article I, section 10, placed no limit on the legislature's authority to reduce or eliminate punitive damages. 334 Or at 445-46. Relying on *Jensen*, *DeMendoza* then explained that, because the "plaintiffs have no underlying 'right to receive an award' that reflects the jury's determination of the amount of punitive damages, \*\*\* the legislature's allocation of a portion of the punitive damages award to the state does not implicate Article I, section 17." 334 Or at 447. One way potentially to reconcile *Lakin* and *DeMendoza*'s Article I, section 17, holdings is that, in one, the remedy clause placed no restriction on the legislature's authority to limit punitive damages while, in the other, the remedy clause restricted the legislature's authority to limit compensatory damages. That is, neither case may have viewed Article I, section 17, as providing an independent right to retain all the damages that a jury awards, and the difference may have turned on the presence or absence of a right under Article I, section 10.

The difficulty with attempting to reconcile *DeMendoza* and *Lakin* that way is that *Lakin* expressly held that the plaintiffs in that case had a right to receive the full amount of the jury's compensatory damages award under Article I, section 17, even if they did not have a right to do so under Article I, section 10. *Lakin*, 329 Or at 80-81. That is, *Lakin*'s reasoning explicitly negates the proposition that its holding can be reconciled with *DeMendoza* on the ground that Article I, section 10, places a substantive limit on the legislature's right to reduce compensatory damages but not punitive damages. In our view, the court's decision in *DeMendoza* is a reasonable extension of its decision in *Jensen*, but *DeMendoza* cannot be fairly reconciled with *Lakin*.

### 3. *Hughes*

*Hughes* poses a similar problem, even though *Hughes* rests on a distinction that *Lakin* itself drew in overruling part of *Greist*. As noted, *Greist* had held that Article I, section 17, does not prevent the legislature from capping a jury's award of noneconomic damages in wrongful death cases for two reasons: (1) the practice of *remittitur* in 1857 was at odds with that argument and (2) a wrongful death action did not exist at common law in 1857 and thus was not subject to Article I, section 17. *Greist*, 322 Or at 294-95. In holding that Article I, section 17, prevents the legislature from limiting damages in a negligence action, *Lakin* rejected the first ground noted in *Greist* but not the second. *Lakin*, 329 Or at 77. That is, *Lakin* reconciled its holding with *Greist* by explaining that *Greist* involved a wrongful death action, which was not recognized by the common law in 1857. *Id.* By contrast, at least one of the claims in *Lakin* was recognized by the common law in 1857. *Id.*

Noting *Lakin*'s implicit acceptance of the second ground in *Greist*, this court held in *Hughes* that the legislature could limit the jury's award of noneconomic damages in wrongful death actions because that action did not exist in 1857. *Hughes*, 344 Or at 154. In doing so, *Hughes* rejected the plaintiff's argument that Article I, section 17, applies not only to claims that existed at common law but also to claims "of like nature." *Id.* at 155. The court did not dispute that the plaintiff's wrongful death claim in *Hughes* was "of like

nature" to a negligence claim, which would have been tried to a jury at common law. However, relying on *Jensen* and *DeMendoza*, the court explained that Article I, section 17, is not a source of law that creates a substantive right to non-economic damages. *Id.* Only if the claim was recognized in 1857 would the jury's verdict be immune from reduction.[32] *Id.*

Two justices dissented in *Hughes*. One of the dissents reasoned that the majority's holding in *Hughes* "subvert[ed]" the fundamental principle that underlies *Lakin*—"that the right to jury trial is a right of substance with which the legislature cannot interfere." *Id.* at 174 (Walters, J., dissenting). The other dissent explained that the majority opinion "t[ook] several odd steps that do not withstand scrutiny. " *Id.* at 171 (Durham, J., dissenting). Both dissents faulted the majority for holding that Article I, section 17, applied only to common-law claims that were recognized in 1857, but not to claims of like nature.

### 4.   *Miramontes*

Later, in *Miramontes*, the court considered an issue that had not been presented in *Hughes*—whether a party was entitled to have a jury rather than a judge decide a claim that had not existed in 1857 but was "of like nature" to claims that were tried to a jury then.[33] The trial court in *Miramontes* had refused to empanel a jury to decide a damages claim against a defendant in a stalking case. 352 Or at 403. The court held that, even though the plaintiff's damages claim in that case was unknown to the common law in 1857, Article I, section 17, gave the defendant the right to try

---

[32] The court took a similar approach in *Lawson*. In that case, a statute prohibited uninsured drivers from recovering noneconomic damages arising from an automobile accident. *See* 339 Or at 260. The court held that that statutory condition did not violate Article I, section 10. *Id.* at 264-65. The court then held that, because Article I, section 17, "'is not a source of law that creates or retains a substantive claim,'" that provision did not assist the plaintiff in the absence of an Article I, section 10, right or some other right to recover noneconomic damages. *Id.* at 267 (quoting *Jensen*, 334 Or at 422).

[33] Because the plaintiff in *Hughes* had tried her wrongful death claim to a jury, that case did not require the court to decide whether she had a procedural right under Article I, section 17, to do so because a wrongful death action was "of like nature" to a claim that would have been tried to a jury in 1857. *Hughes*, 344 Or at 156 n 12.

that claim to a jury because the claim was "of like nature" to one that would have been tried to a jury in 1857. *Id.* at 413-14.

At first blush, *Hughes* and *Miramontes* appear to conflict. One limits Article I, section 17, to claims that would have been tried to a jury in 1857; the other extends the right to claims "of like nature." One way to reconcile those two cases is to say that they bifurcated the Article I, section 17, jury trial right into substantive and procedural components. The substantive component of Article I, section 17, extends only to those common law claims that existed in 1857, and the damages that a jury awards for those claims may not be reduced. By contrast, the procedural component extends to all claims that are "of like nature" to common-law claims that existed in 1857, but the procedural component guarantees only the right to have a jury, as opposed to a judge, decide those claims. That resolution—dividing the jury trial right into two components and attributing different legal consequences to each—alleviates some of the tension between *Hughes* and *Miramontes*, but it does not resolve the underlying conflict—whether the premises on which Article I, section 17, rests support bifurcating the right.[34]

5. *Klutschkowski*

This court followed *Lakin*'s holding in one case *Klutschkowski*. The primary dispute in that case was whether an infant's claim for negligently inflicted injuries that occurred during the infant's birth would have been actionable in 1857. *See Klutschlowski*, 354 Or at 168-69. The court held that the claim would have been and, having reached that conclusion, determined that the plaintiff's claim came within *Lakin*'s holding. *Id.* at 176-77. In

_____

[34] The same tension existed in *Lakin* itself. On one hand, *Lakin* implicitly accepted *Greist*'s holding that Article I, section 17, did not preclude the legislature from capping noneconomic damages in wrongful death actions because actions for wrongful death did not exist in 1857. 329 Or at 77. On the other hand, *Lakin* stated later in the opinion that Article I, section 17, applies to "actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases *of like nature*." *Id.* at 82 (emphasis added). Because a wrongful death action is "of like nature" to the tort action that underlies it, *Lakin*'s acceptance of *Greist* is at odds with its later statement of the scope of Article I, section 17.

both *Lakin* and *Klutschkowski*, the plaintiff was seeking to recover for an injury for which the common law would have provided a remedy in 1857. *Id.*

Admittedly, the fact that *Klutschkowski* was virtually identical to *Lakin* in that respect did not resolve the conflict between *Lakin*, on the one hand, and *DeMendoza*, on the other, nor did it resolve the tension between *Hughes* and *Miramontes*. However, the parties in *Klutshckowski* did not ask the court to reconsider or reconcile its precedents. *Id.* at 169. The court accordingly did not do so. Rather, it looked to the most applicable precedent, which was *Lakin*, and resolved the case on that ground. *Klutschkowski* accordingly did not address the issue that this case presents.

Given our cases, it is difficult to describe *Lakin* as either "settled" or "well-established" precedent. This court has distinguished *Lakin* in all the cases that came after it, with the exception of *Klutschkowski* where the defendant declined to challenge it. Some of the cases distinguishing *Lakin* can fairly be reconciled with it. Others, such as *DeMendoza*, cannot. And while *Hughes* relies on a distinction that *Lakin* itself recognized, the dissenting opinions in *Hughes* reasoned, with some force, that the distinction that *Lakin* drew and that *Hughes* followed "subverted" what they viewed as the fundamental premise of *Lakin*. *See Hughes*, 344 Or at 174 (Walters, J., dissenting). Given the disarray among our Article I, section 17, cases, we conclude that it is appropriate to reconsider *Lakin*'s holding. *See Couey*, 357 Or at 489 (explaining that, when two of this court's decisions cannot be fairly reconciled, it is appropriate to reconsider which decision fits more closely with the constitutional text and history). We accordingly reexamine Article I, section 17's text and history.

B.   *Text*

As noted, Article I, section 17, provides: "In all civil cases the right of Trial by Jury shall remain inviolate." In *Lakin*, the court explained that the word "inviolate" (and we would add the word "remain") suggests that the framers intended to preserve the "right of Trial by Jury" as it existed in 1857. 329 Or at 69. We agree with that proposition, as have

a long line of Oregon cases interpreting Article I, section 17. *See Deane*, 22 Or at 169-70 (Article I, section 17, "secures *** the right to trial by jury in all cases where that right existed at the time the constitution was adopted."); *Tribou*, 7 Or at 158 (same). We also agree with *Lakin* that saying that the framers intended to preserve the "right of Trial by Jury" does not answer the question of what that right encompasses. *Lakin*, 329 Or at 69. Perhaps a textual clue can be drawn from the use of the prepositional phrase "by Jury." That phrase defines the type of trial that Article I, section 17, preserves. It suggests that the right that Article I, section 17, preserves is a right to a procedure (a trial by a jury as opposed to a trial by a judge) rather than a substantive result. However, we agree with *Lakin* that the text of Article I, section 17, standing alone, does not definitively answer the question one way or another.[35]

C.    *History*

We also consider the history that surrounded the adoption of Article I, section 17, to determine the scope of the right that the framers intended to preserve. On that point, *Lakin* observed that the right to a jury trial in civil cases has deep roots. *Lakin* explained that "the guarantee of [a civil] trial by jury was ensured in the Magna Carta in 1215," that it was described by Blackstone as "'the glory of the English law'" and "'the most transcendent privilege that any subject can enjoy,'" and that the majority of the state constitutions leading up to the adoption of Oregon's constitution in 1857 included the right. *See* 329 Or at 70-71 (quoting *Dimick v. Schiedt*, 293 US 474, 485-86, 55 S Ct 296, 79 L Ed 603 (1935)).

---

[35] Although *Lakin* initially recognized that the term "inviolate" was not dispositive, 329 Or at 69, it later followed a Washington Supreme Court decision that gave the term greater significance, *see id.* at 79-80 (following *Sofie v. Fibreboard Corp.*, 112 Wash 2d 636, 771 P2d 711 (1989)). We question how much weight can be put on that term. As the Fifth Circuit recently explained, "'inviolability' simply means that the jury right is protected absolutely in cases where it applies; the term does not establish what that right encompasses." *Learmouth v. Sears, Roebuck Co.*, 710 F3d 249 (5th Cir 2013) (interpreting Mississippi constitutional right to jury trial). Providing that the right to trial by jury shall remain "inviolate" does not differ in any material respect from providing that the right shall remain "sacred" or "preserved," nor does the use of that term explain the scope of the guarantee.

We agree that the right to a jury trial in civil cases was attributed, at least popularly, to Magna Carta,[36] that, approximately 500 years after Magna Carta was signed, Blackstone described the civil jury trial as an essential attribute of the liberty that English citizens enjoyed, and that that view of the right continued in America with the result that its omission from the federal constitution was one of the major objections raised against ratifying the constitution as it emerged from the Constitutional Convention.

To say, however, that the right was viewed as an essential attribute of liberty does not say what the right encompasses. In considering that issue, we begin with Blackstone, whose writing on the civil jury trial was influential in shaping American thought on that issue. *See* Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn L Rev 639, 654 n 45 (1973) (discussing Blackstone's influence). In concluding that the right to a civil jury trial was "the glory of the English law," Blackstone first described the attributes of a civil jury trial and then discussed its structural significance. William Blackstone, 3 *Commentaries on the Laws of England* 349-67, 372-81, 383-85 (1st ed 1768).

In describing the attributes of the right, Blackstone focused solely on the procedures associated with jury trials. He explained that the system for selecting both jury panels and individual jurors was designed to ensure a group of neutral jurors. *Id.* at 355-56 (procedures for calling jurors); *id.* at 359-65 (grounds for challenging jury panels and individual jurors). He also contrasted a civil jury trial with a trial by the ecclesiastical courts. *Id.* at 372-73. In doing so, he praised not only the value of having neutral jurors decide the facts but also the procedural rights that accompany a jury trial, such as the right to cross-examination and the right to have witnesses testify under oath in open court. *Id.* He contrasted those procedural rights, which he associated with civil jury trials, with the procedures

---

[36] We say "popularly" because "[h]istorians no longer accept the Magna Charta pedigree for jury trial." Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn L Rev 639, 653 n 44 (1973).

available in the ecclesiastical courts, which he described as the "private and secret examination taken down in writing before an officer, or his clerk." *Id.* at 373. He explained that, in the ecclesiastical courts, "an artful or careless scribe may make a witness speak what he never meant," while a witness who testifies in open court can clarify his or her meaning, answer occasional questions from the judge or jury, and is subject to cross-examination, which "will sift out truth much better than a formal set of interrogatories." *Id.*

In explaining the structural significance of civil jury trials, Blackstone focused on the division of authority between judges and jurors. He reasoned that, if law and fact were "entirely entrusted to the magistracy, a select body of men [chosen by the prince], their decisions, in spight [*sic*] of their own natural integrity, will have frequently an involuntary biass [*sic*] towards those of their own rank and dignity." *Id.* at 379. Conversely, "if the power of judicature were placed at random [and wholly] in the hands of the multitude, their decisions would be wild and capricious, and a new rule of action would be every day established in our courts." *Id.* at 379-80.

Dividing issues of law and fact between the judges and juries avoided those extremes. Blackstone reasoned that the "principles and axioms of law, which are general propositions, flowing from abstracted reason, and not accommodated to times or to men, should be deposited in the breasts of the judges."[37] *Id.* at 380. However, entrusting factual questions to a single magistrate left too much possibility that a judge would drift towards "partiality and injustice." *Id.* In Blackstone's view, "a competent number of sensible and upright jurymen, chosen by lot from among those of the middle rank, will be found the best investigators of truth." *Id.* Moreover, "the most powerful individual in the state will be cautious of committing any flagrant invasion of another's right, when he knows that the fact of his oppression must

---

[37] Blackstone reasoned that, as to law, "partiality can have little scope the law is well known, and is the same for all ranks and degrees; it follows as a regular conclusion from the premises of fact pre-established." Blackstone, 3 *Commentaries* at 380.

be examined and decided by twelve indifferent men \*\*\*; and that, when once the fact is ascertained, the law must of course redress it." *Id.* It followed, he concluded, that the civil jury system "preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens." *Id.*

In focusing on the procedural benefits of civil jury trials, Blackstone did not suggest that the right to a civil jury imposed a substantive limit on the ability of either the common-law courts or parliament to define the legal principles that create and limit a person's liability. Similarly, in describing the division of authority between judges and juries, he did not state that the jury trial right checked the lawmaking authority of either the common-law courts or parliament. Rather, he explained that courts retain the authority to define the applicable legal principles.

Only one statement that Blackstone made in his discussion of the value of a civil jury arguably points in a different direction. As noted, Blackstone explained that a civil jury trial was valuable because the most powerful members of society would be aware that their actions could "be examined and decided by twelve indifferent men \*\*\*; and that, once the fact is ascertained, the law must of course redress it." *Id.* at 380. That statement—that the law would redress the facts found by the jury—reflected Blackstone's view of the way that the law, announced by parliament and the common-law courts, worked. It did not reflect an understanding that the jury's fact-finding ability imposed a substantive limitation on parliament or common-law courts' authority to announce legal principles that guide and limit the jury's fact-finding function.

The same conclusion follows from the American experience. Before the adoption of the federal constitution, the 13 original states provided for jury trials subject to varying degrees to judicial control. *See* Edith Guild Henderson, *The Background of the Seventh Amendment*, 80 Harv L Rev 289, 318-20 (1966) (describing the "patternless diversity of these jury control practices [among the original states] at the

time the seventh amendment was passed").[38] As Henderson describes, the states differed on the degree to which judges could limit a jury's fact-finding authority. However, she did not identify any substantive limitation among the original states that the right to a civil jury placed on a state legislature's ability to define civil causes of action or damages.

Similarly, before the revolution, one issue that divided the colonies from England was "the extent to which colonial administrators were making use of judge-tried cases to circumvent the right of civil jury trial." Wolfram, *Seventh Amendment*, 57 Minn L Rev at 654. George Mason, for example, "asserted that threats to the accepted practice of trial by jury and injustices perpetrated by the vice-admiralty courts had become points of dispute between the American colonies and England." *Id.* at 654 n 47. In the same vein, John Peter Zenger's libel case became famous, in part because he had criticized New York's colonial governor for attempting to recover a debt in an equity court in order to evade the debtor's right to a civil jury trial. *Id.* at 655. The concern that Mason expressed and that Zenger's case reflected was that decision-making authority was being improperly shifted from a jury composed of American citizens to a judge who was beholden to a British monarch. The perceived value of a civil jury trial lay in the jury's ability to provide a fair application of the law to the facts in an individual case, not in any substantive limitation that the civil jury trial placed on the legislature's lawmaking authority.

Despite the value that the colonists placed on having a jury rather than a colonial judge decide civil claims, the Constitutional Convention did not include a civil jury trial guarantee in the constitution, although the convention did guarantee a jury trial in criminal cases. *See* US Const Art III, § 2.[39] The absence of a civil jury trial guarantee in the

---

[38] The original 13 states continued the institution of jury trials "either by express provision in a state constitution, by statute, or by continuation of the practices that had applied prior to the break with England." Wolfram, *Seventh Amendment*, 57 Minn L Rev at 655.

[39] Article III, section 2, of the United States Constitution provides in part:

"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed."

constitution was not mentioned until five days before the Constitutional Convention adjourned. At that point, Hugh Williamson, a delegate from North Carolina, "observed * * * that no provision was yet made for juries in Civil cases and suggested the necessity of it." 2 *The Records of the Federal Convention of 1787*, at 587-88 (Max Farrand ed., 1911). Elbridge Gerry agreed and "urged the necessity of Juries to guard agst. corrupt Judges." *Id.* In response, Nathaniel Gorham explained that "[i]t is not possible to discriminate equity cases from those [cases] in which juries are proper," and he argued that the question of which civil cases should be tried to a jury and which should be tried to a judge should be left to Congress. *Id.* Still another representative held out the possibility that each state's procedures governing civil juries would apply in the federal court sitting in that state. *Id.*

Those objections to adding a civil jury trial guarantee to the constitution prevailed. Williamson's suggestion to add a civil jury trial guarantee was defeated, as was a motion three days later to add the following guarantee to Article III, section 2, paragraph 3 of the federal constitution: "And a trial by jury shall be preserved as usual in civil cases." *Id.* at 587-88, 628.

When the states were deciding whether to ratify the constitution, one of the primary objections to the federal constitution was that it lacked a bill of rights, including a right to a civil jury trial in the federal courts. *See The Federalist No. 83*, at 558 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (addressing that concern); Wolfram, *Seventh Amendment*, 57 Minn L Rev at 667. One argument was that by providing for jury trials in criminal but not civil cases, the constitution had, *sub silentio*, eliminated a right to civil jury trials in the federal courts. *See The Federalist No. 83*, at 558-59. Hamilton explained, however, that the constitution did not prohibit the use of civil juries in federal court but instead had left it to Congress to decide in which class of civil cases jury trials should be available. *Id.* at 559-60. In Hamilton's view, the strongest argument for guaranteeing a right to a civil jury trial was to check biased or corrupt judges. *Id.* at 563-64. However, he suggested that that check was needed more for judges appointed by a hereditary monarch than for

judges appointed by a popularly elected executive and confirmed by the Senate. *Id.* at 562.

For the most part, Hamilton defended the absence of a civil jury guarantee on the ground that Gorham had raised in the Constitutional Convention. The practice among the states was too diverse to settle on a single principle for specifying when the right would attach, and it would be impolitic to choose the practice of one of the 13 states and impose it on the other states. *Id.* at 564-65. Accordingly, Hamilton explained, the better course was the one that the Constitutional Convention had chosen—leaving it to Congress to define which class of civil cases should be tried to a jury and which should be tried to a judge. *Id.*

Hamilton's discussion of a right to a civil jury trial in *The Federalist No. 83* bears on the issue that *Lakin* decided in two respects. First, the arguments for and against including a civil jury trial guarantee that Hamilton canvassed all addressed the jury's value as a procedural corrective to potentially biased or, worse, corrupt judges serving as the triers of fact. Those arguments do not suggest that the right was viewed as a substantive limit on Congress's lawmaking power. Second, Hamilton made that point expressly in responding to an argument "that trial by jury [serves as] a safeguard against an oppressive exercise of the power of taxation." *Id.* at 563. In addressing that argument, Hamilton explained that the right to a civil jury placed no limit on the legislature's power to define the substantive law. *Id.* He reasoned:

> "It is evident that [the right to a civil jury trial] can have no influence upon the legislature, in regard to the *amount* of the taxes to be laid, to the *objects* upon which they are imposed, or to the *rule* by which they are to be apportioned."

*Id.* (emphases in original). He explained that, if the right to a jury trial had any effect on "an oppressive exercise of the power of taxation," it lay in curbing "the mode of collection, and the conduct of the officers entrusted with the execution of the revenue laws." *Id.* Stated differently, Hamilton explained that the right to a civil jury trial would not limit Congress's ability to enact statutes defining the subjects and extent of taxation. Instead, it could serve as a check on

the manner in which the executive carried out the law in an individual case.[40]

Despite Hamilton's arguments against including a civil jury trial right in the federal constitution, the anti-federalists' objections to the right's omission "struck a very responsive chord in the public" and ultimately carried the day. Wolfram, *Seventh Amendment*, 57 Minn L Rev at 668. Wolfram explains that the antifederalists' objections were not based solely on the ground that juries would be more accurate than judges. Rather, examining the speeches in the state ratifying conventions, Wolfram concluded that the speakers intimated, although they never expressly stated, that juries would provide American debtors greater relief from British creditors than federal judges would. *See id.* at 673-705 (canvassing objections in the ratifying conventions to the absence of a civil jury guarantee). That intimation did not reflect a belief that the right to a civil jury trial would impose a substantive limitation on legislatures. Rather, it reflected the belief that, in an individual case, a jury might adjudicate the facts in a way that would favor local interests over foreign ones.

After the states ratified the constitution and Congress took up the Bill of Rights, an 11-person committee proposed the essence of what became the Seventh Amendment. 1 Annals of Cong. 85 (1789) (Joseph Gale's ed. 1834). Specifically, they modified a proposal that James Madison had made to provide, in part: "In suits at common law, the right of trial by jury shall be preserved." *Id.* at 86. A further amendment was made to limit the right to suits at common law in excess of $20, and the proposal, as amended, was adopted without recorded discussion. *Id.*[41]

---

[40] Having acknowledged that a civil jury might affect the way in which the law was executed, Hamilton then discounted the effect that a civil jury in fact would have on the way the executive carried out the tax laws. *The Federalist No. 83* at 468.

[41] As adopted, the Seventh Amendment provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

US Const, Amend 7.

For all that appears from the record of Congress's action, no one raised the objection, which had been successful in the Constitutional Convention, that, given the diverse practice among the 13 states, a standard that "preserved" the right of trial by jury would have no clear meaning. Twenty-one years after the Seventh Amendment was ratified, Justice Story addressed that issue. He explained that the right of trial by jury that the Seventh Amendment preserved was the right defined by the English common law. *See United States v. Wonson*, 28 F Cas 745, 750 (CCD Mass 1812) (No. 16,750) ("Beyond all question, the common law here alluded to is not the common law of any individual state, (for it probably differs in all), but it is the common law of England, the grand reservoir of all our jurisprudence.").

As this court noted in *Lakin*, since the adoption of the Seventh Amendment, most states have included a civil jury trial right in their state constitutions. 329 Or at 71. As the court also noted, Oregon modeled its guarantee in Article I, section 17, on the guarantee in Indiana's constitution and adopted that guarantee without discussion. It follows that the relevant history of Article I, section 17, comes primarily from the English practice reflected in Blackstone's *Commentaries* and the history leading up to and surrounding the adoption of the Seventh Amendment. That history reveals what the text of that provision implies and what this court consistently had recognized until *Lakin*: Article I, section 17, guarantees a procedural right; that is, it guarantees the right to a trial by a jury (as opposed to a trial by a judge) in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases of like nature.[42] However, the history does not suggest that Article I, section 17, limits the legislature's authority to define, as a matter of law, the substantive elements of a cause of action or the extent to which damages will be available in that action. As this court explained in *DeMendoza*, any substantive limit on the legislature's authority must be found in some other provision of the state or federal constitutions.

---

[42] This case does not require us to consider the limits that Article I, section 17, places on the legislature's ability to alter the essential procedural attributes of a jury trial, and we express no opinion on that issue.

D.   Lakin *reconsidered*

*Lakin* departed from that history, and we consider briefly its reasons for doing so. The court's holding in *Lakin* may rest on one of three propositions. First, *Lakin* concluded that the right to a jury trial guaranteed by Article I, section 17, has the same meaning today that it had in 1857. 329 Or at 72. Second, the court concluded that, in 1857, the extent of a party's damages in an individual case was a question of fact for the jury and that the legislature could not interfere with the jury's fact-finding function. *Id.* at 74. Third, *Lakin* concluded that the legislature's authority to limit a jury's factual findings is no greater than a trial court's. *Id.* at 78. *Lakin* reasoned that, although a trial court had the authority to set aside a jury's verdict in 1857 if the jury's verdict was contrary to the weight of the evidence, the court could do so only if it gave the party that had obtained the verdict the option of a new trial. It followed, *Lakin* reasoned, that neither a trial court nor the legislature could unilaterally limit a jury's award of noneconomic damages in "civil cases in which the right to jury trial was customary in 1857, or in cases of like nature." *Id.*

We take the court's last point first. That a judge cannot reweigh the amount of damages that the jury awards in an individual case does not mean that the legislature cannot enact a statute that specifies, as a matter of law, the nature and extent of damages that are available in a class of cases. Whatever other constitutional issues a damages cap may present, a damages cap does not reflect a legislative attempt to determine a fact in an individual case or to reweigh the jury's factual findings. Rather, a statutory cap is a legal limit on damages that applies generally in a class of cases. The fact that, in 1857, *remittitur* did not permit a trial court to unilaterally substitute its view of the evidence for the jury's in an individual case does not mean that the legislature cannot define, as a matter of law, the nature and extent of damages that are generally available in a class of cases.

The second conclusion on which *Lakin* rests also does not withstand scrutiny. It is certainly true that the amount of damages that a party sustains is ordinarily a

factual issue for the trier of fact. It does not follow, however, that a trier of fact has free rein to determine the amount of a party's damages, unconstrained by legal limits. Rather, common-law courts routinely have imposed legal limits on the type and amount of recoverable damages that a defendant's negligence, in fact, caused. *See* W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* 280-90 (5th ed 1984) (discussing limits on damages caused in fact by defendants' negligence). Sometimes, courts have limited the extent of a defendant's damages by limiting the class of persons to whom the defendant owes a duty. *See id.* at 284-85 (discussing that means of limiting damages); *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987) (when defendant's negligence causes only economic harm, damages limited to persons to whom defendant owed duty). Other times, courts have used concepts such as proximate cause to limit the extent of the damages for which a defendant can be held responsible. *Prosser and Keeton on the Law of Torts* at 282-83.[43] More modernly, in Oregon, defendants ordinarily will be liable only for the foreseeable damages that their negligence caused. *See Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987).

Those differing formulations should not obscure the fact that legal limits on a jury's assessment of civil damages have been and remain an accepted feature of our law. To be sure, statutory damages caps differ from other types of legal limitations on a jury's authority to award damages. They specify, as a matter of law, a numerical limit on the amount of damages that a party can recover instead of describing that limit generically by using a phrase such as foreseeable damages or damages proximately caused by the defendant's act. However, the two types of limitations do not differ in principle. Each limits, as a matter of law, the extent of the damages that a jury can award in a class of cases. One is no more an interference with the jury's fact-finding function than the other. Neither is an attempt to determine legislatively or judicially in an individual

---

[43] A relatively stark example is found in a line of New York cases limiting a defendant's liability for a negligently set fire to the damages suffered by adjoining landowners. *See, e.g.*, *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 NY 47, 120 NE 86 (1918) (so holding).

case the amount of damages that the defendant's act in fact caused. For that reason, we disagree with the second conclusion on which *Lakin* rests and on which the dissent appears to rely.[44]

 We note one final ground on which *Lakin*'s holding may rest. *Lakin* concluded that Article I, section 17, means the same thing today that it meant in 1857, and *Lakin*'s holding may rest on the ground that only those legal limitations on damages that existed in 1857 are constitutionally valid. To the extent that is the ground on which *Lakin* rests, it is at odds with this court's cases. As this court explained in *Fazzolari*, the limits on the extent of a defendant's damages that the common law recognized in 1857 bear little resemblance to those that we recognize today. *See id.* at 4-10 (discussing the growth of the common law). As Justice Linde observed in *Fazzolari*:

> "At the time the Oregon Territory adopted the 'common law of England,' the common law had no broad theory of liability for unintended harm resulting from a failure to take due care toward members of the public generally but only liability for harm resulting from negligent conduct in various callings and relationships. Men had particular duties but no general duty."

*Id.* at 4 (footnote omitted). Over time, the scope of a defendant's liability has expanded, as well as the extent of the damages for which a negligent defendant may be held responsible. *See id.* at 4-10. The court accordingly held in *Fazzolari* that, unless "a status, a relationship, or a particular standard of conduct *** creates, defines, or limits the defendant's duty," a defendant is generally liable for the foreseeable consequences of his or her negligence. *Id.* at 17; *see also Chapman v. Mayfield*, 358 Or 196, 205, 361 P3d 566 (2015) (discussing expanding scope of liability for negligence).

---

[44] One other possible distinction requires mention. By statute, a court can impose the tort claims limit only after the jury returns its verdict. *See* ORS 30.269(3). However, from the perspective of Article I, section 17, the degree of interference with the jury's verdict is the same regardless of whether the jury is informed of the limit in advance of its deliberations or the limit is imposed after the jury returns its verdict.

The state constitutional right to a civil jury trial applies equally to plaintiffs and defendants. If Article I, section 17, froze the legal limits on liability as they existed in 1857 and thus defined the extent of the damages that can be recovered against a negligent defendant, much of the later growth of the law of negligence would be at odds with Article I, section 17. Specifically, a defendant could invoke its right to a jury trial to argue against any expansion of damages beyond those for which it would have been liable when the Oregon Constitution was framed. Nothing in the text of Article I, section 17, its history, or our cases interpreting it suggests that the framers intended such sweeping consequences in guaranteeing the right to have a jury rather than a judge decide claims and defenses commonly heard at common law.

This court's cases that preceded *Lakin* also provide no support for *Lakin*'s holding. *Lakin* cited only one Oregon case—*Molodyh v. Truck Insurance Exchange*, 304 Or 290, 744 P2d 992 (1987)—to support its conclusion that Article I, section 17, limits the legislature's authority to define the extent of available damages. However, *Molodyh* stands for a more limited proposition than the one *Lakin* drew from it. *Molodyh* holds that, when the legislature has made a factual issue part of a claim that is subject to Article I, section 17, the legislature may not assign that factual issue to any entity other than a jury.

The statute at issue in *Molodyh* gave one party to a fire insurance contract the right to require that disputes about the amount of an insured's loss be decided by a panel of three appraisers. *See id.* at 293 (setting out the statute). When the insured in *Molodyh* sued the insurer for breach of contract, the insurer asserted its statutory right to have the amount of the loss (or the damages for the breach of contract) be determined by a panel of appraisers rather than the jury. *Id.* at 292. The insured objected on the ground that taking a factual element of the claim away from the jury violated Article I, section 17.

This court agreed with the insured. It explained that, under Article I, section 17, the insured was entitled to a jury trial on his cause of action for breach of contract

because the elements of that claim—including the amount of the loss—customarily would have been tried to a jury in 1857. *Id.* at 296-97. It also held that, having included that factual element as part of the plaintiff's claim, the legislature could not assign the determination of that factual element to any factfinder other than a jury, at least over a party's objection. *Id.* at 297-98. *Molodyh* did not hold that the legislature may not place a legal limit on the nature or extent of the damages that the jury can find. Rather, it held that, once the legislature has made a factual element part of a claim subject to the jury trial right, only a jury may decide that factual element unless both parties give that right up. Properly understood, *Molodyh* does not call into question the legal limit that the legislature placed on the amount of damages that may be recovered from state employees.

Finally, we note that 22 other jurisdictions have considered this issue. Seventeen of those jurisdictions have held that a damages cap does not violate either the state or federal constitutional right to a jury trial. Specifically, Idaho, Indiana, Maryland, Massachusetts, Michigan, Nebraska, Utah, Virginia, West Virginia, and Wisconsin have upheld damages caps against state constitutional jury trial challenges.[45] Additionally, the United States Courts of Appeals for the Third, Fourth, and Sixth Circuits have upheld damages caps against Seventh Amendment challenges, and the United States Court of Appeals for the Fifth Circuit has upheld a damages cap against a state jury trial challenge.[46] In addition to those jurisdictions, the Kansas

---

[45] *Kirkland v. Blaine Cnty. Med. Ctr.*, 134 Idaho 464, 4 P3d 1115 (2000) (cap on noneconomic damages); *Johnson v. St. Vincent Hosp., Inc.*, 273 Ind 374, 404 NE2d 585 (1980) (capped damages with possibility of additional recovery from compensation fund), *modified on other grounds by In re Stephens*, 867 NE2d 148 (Ind 2007) (permissible limits on attorney fees); *Murphy v. Edmonds*, 325 Md 342, 601 A2d 102 (1992) (cap on noneconomic damages); *English v. New England Med. Ctr.*, 405 Mass 423, 541 NE2d 329 (1989) (cap on medical malpractice damages); *Phillips v. Mirac, Inc.*, 470 Mich 415, 685 NW2d 174 (2004) (cap on noneconomic damages); *Gourley v. Neb. Methodist Health Sys., Inc.*, 265 Neb 918, 663 NW2d 43 (2003) (cap on medical malpractice damages); *Judd v. Drezga*, 103 P3d 135 (Utah 2004) (cap on "quality of life" damages); *Etheridge v. Med. Ctr. Hosp.*, 237 Va 87, 376 SE2d 525 (1989) (cap on noneconomic damages); *Robinson v. Charleston Area Med. Ctr., Inc.*, 186 W Va 720, 414 SE2d 877 (1991) (same); *Maurin v. Hall*, 274 Wis 28, 682 NW2d 866 (2004) (same).

[46] *Davis v. Omitowoju*, 883 F2d 1155 (3d Cir 1989) (noneconomic damages cap); *Boyd v. Bulala*, 877 F2d 1191 (4th Cir 1989) (same); *Smith v. Botsford*

Supreme Court has held that a cap on noneconomic damages does not violate the right to a jury trial as long as it does not violate that state's remedy clause,[47] and the Maine Supreme Court considered those two provisions together in holding that a $250,000 damages cap did not violate that state's jury trial and right to remedy clauses.[48] Finally, the Alaska Supreme Court affirmed by an equally divided court a judgment upholding a damages cap.[49] On the other side of the ledger, five states have held that caps on noneconomic damages violate the right to a jury trial.[50]

By a considerable majority, the jurisdictions that have considered whether damage caps violate the right to a jury trial have held that they do not. Ultimately, however, the question is not what the majority rule is in other jurisdictions or what we would decide if we were considering this issue for the first time. Rather, the question is whether *Lakin* should be overruled. For the reasons explained above, *Lakin*

---

*Gen. Hosp.*, 419 F2d 513 (6th Cir 2005), *cert den*, 547 US 1111 (2006) (same); *Learmonth v. Sears, Roebuck & Co.*, 710 F3d 249 (5th Cir 2013) (upholding damages caps against challenge based on state constitutional right to jury trial after Mississippi Supreme Court refused to accept certified question on that issue).

[47] In 1988, the Kansas Supreme Court explained that, under the Kansas Constitution, a damages cap will violate a party's right to a jury trial if the cap violates the state's remedies clause. *Kansas Malpractice Victims Coal. v. Bell*, 243 Kan 333, 757 P2d 251 (1988). Because the statute capping noneconomic damages in that case violated the state remedy clause for lack of a sufficient *quid pro quo*, the cap also violated the right to a jury trial. *Id*. In 2012, the court held that a different statute capping noneconomic damages in personal injury actions contained a sufficient *quid pro quo* to satisfy the state remedy clause and, as a consequence, held that that cap did not violate the right to a jury trial. *Miller v. Johnson*, 295 Kan 636, 289 P3d 1098 (2012).

[48] The Maine Supreme Court explained that,

"[a]lthough it is conceivable that a statute could limit the measure of tort damages so drastically that it would result in a denial of the right to trial by jury and the denial of a remedy, the $250,000 cap before us [on damages for persons injured as the result of negligently over-serving alcohol] is not such a measure."

*Peters v. Saft*, 597 A2d 50, 53 (Me 1991).

[49] *Evans ex rel. Kutch v. State*, 56 P3d 1046 (Alaska 2002) (affirmed by an equally divided court).

[50] *Moore v. Mobile Infirmary Ass'n*, 592 So 2d 156 (Ala 1991) (cap on noneconomic damages); *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga 731, 691 SE2d 218 (2010) (same); *Watts v. Lester E. Cox Med. Ctr.*, 376 SW3d 633 (Mo 2012) (same); *Knowles v. United States*, 544 NW2d 183 (SD 1996) (same); *Sofie v. Fibreboard Corp.*, 112 Wash 2d 636, 771 P2d 711 (1989) (same).

"cannot be fairly reconciled with other decisions of this court on the same constitutional provision." *Couey,* 357 Or at 487 (noting that ground for reexamining our constitutional decisions). Not only does that conflict require resolution, but *Lakin* is of relatively recent vintage. And, since this court decided *Lakin*, we have distinguished rather than followed it with the exception of one case in which the parties did not dispute that *Lakin* governed.

Given those circumstances, we conclude that *Lakin* should be overruled. The text of Article I, section 17, its history, and our cases that preceded *Lakin* establish that Article I, section 17, guarantees litigants a procedural right to have a jury rather than a judge decide those common-law claims and defenses that customarily were tried to a jury when Oregon adopted its constitution in 1857, as well as those claims and defenses that are "of like nature." However, that history does not demonstrate that Article I, section 17, imposes a substantive limit on the legislature's authority to define the elements of a claim or the extent of damages available for a claim.

One other consideration informs our decision. As this court suggested in *DeMendoza,* the most obvious textual limitation on the legislature's authority to alter or adjust a plaintiff's right to a remedy is found in the remedy clause of Article I, section 10. Perhaps a plaintiff also could argue that a damages cap violates some other provision of the state or federal constitutions that imposes a substantive limitation on legislative action. However, if a damages cap does not violate one of those provisions, it is difficult to see how the jury trial right renders a damages cap unconstitutional. Neither the text nor the history of the jury trial right suggests that it was intended to place a substantive limitation on the legislature's authority to alter or adjust a party's rights and remedies. We accordingly overrule the court's decision in *Lakin.*

## III.    ARTICLE VII (AMENDED), SECTION 3

The trial court ruled that applying the tort claims limit to the jury's verdict violates Article VII (Amended), section 3, of the Oregon Constitution. That section provides, in part:

> "In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

Article VII (Amended), section 3, is an initiated constitutional amendment, which the voters adopted in 1910. *See* General Laws of Oregon 1911, at 7-8. We interpret initiated constitutional amendments the same way that we interpret a statute; that is, we look to the text, context, and legislative history of the amendment to determine the intent of the voters. *State v. Algeo*, 354 Or 236, 246, 311 P3d 865 (2013) (initiated constitutional amendment); *State v. Harrell/Wilson*, 353 Or 247, 254-55, 297 P3d 461 (2013) (referred constitutional amendment).

We start with the text of the constitution. Section 3 begins with a prepositional phrase that describes the class of cases to which it applies: "all actions at law, where the value in controversy shall exceed $750." Two independent clauses follow that prepositional phrase. The first independent clause provides that, in those cases, the "right of trial by jury shall be preserved." Plaintiff does not argue that that independent clause guarantees anything beyond what Article I, section 17, guarantees; that is, she does not argue that, if the tort claims limitation does not violate Article I, section 17, it violates the first independent clause of Article VII (Amended), section 3.

Plaintiff focuses her argument instead on the second independent clause, which is qualified by a dependant clause. Those clauses provide that "no fact shall be otherwise re-examined in any court of this state, unless the court can affirmatively say that there is no evidence to support the verdict." Although the second independent clause uses the passive voice, "the court" is the subject of the related dependent clause. Reading the second independent clause and the related dependent clause together, we conclude that both clauses are directed to the courts. They prohibit courts from reexamining the facts that a jury has found "unless the court can affirmatively say that there is no evidence to support the verdict."

When the people adopted Article VII (Amended), section 3, "reexamine" meant "[t]o examine anew," and "examine" meant "to inspect carefully with a view to discover the real character or state of" something. *Webster's Int'l Dictionary* 1206, 519 (1907). By its terms, that constitutional provision prohibits courts from reassessing or second-guessing the facts that the jury found unless there is no evidence to support the jury's verdict. Textually, the section places no restriction on the legislature's ability to limit, as a matter of law, the issues before the jury or the extent of the damages available for a cause of action. Similarly, it does not limit a court's ability to set aside a jury's verdict that is inconsistent with the substantive law.

The same conclusion follows from the provision's history. In 1899, this court followed the United States Supreme Court's lead and held that a trial court could grant a motion for a new trial if the court determined that the jury's verdict was "against the clear weight or preponderance of evidence." *Serles v. Serles*, 35 Or 289, 295, 57 P 634 (1899), *abrogated by* Or Const, Art VII (Amended), § 3. Because the trial court in *Serles* had held that it lacked authority to grant a new trial if there was "any evidence to support" the jury's verdict, this court reversed the trial court's judgment and remanded the case for the court to apply the new standard that it had announced. *Id.* at 290, 297. *See also Multnomah Co. v. Willamette T. Co.*, 49 Or 204, 213, 89 P 389 (1907) (following *Serles*).

In 1910, the People's Power League proposed a series of initiated measures, one of which was Article VII (Amended). *See* Official Voters' Pamphlet, General Election, Nov 8, 1910, 201-02 (setting out the measure); *id.* at 166-77 (discussing the League's measures). The League submitted the only argument discussing the measure. *See id.* at 176-77. The League's argument did not discuss the part of section 3 on which plaintiff relies, but it explained that the proposed amendments generally were intended to shorten lengthy trials and reduce the number of retrials. *See id.* (discussing, among other things, a court's authority to uphold verdicts when the mistake is technical and also the requirement that only three-fourths of the jurors must agree in civil

cases). Contemporary news articles did not discuss the part of section 3 on which plaintiff relies, while a law journal published shortly after Article VII (Amended) was adopted criticized the measure because it took away a trial court's authority to grant a new trial when the jury's verdict was contrary to the weight of the evidence. 77 Cent LJ 384, 388 (1913).

Although the history of Article VII (Amended), section 3, is sparse, this court has summarized its purpose succinctly: "to eliminate, as an incident of a jury trial in this state, the common law power of a trial court to re-examine the evidence and set aside a verdict because it was excessive or in any other respect opposed to the weight of the evidence." *Van Lom*, 187 Or at 99. As *Van Lom* made clear, the part of Article VII (Amended), section 3, on which plaintiff relies was directed at a specific practice—a trial court's decision to grant a new trial because the court concluded that the verdict was contrary to the weight of the evidence.

That practice is not present here. In applying the statutory limit on damages, the trial court was not "reexamining" a fact found by the jury, determining that the fact was contrary to the weight of the evidence, and granting a new trial for that reason. Rather, the court was applying a legal limit, expressed in the statute, to the facts that the jury had found. Article VII (Amended), section 3, does not prohibit courts from applying the law to the facts.

Plaintiff's contrary argument, as we understand it, is that the legal limit that the legislature placed on the extent of a jury's damages award has as deleterious an effect on the exercise of her jury trial right as the pre-1910 practice of *remittitur*. That may be true. The Tort Claims Act limits the amount of the jury's damages award without giving a plaintiff the option of a new trial. However, the text of Article VII (Amended), section 3, its history, and our cases interpreting it provide no basis for converting a limit on a trial court's ability to second-guess a jury's factual findings into a limit on the legislature's ability to state legal principles that define the elements of a cause of action or the type or extent of the available damages. Article VII (Amended),

section 3, does not provide a basis for holding the damages limitation stated in the Tort Claims Act unconstitutional. Again, any constitutional limitation must find its source in some other provision of the state or federal constitution.

We conclude that applying the Tort Claims Act limit to plaintiff's claim against defendant does not violate the remedy clause in Article I, section 10, nor does giving effect to that limit violate the jury trial clauses in Article I, section 17, or Article VII (Amended), section 3. We accordingly reverse the trial court's limited judgment and remand this case to the trial court for entry of a judgment consistent with this decision.

The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**LANDAU, J.,** concurring.

This case presents the court with some very difficult issues involving not just the meaning of particular sections of the state constitution but also larger questions concerning the nature of constitutional interpretation itself and the role of *stare decisis*. In large part, it is a difficulty of the court's own making. For decades, the court interpreted the constitution more or less on a case-by-case basis, resulting in lines of case law that, taken together, simply don't make sense. For a time, the court attempted to move away from such incrementalism, adopting what purported to be a rigid originalist interpretive approach. *See, e.g.*, *Lakin v. Senco Products, Inc.*, 329 Or 62, 72, 987 P2d 463, *modified*, 329 Or 369, 987 P2d 476 (1999) ("[W]hatever the right to 'Trial by Jury' meant in 1857, it means precisely the same thing today."). But as often as not, the effort was marred by historical analysis that did not withstand careful scrutiny and led to the adoption of rules that proved unworkable. In this case, the majority confronts those very problems with respect to the interpretation of two constitutional provisions—the jury trial guarantee of Article I, section 17, and the remedy provision of Article I, section 10.

In the case of Article I, section 17, the precedents have become irreconcilable, as the majority persuasively

demonstrates. That requires us to reevaluate, and the majority carefully and critically does just that, consistently with principles of constitutional interpretation that this court has settled on in recent years—principles that are less rigidly originalist and that require more careful historical analysis. I agree with the majority's reevaluation and with its ultimate conclusion that *Lakin* must be overruled.

I also agree with the majority's analysis of Article I, section 10, at least in part. Like *Lakin*, *Smothers v. Gresham Transport, Inc.*, 332 Or 83, 23 P3d 333 (2001), must be overruled. I have long argued that *Smothers* was incorrectly decided—not just incorrect in the sense that reasonable people could disagree about its analysis and holding, but incorrect in the sense that its analysis is demonstrably at odds with the very sources on which it relies. *See generally Klutschkowski v. PeaceHealth*, 354 Or 150, 178-96, 311 P3d 461 (2013) (Landau, J., concurring); *Brewer v. Dept. of Fish and Wildlife*, 167 Or App 173, 191-98, 2 P3d 418 (2000) (Landau, J., concurring).

In my view, however, the majority didn't go far enough. The problems with this court's remedy-clause jurisprudence run far deeper than one errant decision. *Smothers* was but the latest in a long line of remedy-clause decisions that—for over a century—have veered in one direction, then another, then another still, resulting in a jurisprudence that this court itself has complained lacks anything resembling doctrinal coherence.

In my view, the majority should not have stopped with overruling *Smothers*. Instead, it should have subjected the entire line of remedy-clause decisions to the same searching and critical analysis to which it subjected our cases construing the jury guarantee. That sort of critical analysis of the remedy provision of Article I, section 10, shows that it is debatable whether the framers of the Oregon Constitution intended or understood Article I, section 10, to operate as a limitation on legislative authority at all. At best, the wording of the constitution and the historical circumstances surrounding its adoption fairly may be read to support a general principle that the remedy provision precludes legislative interference with judicial independence and access to

the courts, but not that it limits the legislature's authority to determine substantive rights and remedies, as many of this court's prior cases declare. I would overrule those cases. It is for that reason that I conclude that the trial court in this case erred in holding that the legislature's statutory cap on damages violates Article I, section 10, and therefore concur in the result that the majority reaches.

## I.   *STARE DECISIS* AND THE APPROPRIATE STANDARD OF REVIEW

At the outset, I acknowledge the importance of *stare decisis*. It goes without saying that stability and predictability are essential to the consistent administration of justice and the legitimacy of this court's decisions. But stubborn adherence to precedent that is demonstrably in error is not without cost. Correctness is also important to the administration of justice and this court's legitimacy, particularly in the case of constitutional interpretation. *Couey v. Atkins*, 357 Or 460, 485, 355 P3d 866 (2015) ("Especially in cases involving the interpretation of the state constitution, the value of stability that is served by adhering to precedent may be outweighed by the need to correct past errors."). When this court examines a line of carefully considered and consistent precedents, I agree that the burden on anyone challenging them is a heavy one and that we should adhere to those precedents unless they are clearly incorrect. *Id.* at 485-86. When the existing case law is hopelessly inconsistent, however, there is no such burden. In such cases, in order to make sense of the law, something will have to be jettisoned. No particular burden applies. *Id.*

In the case of Article I, section 10, the case law is hardly consistent. As then-professor David Schuman commented, "the remedy clause has not occasioned a coherent body of case law leading to anything that could be called an 'interpretation.'" David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or L Rev 35, 36 (1986). That is also the court's own assessment of its precedents. *Neher v. Chartier*, 319 Or 417, 423, 879 P2d 156 (1994) ("This court's case law throughout the nineteenth and twentieth centuries interpreting Article I, section 10, *** has failed definitively to establish

and consistently to apply any one theory regarding the protections afforded by the remedies guarantee."). Indeed, *Smothers* itself observed that "this court has not developed a consistent body of law interpreting the remedy clause of Article I, section 10." 332 Or at 90.[1]

About that much, *Smothers* was correct. For example, in some cases, the court has rejected out of hand the notion that Article I, section 10, constrains the legislature at all. *Templeton v. Linn County*, 22 Or 313 (1892), illustrates the point. At common law, a county was not liable for injury resulting from a defect in one of its roads. But the territorial legislature recognized such a right by statute, at least for a time. Some years later, the Oregon legislature repealed that statute. Templeton, who was injured as a result of an alleged defect in a Linn County road, argued that the repeal of the statute violated the remedy guarantee of Article I, section 10. The court rejected the argument. Chief Justice Strahan explained that the plaintiff's argument appeared to be that, once the legislature has granted a remedy, the constitution "tied the hands of the legislature so that such liability should endure as long as the constitution shall remain in force. As a proposition of constitutional law," he observed, "this contention seems startling." *Id.* at 316. "[N]o judicial authority was cited upon the argument in support of it," the Chief Justice wrote, "and I think it may be safely assumed that none exists." *Id.*[2]

---

[1] *See also* [Storm v. McClung](), 334 Or 210, 221, 47 P3d 476 (2002) (citing *Smothers* for observation that "this court previously had failed definitively to establish and consistently apply any one theory regarding the protections afforded by the remedies guarantee"); *Greist v. Phillips*, 322 Or 281, 304, 906 P2d 789 (1995) (Unis, J., concurring in part) (complaining about the court's "inconsistent" approach to the remedy guarantee); Junping Han, *The Constitutionality of Oregon's Split-Recovery Punitive Damages Statute*, 38 Willamette L Rev 477, 529-30 (2002) (noting shifts in Oregon Supreme Court analysis of remedy guarantee); Lisa S. Guterson, *The Remedy Clause Analysis of* Neher v. Chartier, 74 Or L Rev 379, 382 (1995) (noting back-and-forth nature of Oregon remedy analysis); Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1279, 1282 (1995) (noting lack of principled analysis of Article I, section 10).

[2] Interestingly, in *dictum*, the Chief Justice added that, had Templeton's claim vested before the time the legislature acted, the result might have been different. *Templeton,* 22 Or at 317. As I explain below, that comment comports with the common early-nineteenth century view that remedy guarantees, at best, prohibited the legislature from retroactively altering vested rights, but do not

In contrast, in *Mattson v. Astoria*, 39 Or 577, 580, 65 P 1066 (1901), the court took an entirely different view of Article I, section 10, holding instead that its remedy provision was "intended to preserve the common-law right of action for injury to person or property." There was no mention of the directly contrary view taken by the court in *Templeton*. Then in *Thieler v. Tillamook County*, 75 Or 214, 217, 146 P 828 (1915), the court followed *Mattson*, expressly adopting the view of Article I, section 10, that earlier had been set out by Federal District Court Judge Matthew Deady in *Eastman v. County of Clackamas*, 32 F 24 (D Or 1887). In that case, Deady suggested that, under Article I, section 10, "[w]hatever injury the law, as it then stood [at the time the constitution was adopted], took cognizance of and furnished a remedy for, every man shall continue to have remedy for by due course of law." *Id.* at 32. This time, at least, the court mentioned *Templeton*, but it said that a "vigorous dissenting opinion" in that case had deprived the court's opinion of its "binding force"—an interesting view of the authority of dissenting opinions, to be sure. *Theiler*, 75 Or at 217-18. Any doubts that the court had adopted Deady's views of the remedy provision in *Eastman* were put to rest in *Stewart v. Houk, et al.*, 127 Or 589, 593, 271 P 998 (1928), in which the court preceded a lengthy quote from *Eastman* with the assertion that the quoted material "was adopted" in *Theiler*. *See also West v. Jaloff*, 113 Or 184, 195, 232 P 642 (1925) ("[I]t has been the settled law of this state that the common-law remedy for negligently inflicted injuries could not be taken away without providing some other efficient remedy in its place.").

But then in *Perozzi v. Ganiere*, 149 Or 330, 345, 40 P2d 1009 (1935), the court altered course, upholding the constitutionality of Oregon's guest passenger statute and rejecting the plaintiff's contention that "in all instances in which recovery could be had at common law for injuries to person or property such right of recovery has, by [A]rticle I, [section] 10, been preserved, and that it is not within the province of the legislature to take it away or in any way limit it." The court commented that, "had it been the intention of

constrain legislatures from prospectively redefining the nature of injuries that the law will protect or the nature of those protections.

the framers of the constitution to adopt and preserve the remedy for all injuries to person or property which the common law afforded, they undoubtedly would have signified that intention by exact and specific wording, rather than the language used in [A]rticle I, [section] 10." *Id.* at 346.

In *Noonan v. City of Portland*, 161 Or 213, 88 P2d 808 (1939), the court took a similar position, holding that the constitution "does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." *Id.* at 249 (quoting *Silver v. Silver*, 280 US 117, 121, 50 S Ct 57, 74 L Ed 221 (1929)). The court noted that, notwithstanding the constitutional remedy guarantee, it had countenanced the elimination of whole claims, such as alienation of affection and actions for breach of promise. *Id.* Interestingly, the court went out of its way to disavow Deady's altogether different reading of the remedy clause in *Eastman*, commenting that—contrary to *Stewart*—such views "do not represent the construction of this court." *Id.* In a similar vein, *Sealey v. Hicks* 309 Or 387, 788 P2d 435 (1990), asserted that "[t]he legislature has the authority to determine what constitutes a legally cognizable injury" without running afoul of Article I, section 10.

*Smothers* recognized the unsettled state of this court's prior remedy-clause jurisprudence and attempted to resolve, once and for all, the proper interpretation of the clause. 332 Or at 90-91. It overruled (among other cases) *Perozzi* and *Sealey*, resuscitated *Eastman* and the cases relying on it, and concluded that the remedy clause constrained the legislature from unduly altering common-law rights. *Smothers*, 332 Or at 119, 123-24.

Unfortunately, the court failed in its effort to bring clarity to the law. Indeed, in the years since *Smothers*, this court has had difficulty even agreeing on what the decision means, as this court's sharply-divided post-*Smothers* case law makes clear. *See, e.g.*, [Howell v. Boyle](), 353 Or 359, 298 P3d 1 (2013); [Lawson v. Hoke](), 339 Or 253, 119 P3d 210 (2005).[3]

---

[3] *Lawson* was especially perplexing in that the court appeared to transform the principle in *Smothers* that certain "absolute" rights were protected by Article I, section 10, into one that the remedy clause applies only when a plaintiff

So, in a nutshell, this court started out in *Templeton* by saying that Article I, section 10, imposes no limits on legislative authority; then it abandoned *Templeton* in *Mattson* and *Thieler*, adopting instead the views of Deady that the provision preserved common-law rights that existed at the state's founding; but then it disavowed Deady, along with *Mattson* and *Thieler*, in *Perozzi* and *Noonan*; only to have those very cases revived, and *Perozzi* and *Noonan* disavowed, in *Smothers*; which we now overrule, thereby reviving *Perozzi* and *Noonan*. It's no small wonder to me that this court's remedy-clause jurisprudence has been the subject of derision. In my view, there exists no body of Oregon case law that uniformly views the meaning and application of the remedy clause of Article I, section 10, and that we must now determine was clearly incorrect. As I see it, there is only a constantly shifting series of cases on the clause that cannot be reconciled among themselves, leaving us to decide which, if any, are correct.

## II.    ANALYSIS OF ARTICLE I, SECTION 10

I turn, then, to the proper analysis of Article I, section 10, examining the text of the provision, in its historical context, and in light of relevant case law. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). I hasten to add that, in engaging in that examination, I don't believe that the meaning of the Oregon Constitution is limited to whatever its framers would have understood at the time of its adoption. As I have noted elsewhere, I think that that brand of originalism is unwise and untenable and all too often—as in *Lakin* and *Smothers*—results in reliance on interpretations of historical source materials that are both unduly selective and anachronistic. *See, e.g.*, *State v. Hemenway*, 353 Or 129, 156-57, 295 P3d 617 (2013) (Landau, J., concurring), *vac'd by* *State v. Hemenway*, 353 Or 498, 302 P3d 413 (2013) (so noting).

But that doesn't mean that the constitution is simply a blank canvas on which we may paint our personal

---

would have had an absolute right to recover—that is, free from any possible defenses. *Lawson*, 339 Or at 264-65 (because the plaintiff's personal injury claim would have been subject to defenses that would have barred recovery, there was "no absolute common-law right" that the remedy guarantee protected).

preferences. If our constitutional doctrine is to retain legitimacy as constitutional "interpretation," it still must comport with the reasonable construction of the text; why else, it might be asked, do we have a written constitution?[4] Moreover, although the meaning of our constitution may not be frozen in the mid-nineteenth century, it remains a 150-year-old historical document, which must be viewed in its historical context. As we explained in *State v. Mills*, 354 Or 350, 354, 312 P3d 515 (2013), the purpose of examining the historical context of a provision is not "to fossilize the meaning of the state constitution so that it signifies no more than what it would have been understood to signify when adopted in the mid-nineteenth century." It is instead to determine the general principles that animate it and that may be applied to modern circumstances. *State v. Davis*, 350 Or 440, 446, 256 P3d 1075 (2011). History may not be controlling, but it is never irrelevant. In my view, adherence to those fundamental principles of constitutional interpretation precludes perpetuating the erroneous conclusion of *Smothers* and its predecessors that Article I, section 10, constitutionally guarantees a right to assert particular tort claims without legislative qualification or modification.

A.  *Text*

Article I, section 10, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property or reputation."

I quote the entire section because it is important to emphasize that what we often refer to as the "remedy clause" of Article I, section 10, actually is but a part of a larger,

---

[4] As David Schuman suggests, constitutional interpretation must demonstrate "fidelity" to the constitution. David Schuman, *The Right to a Remedy*, 65 Temple L Rev 1197, 1219 (1992):

"The requirement of 'fidelity to the text,' in this context, is the relatively obvious and uncontroversial requirement that a court's explanation of the meaning of a given constitutional provision should demonstrate some logical connection to the words it purports to interpret, including their source, history, and position in the overall document."

*Id.*

single, complete sentence. Taken as a whole, the subject of that sentence is fairly clear to me: It is about the courts, the authority of the courts, and the obligations of the courts.[5] As then-professor Hans Linde observed of the clause, "[s]ection 10 as a whole is plainly concerned with the administration of justice." Hans A. Linde, *Without "Due Process": Unconstitutional Law in Oregon*, 49 Or L Rev 125, 136 (1970). Nothing in the wording of the section suggests that its purpose is to constrain the otherwise plenary authority of the legislature. *MacPherson v. DAS*, 340 Or 117, 127, 130 P3d 308 (2006) (quoting *Jory v. Martin*, 153 Or 278, 286, 56 P2d 1098 (1936) ("'Plenary power in the legislature, for all purposes of civil government, is the rule, and a prohibition to exercise a particular power is an exception.'")).

That does not necessarily mean that Article I, section 10, cannot be read to constrain the legislature in any way. To the extent that the legislature were to enact a statute that interfered with the constitutional obligations of the courts—requiring the courts to operate in secret, for example—such legislation could violate the remedy clause. *See, e.g.*, *State ex rel. Oregonian Pub. Co. v. Deiz*, 289 Or 277, 284, 613 P2d 23 (1980) (notwithstanding statute authorizing trial court to exclude public from juvenile cases, trial court order barring public violated Article I, section 10). The point remains, however, that the focus of the section is a procedural one, involving access to the courts, which are to administer justice to every person, openly, freely, completely, by due course of law.

I acknowledge that what I have described is not the only plausible way to read the text of Article I, section 10. The section's single sentence could be divided into three independent clauses, each of which could then interpreted separately. Thus, the first two clauses could be seen as procedural in nature, concerning the administration

---

[5] It does not say, as is sometimes suggested, that everyone is entitled to "*a* remedy" for every personal injury. *See, e.g.*, *Howell*, 353 Or at 389 n 1(DeMuniz, *pro tem*, dissenting) ("The Remedy Clause affords plaintiff, and every person in this state, the right to a remedy by due course of law for personal injuries."). Nor does Article I, section 10, include the qualifier that remedies must be "adequate," as some other state constitutions do. *E.g.*, La Const, Art I, § 22 ("All courts shall be open, and every person shall have an adequate remedy by due process of law[.]").

of justice, while the third clause could be interpreted to signify a guarantee of a remedy for the specified types of injuries.

But the issue to me is not whether Article I, section 10, may be *plausibly* interpreted one way or another. As I said at the outset, I do not start from the assumption that this court's existing case law represents a coherent view of the remedy clause, which we must uphold so long as it is reasonable. The case law represents no such coherent view, and so I look at the provision afresh, to determine what it most likely was intended or understood to mean.

With that in mind, it strikes me that reading the remedy clause as an independent clause is not the most likely reading of Article I, section 10. It requires us to extract the clause from the balance of the sentence and ignore its immediate and indispensible context. *Cf.* [Vsetecka v. Safeway Stores, Inc.](), 337 Or 502, 508, 98 P3d 1116 (2004) ("Viewed in isolation, that text provides support for employer's position. Ordinarily, however, text should not be read in isolation but must be considered in context."). Moreover, I am not persuaded that reading the remedy clause in isolation is altogether faithful to the wording of that independent clause. Taking the clause as a whole, it seems to me that it guarantees "every" person a remedy "by due course of law." As David Schuman put it, the remedy clause of Article I, section 10, "guarantees that for *injuries* of a certain type, a person shall have access to a *remedy* through the state's *legal apparatus*." David Schuman, *The Right to a Remedy*, 64 Temple L Rev 1197 1201-02 (1992) (emphasis in original). Indeed, it occurs to me that reading the clause to impose a guarantee of particular substantive rights and remedies doesn't leave anything for the phrase "by due course of law" to do. I would think that we would be constrained to avoid interpretations that entail such superfluities.

B.   *Historical context*

Assuming for the sake of argument the plausibility of reading the text of Article I, section 10, to express a substantive limitation on legislative authority to determine rights and remedies, the fact remains that the alternative reading that I have suggested is at least plausible

as well. That leads to an examination of the historical context in which that possibly ambiguous wording was adopted.

I set out my views about the historical roots of modern remedy provisions in *Klutschkowski* and in *Brewer*, and I won't reprise them in detail here. In brief, the genesis of modern remedy provisions lies in English concerns about royal interference with the courts, first given expression in Lord Edward Coke's writings about Magna Carta and later voiced in William Blackstone's *Commentaries on the Laws of England*. *Klutschkowski*, 354 Or at 180-84; *Brewer*, 167 Or App at 195-97. Early American state constitutions adopted remedy guarantees patterned after those English sources, with a notable absence of explanation that the guarantees were intended to accomplish something else, such as establish a limitation on legislative authority to determine substantive rights and remedies. *Klutschkowski*, 354 Or at 185-86. While those early state constitutions reflected some mistrust of legislative power, that mistrust focused on corruption in the legislative process and lack of deliberation in the passage of laws, not the abrogation of common-law remedies. *Id.*

The majority in this case acknowledges that history, but suggests that it is at least possible that the framers of the Oregon Constitution could have had a different understanding of the meaning and effect of Article I, section 10, because of some ambiguities in the writings of Coke and Blackstone and because of the holdings of a number of state courts interpreting state constitutional remedy guarantees in the early-to mid-nineteenth century. 359 Or at 205, 208.

I have a different view of those historical sources and their significance. In large part, that is because I frame the issue differently from the majority. Again, the question for me is not what the historical sources might plausibly be said to signify; rather it is what they, in fact, show that the framers of the state constitution most likely would have understood or intended Article I, section 10, to mean. With that in mind, I turn to Coke, then to Blackstone, and finally to the nineteenth-century American case law.

The focus of Coke's writing on Chapter 29 of Magna Carta[6] was the protection of the common-law courts from royal and preferential interference, and the oft-quoted provision that was the textual basis for modern remedy guarantees makes that clear:

> "And therefore, every subject of this realme, for injury done to him, in *bonis*, *terres*, *vel persona*, by any other subject, be he ecclesiastical, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay."

Edward Coke, *The Second Part of the Institutes of the Laws of England* 55 (1797 ed.). Read in context, it becomes abundantly clear that Coke's point is that *every* subject has access to the justice of the courts, regardless of age, gender, or station in life. The passage says nothing about limitations on legislative authority to revise the common law. To the contrary, "Coke clearly acknowledges that statutes can correct the common law and thus that they take precedence over the common law that they revise." James R. Stoner, Jr., *Common Law and Liberal Theory: Coke, Hobbes, and the Origins of American Constitutionalism* 22 (1992).

Coke did author *Dr. Bonham's Case*, in which he said, in *dictum*, that when acts of Parliament are "against common right and reason, or repugnant, or impossible to be performed, the common law will controul it, and adjudge such Act to be void." 77 Eng Rep 646, 652 (CP 1610). That *dictum* has been read by some to suggest a sort of progenitor to modern conceptions of judicial review, although the view is controversial, and modern scholarship tends to regard the case as standing for a more limited proposition that acts of Parliament were to be construed to avoid conflicts with the

---

[6] Magna Carta had been "reissued" several times between 1215, when it was originally sealed, and 1225. In the process, several of the original provisions got renumbered. Among them were the original Chapters 39 and 40, which were renumbered as Chapter 29 of the 1225 version. Coke wrote about that later version of the document, not the original. *See generally* Faith Thompson, *Magna Carta: Its Role in the Making of the English Constitution 1300-1629* at 5 (1948) (describing Coke's reliance on 1225 version of Magna Carta).

common law.[7] While interesting, the *dictum* in *Dr. Bonham's Case* is a bit of a red herring concerning the origin and meaning of state constitutional remedy guarantees. For even assuming that Coke meant to suggest that there may be *some* limits on parliamentary authority, nothing in the decision connects it with Magna Carta and the idea that Chapter 29 limited the authority of Parliament to determine substantive rights and remedies. Moreover, whatever Coke may have been up to in *Dr. Bonham's Case*, the notion that Parliament was subject to the common law gave way to a much more vigorous doctrine of parliamentary supremacy by the time of Blackstone.

Blackstone, like Coke, viewed Chapter 29 of Magna Carta as having been directed at royal interference with judges and courts. In his view, Magna Carta forbade the crown from issuing "commands or letters" to the courts either "in disturbance of the law" or "to disturb or delay common right." William Blackstone, 1 *Commentaries on the Laws of England* 138 (1st ed 1765). Nothing in the *Commentaries* suggests that Blackstone thought that Magna Carta limited the authority of Parliament to determine substantive rights

---

[7] Leading historian R.H. Hemholz remarked, "[t]he student who picks Bonham's Case as a topic had better take a deep breath first." R.H. Hemholz, *Bonham's Case, Judicial Review, and the Law of Natur*e, 1 J Legal Analysis 325, 325 (2009). The dispute centers on whether Coke's opinion announced a principle of statutory construction, *see, e.g.*, Samuel E. Thorne, *Dr. Bonham's Case*, 54 LQ Rev 54 (1938), or a principle that judges have authority to invalidate parliamentary enactments that violate higher law, Raoul Berger, *Doctor Bonham's Case: Statutory Construction or Constitutional Theory?*, 117 U Pa L Rev 521 (1969), or something in between, R.A. McKay, *Coke: Parliamentary Sovereignty or the Supremacy of the Law?*, 22 Mich L Rev 215 (1924). A number of scholars have noted that Coke and Blackstone actually made inconsistent statements about *Dr. Bonham's Case*, leading some to say that they were simply mistaken about the decision, T.F.T. Plucknett, *Bonham's Case and Judicial Review*, 40 Harv L Rev 30, 69 (1926), or (my favorite) that their views on the case depended on their "mood," W.W. Buckland, *Some Reflections on Jurisprudence* 38 (1945). In spite of the longstanding debate, "[t]he weight of modern scholarship" supports the more limited view that *Dr. Bonham's Case* merely reflects a rule of construction, not a broader principle concerning judicial authority to invalidate statutes. Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale LJ 1672, 1690 (2012). In addition, although it is often stated that, even if Coke originally intended that his decision stand for the narrower proposition, the founders of the American constitution read it more broadly, that view, too, is viewed more skeptically by modern scholars. *See, e.g.*, Larry D. Kramer, *The People Themselves: Popular Constitutionalism and Judicial Review* 19-22 (2004); Chapman & McConnell, *Due Process as Separation of Powers*, 121 Yale LJ at 1691.

and remedies. To the contrary Blackstone, even more than Coke, believed in parliamentary supremacy.[8] In Blackstone's view, "[t]he power and jurisdiction of Parliament *** is so transcendent and absolute that it cannot be confined, either for causes or persons, within any bounds." *Id*. at 156. He took the position that "the legislature being in truth the sovereign power," it is "always of absolute authority; it acknowledges no superior on earth." *Id*. at 90. That sovereign and absolute power, Blackstone explained, included the authority to enlarge "the common law where it was too narrow and circumscribed" and to "restrain[] it where it was too lax and luxuriant." *Id*. at 86-87. In cases of conflict between the common law and parliamentary legislation, Blackstone said, "the common law gives place to the statute." *Id*. at 89.

To be sure, Blackstone also sprinkled his *Commentaries* with suggestions that the law—both common law and legislation—should reflect reason. *Id*. at 70. He went so far as to say that "what is not reason is not law" and that acts of Parliament contrary to reason or leading to absurd results would be "void." *Id*. at 70.

But to read in those suggestions some broader notion that Blackstone recognized limits to legislative authority would be a mistake. Blackstone himself explained that, although certain acts of Parliament may in some sense be "void" because they offend natural law or reason, the courts lack power to do anything about it. "[T]hough I know it is generally laid down more largely, that acts of parliament contrary to reason are void," he said, "if the parliament will positively enact a thing to be done which is unreasonable, I know of no power to control it." *Id*. at 91. Blackstone explicitly

---

[8] *See generally* Gordon S. Wood, *The Creation of the American Republic 1776-1787* at 260 (3d ed 2011). ("Parliament, as *** Blackstone had made evident, was no longer simply the highest court among others in the land, but had in truth become the sovereign lawmaker of the realm, whose power, however arbitrary and unreasonable, was uncontrollable."); Theodore F.T. Plucknett, *A Concise History of the Common Law* 337 (1956) (by the eighteenth century, "there were no legal limitations upon the powers of Parliament"); Bernadette Meyler, *Towards a Common Law Originalism*, 59 Stan L Rev 551, 562 (2006) (Blackstone "wrote at a point when the common law itself was on the wane, and parliamentary supremacy had been definitely established"); Suja A. Thomas, *A Limitation on Congress: "In Suits at Common Law*," 71 Ohio St LJ 1071, 1102-03 (2010) (in the eighteenth century, "there was the general belief that Parliament could take any actions, including the alteration of the common law").

rejected the idea that judges are at liberty to invalidate acts of Parliament, which he said "would be subversive of all government." *Id.*[9]

Thus, I find no support in Blackstone's *Commentaries* for the suggestion that when Magna Carta (as Coke reimagined it) guaranteed access to courts free of royal interference, it also guaranteed access to some irreducible quantum of common-law remedies. Such a suggestion runs directly counter to Blackstone's views about the supremacy of parliamentary authority. He said that the law of the land "is permanent, fixed and unchangeable, *unless by the authority of parliament.*" *Id.* at 137 (emphasis added). According to Blackstone, "[Parliament] being the highest and greatest court, over which none other can have jurisdiction in the kingdom, if by any means a misgovernment should any way fall upon it, the subjects of this kingdom *are left without all manner of remedy.*" *Id.* at 157 (emphasis added).[10]

Finally, there is the body of early to mid-nineteenth century American appellate court decisions that interpreted, discussed, or referred to state constitutional remedy guarantees. There were a number of such decisions, and they reflected something of a spectrum of views about remedy guarantees. Some concluded that the remedy clauses applied as constraints on the courts alone, not legislatures.

---

[9] As one scholar has summarized, Blackstone was "a champion of parliamentary supremacy" and did not share the view often attributed to Coke's *dictum* in *Dr. Bonham's Case* that judges could disregard legislation that they regarded as inconsistent with reason or the laws of nature. Albert W. Alschuler, *Rediscovering Blackstone*, 145 U Pa L Rev 1, 19 n 106 (1996) "If Parliament were to defy the law of nature (a prospect that Blackstone thought almost inconceivable), the only remedy would lie in the streets rather than in the courts." *Id.*; *see also* Wood, *The Creation of the American Republic 1776-1787* at 260 ("[T]o most Englishmen *** moral and natural law limitations on the Parliament were strictly theoretical, without legal meaning, and relevant only in so far as they impinged on the minds of the lawmakers.").

[10] Blackstone's views of parliamentary supremacy were not wholeheartedly embraced in the American colonies. James Wilson, for example, rejected Blackstone's views as "dangerous and unsound," containing the "seeds of despotism." 1 *The Works of James Wilson 168-93* (Robert G. McCloskey ed. 1967); *see generally* Arthur E. Wilmarth, Jr., *Elusive Foundation: John Marshall, James Wilson, and the Problem of Reconciling Popular Sovereignty and Natural Law Jurisprudence in the New Federal Republic*, 72 Geo Wash L Rev 113, 167 (2003) ("Wilson, however, rejected Blackstone's claim of Parliamentary supremacy."). But that only confirms the point that it is a mistake to suggest that Blackstone was a source for the idea that courts could check abuses of legislative authority.

Others adopted the view that remedy guarantees foreclosed legislation that interfered with ongoing court procedures and proceedings. Still others concluded that remedy provisions prohibited legislatures from retroactively altering vested rights, which was viewed as a violation of separation of powers principles. Finally, some invoked remedy guarantees as grounds for giving statutes narrow interpretation and application.

It is significant to me that none of those early to mid-nineteenth century cases held that state remedy guarantees limited the authority of state legislatures to define, prospectively, the nature of substantive rights and remedies. In fact, the idea that state constitutional remedy guarantees impose such a substantive limit on the authority of state legislatures did not emerge until relatively late in the nineteenth century. *See generally* Thomas R. Phillips, *The Constitutional Right to a Remedy*, 78 NYU L Rev 1309, 1329 (2003) ("Not until well after the Civil War was there any reported opinion dealing with a remedies clause challenge to a statute limiting a tort claim."). And the first appellate court decision to actually to strike down such a statute on remedy clause grounds was this court's decision in *Mattson*, published in 1901. *Id.* at 1330.

The first category of early to mid-nineteenth century remedy-clause cases that I mentioned consists of those viewing the clause as limiting the authority of the courts alone, not legislatures. In *Barkley v. Glover*, 61 Ky 44, 45 (1862), for example, the Kentucky Court of Appeals expressly rebuffed the suggestion that the state's remedy clause constrained the state legislature at all, explaining, "The doctrine that the [remedy guarantee] applies alike to the legislative and judicial branches is, in our judgment, directly opposed to the meaning and language of the section." In that court's view, "The courts form its sole subject matter, and every part and parcel of the section relates directly to some duty of that branch of the government." *Id.* at 46. Certainly, such a limited view of the remedy guarantee is consistent with its English antecedents in the writings of Coke and Blackstone.

The second category that I mentioned includes cases in which courts invoked state remedy guarantees

to forbid legislative interference with judicial administration. In *Weller v. City of St. Paul*, 5 Minn 95, 101 (1860), for instance, the court held that access to courts cannot be limited by a requirement of payment of certain fees in advance. Similarly, in *Menges v. Dentler*, 33 Pa 495, 498 (1859), the court explained that remedy guarantees prevented "legislative and executive interference" with judicial proceedings. *See also Sharpless v. Mayor of Philadelphia*, 21 Pa 147, 166 (1853) (remedy clause was "clearly intended to insure the constant and regular administration of justice"). In a related vein, in *Lewis v. Webb*, 3 Me 326, 335 (1825), the court held that legislation purporting to vacate an existing judgment or decree violates the state constitutional remedy guarantee. Although the views of state remedy guarantees expressed in such cases expand the reach of the clauses to include limitations on legislative authority, they align quite well with the historical roots of such clauses in fears of interference with the independent exercise of the judicial function.

The third category of cases is perhaps the largest and comprises decisions proscribing retroactive abrogation of "vested rights." Especially important in understanding the significance of those cases is the fact that they barred only *retroactive* alteration of such rights. Indeed, a number of the decisions went out of their way to emphasize the authority of legislatures to adjust, modify, or eliminate remedies for specified injuries as long as they did so on a prospective basis.

*Gooch v. Stephenson*, 13 Me 371 (1836), serves as a good illustration. At issue in that case was the constitutionality of a legislative grant of immunity against trespass claims based on cattle wandering on to property that was inadequately fenced. The plaintiff had argued that the grant of statutory immunity ran afoul of the state's constitutional remedy guaranty. The Supreme Judicial Court of Maine rejected the argument, explaining that

"It was for the legislature to determine what protection should be thrown around this species of property; what vigilance and what safeguards should be required at the hands of the owner; and where he might invoke the aid of courts of justice. They have no power to take away vested

rights; but they may regulate their enjoyment. Lands in this country cannot be profitably cultivated, if at all, without good and sufficient fences. To encourage their erection, it is undoubtedly competent for the legislature to give to the owners of lands thus secured, additional remedies and immunities."

*Id*. at 376-77; *see also Preston v. Drew*, 33 Me 558, 560 (1852) ("[t]he State, by its legislative enactments, operating prospectively, may determine that articles injurious to the public health or morals, shall not constitute property" subject to remedy, without violating remedy guarantee).

*Fisher's Negroes v. Dabbs*, 14 Tenn 119 (1834), provides another excellent example. The Tennessee Supreme Court's opinion may well be the most extensive antebellum state court analysis of constitutional remedy guarantees. In that case, an act of 1829 provided that, when a slave owner freed slaves by will but the testator refused to file a bill in the county court to act on that devise, the slaves, "by their next friend," could file a bill to obtain legal recognition of their emancipation. When one Fisher died, his will directed that his slaves be freed and given the right to live on his land for the next 15 years. The executor of the will refused to recognize the devise and declined to file a bill in county court to obtain the emancipation of Fisher's slaves. Pursuant to the 1829 statute, an action was filed on behalf of Fisher's slaves to obtain their emancipation. While the action was pending, the Tennessee legislature repealed the earlier statute in 1831 and directed that any pending cases under it be dismissed. The chancellor ruled that the 1831 statute could not divest Fisher's former slaves of their claims, which were pending at the time of passage, based on the state's constitutional remedy guarantee:

"This declaration, copied from the great charter, is not a collection of unmeaning epithets. In England, the reason of riveting this barrier around the rights of the subject was well understood. Their sovereign was wont to interfere in the administration of justice; 'a remedy by due course of law' was often refused, under the mandate of men in power, and the injured man denied justice; they were ordered sometimes not to proceed with particular causes, and justice was delayed; and the obtainment of their rights was

often burdened with improper conditions and sacrifices, and justice was sold. *** [T]he framers of our constitution decreed, that the judicial department should be independent and coordinate, and that the legislature should have no judicial power.

"*****

"A distinction between the right and the remedy is made and exists. But where the remedy has attached itself to the right, and is being prosecuted by 'due course of law,' to separate between them, and take away the remedy, is to do violence to the right, and comes within the reason of that provision of our constitution which prohibits retrospective, or, in other words, retroactive, laws from being passed, or laws impairing the obligation of contracts.

"By the act of 1829, all slaves in whose favor there is a devise of liberty, and where the representative of the testator refuses to apply to the county court, they may file a bill, by their next friend, in this court. The act of 1831 attempts to take away this right from a portion of them, and from that portion of them where the right and remedy had attached by the actual pendency of a suit in a 'due course of law.'"

*Id*. at 137-38. The executor appealed, but the Supreme Court of Errors and Appeals affirmed, adopting the opinion of the chancellor, explaining that,

"He who has a lawful right, and a legal remedy to enforce that right, and the jurisdiction of a court has attached upon it, is entitled to judgment. The legislature has no power to close the courts. The courts shall be open, and every man shall have remedy by due course of law."

*Id*. at 159.

A further example is provided by *Barclay v. Weaver*, 19 Pa 396 (1852), in which the court addressed the applicability of a statute that purported to alter, retroactively to existing contracts already in force, the notice requirements for enforcing contracts. The Pennsylvania Supreme Court construed the statute as not having immediate effect on existing contracts to avoid a conflict with the state remedy guarantee. *Id.* at 399. The court explained that it could not give the statute immediate effect "without at all affecting or

altering contracts already made, and a regard for the constitution requires us to presume that no other effect was intended." *Id*. A few years later, in *In re Stuber's Road*, 28 Pa 199 (1857), the same court went even further and held that legislation vacating interests in land that had previously been acquired by prescription did not violate the state constitutional remedy provision, explaining that the constitution "furnish[es] no guaranty that the law of the land and the due course of law shall remain unalterable." *Id*. at 201.

The Mississippi Supreme Court invoked similar reasoning in *Commercial Bank of Natchez v. Chambers*, 16 Miss 9 (1847), in which the legislature purported to amend an earlier statute governing actions against corporations for forfeiture of their charters. The court concluded that the statute violated the state constitutional remedy guarantee because "[i]t takes away from [the parties] a suit pending, which is made a matter of right." *Id*. at 29.

I suppose it may plausibly be asserted that those cases could be read to stand for the proposition that early to mid-nineteenth century courts—or at least a good number of them—saw state constitutional remedy guarantees in broader terms than their English roots would otherwise have suggested. Once again, though, I don't see the task in those terms. The question isn't whether those cases might plausibly be read to support a broader rendition of the remedy guarantee. The question for me is what, in fact, did the framers of Oregon's constitution most likely understand them to mean.

The answer to that question is that it is highly unlikely that the framers of Article I, section 10, would have understood those decisions as having significantly broadened the effect of state constitutional remedy guarantees to impinge on the authority of legislatures to make policy decisions about the nature of rights and remedies for injuries to person, property and reputation. That is because there was a well-established reason for early to mid-nineteenth century courts' antipathy to retroactive legislation—a reason that lines up perfectly with what I have described is suggested by the text of Article I, section 10, and its historical context.

In brief, retroactive legislation that infringed on vested rights was seen as violating antebellum conceptions of the separation of legislative and judicial powers. As the Illinois Supreme Court explained in *Newland v. Marsh*, 19 Ill 376, 383 (1857), a vested right may not be eliminated "except by judgment of law; and the legislature, having no judicial power, cannot impart to their enactments the force of a judicial determination."[11]

Although it may ring oddly to our twenty-first century ears, early conceptions of the separation of powers

---

[11] *See also* Joseph Story, 3 *Commentaries on the Constitution of the United States* § 1392, 266-67 (1833) (legislation altering vested rights amounted to legislative exercise of "judicial functions"); Theodore Sedgwick, *A Treatise on the Rules Which Govern the Interpretation and Application of Statutory and Constitutional Law* 676-77 (1857) (retroactive legislation altering vested rights is unconstitutional because "legislatures by our fundamental law [are] prohibited from doing any judicial acts"); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 362 (1868) (Whether a vested right "springs from contract or from the principles of common law, it is not competent for the legislature to take it away *** unless steps are taken to have the forfeiture declared in due judicial proceedings. Forfeitures of rights or property cannot be adjudged by legislative act.").

There is a wealth of modern scholarship on pre-Civil War judicial antipathy to retroactive legislation regarding vested rights as the theoretical underpinning for a range of constitutional doctrines, including *ex post facto*, impairment of contract, remedy by due course of law or law of the land, and—especially—due process guarantees. *See, e.g.*, Chapman & McConnell, *Due Process as Separation of Powers*, 121 Yale LJ at 1727 ("Courts used separation-of-powers logic to invalidate legislative acts under a variety of constitutional provisions."); Ann Woolhandler, *Public Rights, Private Rights, and Statutory Retroactivity*, 94 Geo LJ 1015, 1025 (2006) (retroactive elimination of vested rights "were often said either to deprive people of property without 'due process of law' or to cross the line between 'legislative' and 'judicial' power); Nathan N. Frost, Rachel Beth Klein-Levine & Thomas B. McAfee, *Courts Over Constitutions Revisited: Unwritten Constitutionalism in the States*, 2004 Utah L Rev 333, 382 (2004) ("The doctrine of vested rights grew out of a recognition that when legislatures act like courts, the potential for abuse grows not only by the omission of some particular procedure in question—such as trial by jury—but also by the departure from separation of powers."); John Harrison, *Substantive Due Process and the Constitutional Text*, 83 Va L Rev 493, 511 n 46 (1997) (explaining that early vested-rights case law was understood "primarily in terms of the constitutional structure of separated powers" in that legislative abrogation of vested rights was "seen as an attempt to exercise the judicial power"); James L. Kainen, *The Historical Framework for Reviving Constitutional Protection for Property and Contract Rights*, 79 Cornell L Rev 87, 108 n 82 (1993) (citing Sedgwick for pre-Civil War view that "the protection of vested rights defines the proper role of courts in securing individual rights against legislative interference when there is no express federal or state constitutional shield"); Wallace Mendelson, *A Missing Link in the Evolution of Due Process*, 10 Vand L Rev 125, 136 (1956) (noting the significance of separation of powers doctrine as the rationale for voiding retroactive legislation altering vested rights).

assumed that judicial decisions applied retrospectively, while legislation was held to apply prospectively.[12] In that era, rights were understood to be governed by the law in effect at the time they vested. *See, e.g.*, Chapman & McConnell, *Due Process as Separation of Powers*, 121 Yale LJ at 1737-38 (According to nineteenth-century views, vested rights "had been conclusively acquired pursuant to the positive law in effect at the time of acquisition.").[13] In consequence, any disputes about those rights necessarily were subject to resolution by the courts in accordance with that law. Any attempt by a legislature to alter the law that the courts otherwise would have been required to apply at the time of vesting was regarded as a usurpation of the judicial function. As an early nineteenth-century authority explained, legislation retroactively altering vested rights amounted to

> "a gross usurpation in most cases upon the judicial power. Now what is the nature, and what the object of all retrospective laws? In the first place, they do not look to the future; their operation is upon the past, and in this aspect they directly invade the appropriate domain of the judicial power."

---

[12] So deep was nineteenth-century antipathy to retroactivity that, even when vested rights were not involved, the prevailing doctrine worked hard to avoid giving legislation anything but prospective effect. As a later-nineteenth-century treatise explained, citing pre-Civil War case law, "One of the cardinal rules by which courts are governed in interpreting statutes is, that they must be construed as prospective in every instance," except when a contrary intent "is expressed in clear and unambiguous terms." William P. Wade, *A Treatise on the Operation and Construction of Retroactive Laws* 39-40 (1880). "Every reasonable doubt," the treatise added, "is resolved *against*, rather than *in favor of*, the retroactive operation of the statute." *Id.* at 41 (emphasis in original); *see also* Henry Campbell Black, *An Essay on Constitutional Prohibitions Against Legislation Impairing the Obligation of Contracts and Against Retroactive and Ex Post Facto Laws* 230 (1887) ("It is an inflexible rule that a statute will be construed as prospective and operating *in futuro* only, unless the intention of the legislature to give it retroactive effect is expressed in language too clear and explicit to admit of reasonable doubt.") (Citing early-nineteenth century decisions).

[13] Thus, for example, contract disputes were governed "according to the course of justice as it existed at the time the contract was made." Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 308 (2d ed 1871); *see also* Francis Wharton, *Retrospective Legislation and Grangerism*, 3 Int'l Rev 50, 60 (1876) ("For it is a fundamental principle of jurisprudence that a contract is to be construed according to the law which was in force at the time of its execution. * * * The right to insist on the perfection of these rules, no matter what may be the course of subsequent legislation, is vested in both parties at the time of the execution of the contract.").

Simeon Nash, *The Constitutionality of Retrospective Statutes*, 2 WLJ 170, 174 (1844-45) (emphasis omitted). The author explicitly referred to the state constitutional remedy guarantee, noting that its purpose was to ensure that vested rights were to be determined "by the court and not by the legislature." *Id.*

In that context, there is nothing at all unusual about early to mid-nineteenth century court decisions declaring that retroactive legislation impairing vested rights violated state remedy guarantees. The underlying rationale for such decisions was that legislation of that sort interfered with the independence of the judiciary, which as I have noted, was precisely the historical underpinning of the remedy guarantees in the first place.[14]

The fourth and last category of early to mid-nineteenth century remedy-clause precedents involves those in which the courts invoked remedy guarantees as a reason to impose a narrowing construction on a statute at issue. For example, in *Thornton v. Turner*, 11 Minn 336, 339 (1866), the court expressed "doubt" about the constitutionality of giving a broad interpretation to a statute limiting actions for damages arising out of the erection of a mill dam to avoid possible constitutional problems. Likewise, in *Hotchkiss v. Porter*, 30 Conn 414, 421 (1862), the court commented that a more limited construction of a statute limiting recovery for libel avoided constitutional difficulties. And in *Schuylkill Nav. Co. v. Loose*, 19 Pa 15, 18 (1852), the court similarly construed a statute narrowly and mentioned in the process the state constitutional remedy guarantee.

---

[14] I suppose that an alternative way to treat the anti-retroactivity cases would be simply to say that, in addition to guaranteeing judicial independence and access to courts, the remedy provision of Article I, section 10, prohibits certain forms of retroactive legislation. Some courts, in fact, have taken that view. *See, e.g.*, *Friends of Pennsylvania Leadership Charter School v. Chester County Board of Assessment Appeals*, 61 A3d 354, 360 (Pa 2013) ("[i]t is well-settled that applying legislation retroactively to extinguish an accrued vested right is prohibited" by the state constitutional remedy guarantee); *State ex rel. Howell v. Wildes*, 34 Nev 94, 116 P 595, 600 (1911) (retroactive alteration of vested rights is "an attempted infringement upon the functions of the judicial branch of government"). I do not. It strikes me that it reflects the sort of wooden originalism about which I have complained, in applying nineteenth-century case law without attempting to draw from it an underlying principle that may be applied to modern circumstances.

It may be argued that those courts, in so doing, appear to have assumed that giving the statutes at issue a broader interpretation would run afoul of the state remedy guarantee, thus supporting the inference that at least some courts thought that those constitutional provisions limited legislative authority to determine rights and remedies.

Once again, though, that frames the issue in a different way than I think this case warrants. For me the question is not whether a *plausible argument* can be made that the cases would have been understood to reflect a broader understanding of remedy guarantees; rather it is whether, in fact, it is likely that they would have been so understood. I don't think so.

To begin with, that a court elects to give a statute a narrow construction to avoid possible constitutional issues does not necessarily mean that the court is, in the process, actually deciding what the constitution means. Under the statutory construction conventions of the era, courts sometimes gave a narrowing construction to a statute merely to avoid *potential* constitutional problems. *See, e.g.*, John Copeland Nagle, Delaware & Hudson *Revisted*, 72 Notre Dame L Rev 1495, 1509 (1997) (Examining nineteenth-century cases in which courts concluded that "[t]he existence of constitutional doubts provided a sufficient basis for rejecting an argument that a statute was unconstitutional. Statutes were presumed constitutional—often to the point that courts demanded that the unconstitutionality of a statute be proved 'beyond a reasonable doubt.' Therefore, if a court determined that an interpretation of a statute simply raised doubts about its constitutionality, the court abided by that interpretation and rejected the constitutional challenge.").

Moreover, the inference that the courts in those cases implicitly held that remedy guarantees imposed a broad limitations on the authority of the legislature to eliminate tort remedies is unlikely in light of the fact that the same courts, in other cases, held more explicitly to the contrary when actually deciding the meaning of the remedy guarantees. In *Schuylkill Nav. Co.*, for example, the Pennsylvania Supreme Court cited the state's remedy clause in narrowly construing a statute. Ten years earlier, though,

the same court held that "it is now clearly established by repeated decisions, that the legislature may pass laws altering, modifying or even taking away remedies for the recovery of debts," without violating various constitutional provisions that otherwise limit legislative authority. *Evans v. Montgomery*, 4 Watts & Serg 218, 220 (Pa 1842). According to the court, "where the provisions of such laws, in relation to remedies, apply only to future proceedings, there is not the least ground for appealing to constitutional restrictions on the powers of the legislature." *Id*. And, consistently with that holding, the Pennsylvania Supreme Court held in *Barclay* and *Stuber's Road* that the remedy guarantees precluded retroactive alteration of vested rights. In my view then, it is a bit of a stretch to say that early to mid-nineteenth century cases giving more limited interpretations to statutes suggest a broader view of remedy guarantees. As I have stated earlier, the fact is that it was not until the early twentieth century that appellate court decisions went that far.

In short, none of the four categories of early to mid-nineteenth century remedy-clause cases supports the notion that the clause was understood or intended to serve as a limitation on legislative authority to determine rights and remedies for injuries to persons, property, or reputation. At best, they suggest that the clause could have been understood to limit legislative authority to interfere with the administration of justice and to alter retroactively vested rights, which would have been seen as an encroachment upon judicial independence.

Interestingly, Oregon territorial case law is consistent with that understanding of early to mid-nineteenth century law. In *McLaughlin v. Hoover*, 1 Or 32 (1853), for example, the Territorial Supreme Court addressed the operation of a statute of limitations. The court noted that, "it is the duty of the court to apply the remedy by limitation in all cases, except where it would cut off the right" that has already vested, in which case the court "is bound, by fundamental law, to give a party reasonable time in which to escape the effect of such remedy." *Id.* at 35; *see also Steamer Gazelle v. Lake*, 1 Or 119, 121 (1854) ("It is competent for the legislature, at any time, to alter or change the remedy

or mode of enforcing a right, and all proceedings instituted thereafter must conform to the new remedy.").

It was in that context that the framers of the Oregon Constitution adopted not only Article I, section 10, but also Article XVIII, section 7, which provides that, "[a]ll laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force *until altered or repealed*." (Emphasis added.) It was thus expressly contemplated that the legislature would have the authority to alter or repeal common-law remedies. In the context of the Oregon territorial-era case law, along with the early-nineteenth century decisions from other jurisdictions, it seems fairly clear to me that the framers, at best, would have understood that the legislature's authority to do that might be limited to adopting such changes prospectively. But I find a complete absence of evidence to support the idea that the framers would have understood the legislature to be further constrained by a requirement that there be "adequate" justification of "public importance" or some other limitation on its substantive authority.

## C.  *Significance of the Historical Context*

It remains for me to determine the significance of the historical context. After all, I did say that we are not strictly limited by the meaning of a constitutional provision that would have been generally accepted in 1857. But I also said that, as our precedents correctly require, we cannot simply ignore the historical context. Whatever construction we adopt must be faithful both to the text and the general purposes reflected by the context in which that text was adopted.

In this case, the text reflects no particular purpose in limiting the substantive authority of the Oregon legislature. Rather, it speaks to the courts ("No court shall . . .") about the authority of the courts and the responsibilities of the courts—to ensure that justice is administered openly, speedily, affording every person remedy by due course of law.

The historical roots of the wording of remedy guarantees lay in concern with executive interference with the

courts. From Coke to Blackstone and into the early years of the republic, the basic idea was that courts must be free to administer justice to all, without interference from the executive. I find little, if any, historical support for a broader notion that remedy guarantees might also have been designed to curb legislative excesses. As I have explained, that notion is an anachronism, contrary to the sort of notions of legislative supremacy that prevailed at the time.

Although, strictly speaking, state remedy guarantees are rooted in concern about interference from the executive—and not the legislature—I do not oppose drawing from the historical context a broader principle that would prohibit interference from the legislature as well.[15] But that principle does not automatically carry with it the more expansive notion still that remedy guarantees also limit legislative authority to determine the nature of injuries that must be remedied by due course of law. That is a qualitatively different proposition.

Legislative determination of the nature of injuries that may be remedied and the nature of those remedies in no way interferes with the court's constitutional obligation to see that justice is administered openly, speedily, affording every person remedy by due course of law. It is for the legislature to determine what the due course of law entails. And, under the remedy guarantee, it is for the courts to see to it that all persons are given remedy by it.

The potential fly in the ointment, so to speak, is the existence of a number of early to mid-nineteenth century

---

[15] There is ample precedent for that much. Article I, section 9, for example, is addressed to the legislature ("No law shall . . ."), and such search and seizure provisions historically were understood not to apply directly to executive branch law enforcement authorities. *See, e.g.*, Thomas Y. Davies, *Correcting Search-and-Seizure History: Now Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law*," 77 Miss LJ 89, 90 (2007) ("The current notion that constitutional standards, such as search-and-seizure standards, address the conduct of ordinary [police] officers dates back only to the beginning of the twentieth century. Under framing-era doctrine, legislation and court orders were governmental in character, so it was possible to conceive of an 'unconstitutional' statute or an 'unconstitutional' general warrant issued by a court. However, there was no conception that an ordinary officer could act 'unconstitutionally.'"). Nevertheless, this court—like most courts—has construed the constitutional provision to state a broader principle that applies to all branches of government. *See generally State v. McDaniel*, 115 Or 187, 209, 231 P 965 (1925).

decisions from other states that hold that state constitutional remedy guarantees also prohibit legislation that retroactively alters vested rights. But, as I have explained, a more careful examination of the underlying rationale for those decisions makes clear that they actually line up quite nicely with what the text and the historical underpinnings of the remedy guarantee so strongly suggest. Those decisions hold that retroactive alteration of vested rights violates state remedy guarantees because such legislation was regarded as a violation of the judicial function, *viz.*, to apply the law that applied at the time rights vested.

I hasten to add that I do not suggest that our reading of the remedy guarantee should be constrained by nineteenth-century conceptions of vested rights and retroactivity. As I have said—and as our cases hold—we attempt to draw from historical context more general principles that may be applied to modern circumstances. In this case, the broader principle that I draw from the early to mid-nineteenth century cases is simply that state constitutional remedy guarantees constrain not only executive interference with judicial independence and access to the courts, but legislative interference as well. I should add that reading the remedy clause to forbid only interference with judicial independence and access to courts—and not as a limitation on the authority of legislatures to define injuries and remedies—is not an unusual or retrograde interpretation. It is, in fact, what most other state courts make of their constitutional remedy guarantees.[16]

---

[16] As the Montana Supreme Court explained in *Stewart v. Standard Pub. Co.*, 102 Mont 43, 55 P2d 694, 696 (1936):

"A reading of the [state remedy guarantee] discloses that it is addressed exclusively to the courts. The courts are its sole subject matter, and it relates directly to the duties of the judicial department of the government. It means no more nor less than that, under the provisions of the Constitution and laws constituting them, the courts must be accessible to all persons alike, without discrimination, at the time or times, and the place or places, appointed for their sitting, and afford a speedy remedy for every wrong recognized by law as being remediable in court."

*See also*, *e.g.*, *O'Quinn v. Walt Disney Productions, Inc.*, 177 Colo 190, 195, 493 P2d 344, 346 (1972) (remedy clause "simply provides that if a right does accrue under the law, the courts will be available to effectuate such right"); *Hawley v. Green*, 117 Idaho 498, 500-01, 788 P2d 1321, 1323-24 (1990) (state remedy guarantee "merely admonishes the Idaho courts to dispense justice and to secure citizens the rights and remedies afforded by the legislature or by the common law");

I am aware of the fact that adopting that view of the remedy guarantee of Article I, section 10, would require overruling a lot of case law, and I do not take that fact lightly. But this court's case law is so hopelessly conflicting that I do not understand how we can move forward—particularly if we hope to provide the bench and bar with anything close to helpful doctrine—without overruling something. As I mentioned at the outset of this opinion, stubborn adherence to case law that is in conflict and demonstrably in error is not costless. It produces its own threats to stability and predictability—the very virtues that *stare decisis* is supposed to promote.

## III.   SOME PRACTICAL CONCERNS

That last point concerning the costs of adhering to erroneous precedent leads me to conclude with some observations about the practical consequences of the majority's decision. To begin with, it is not clear what remains of our prior case law. The majority overrules *Smothers*, and *Smothers* alone. But it strikes me that the decision to do that may have ripple effects back through a number of earlier decisions. *Smothers* itself overruled a number of prior cases, such as *Perozzi* and *Noonan*. I presume those have once again been resuscitated. But *Smothers* also relied on other cases for its holding that the remedy clause applies only to common-law actions existing at the time of the adoption of our constitution. *Stewart*, for example, concluded that "[t]he purpose of this provision is to save from legislative abolishment those jural rights which had become well established prior to the enactment of our Constitution." 127 Or at 591. That is precisely the proposition of law that the majority in this case abjures in overruling *Smothers*.

Aside from that, it is also unclear to me what standard applies to remedy-clause challenges going forward. The majority offers three "categories" of legislation with three

---

*MJ Farms, Ltd v. Exxon Mobil Corp.*, 998 So 2d 16, 37 (La 2008) (state remedy clause "operates only to provide remedies which are fashioned by the legislature"); *Lamb v. Wedgewood South Corp.*, 308 NC 419, 444, 302 SE2d 868, 882 (1983) ("[T]he remedy constitutionally guaranteed must be one that is legally cognizable. The legislature has the power to define the circumstances under which a remedy is legally cognizable and those under which it is not.").

different tests concerning the limits of legislative authority. First, there are statutes that leave in place a duty but deny a remedy for breach of that duty. 359 Or at 219. Second, there are statutes that adjust an individual's rights and remedies as part of a "larger statutory scheme" that extends benefits to some while limiting benefits to others. *Id*. Third, there are statutes that wholly eliminate claims and underlying duties. According to the majority, whether such statutes are constitutionally permissible depends on whether the action that was modified "continues to protect core interests" or whether, in light of changed circumstances, those interests "no longer require the protection formerly afforded them." *Id*.

I don't begrudge the majority its attempt to reconcile our existing cases by coming up with new tests for evaluating remedy-clause challenges. If we are not going to overrule any of them, those cases fairly cry out for such an effort. This, however, is but the latest in a series of attempts by this court to accomplish that very feat. Each of those prior attempts has failed to offer any real doctrinal clarity, by this court's own reckoning. And I fear that the majority's effort in this case will fare no better.

The majority's first category seems unobjectionable to me. It requires that statutes altering remedies for existing duties not be "insubstantial." As we explained in *Howell*, that's what the prior case law says, even if it leaves something to be desired in the way of clarity. 353 Or at 388.

The second category, likewise, appears supported by case law, although the nature of the *quid pro quo* test itself has proven somewhat elusive. *Compare Howell*, 353 Or at 376 (applying *Hale's* "balance" analysis), *with* 353 Or at 393-94 (DeMuniz, *pro tem*, dissenting) (contesting majority's reading of *Hale*).

It is the majority's third category that gives me pause. To begin with, I do not know where it comes from. The majority asserts that, in assessing whether the legislature constitutionally abolished an underlying duty or a claim, we must take into account whether "core interests" remain protected. I have searched in vain for a single decision of this

court that even uses the phrase, much less identifies it as a relevant consideration in remedy-clause analysis.

It appears that the majority is assuming that, while the legislature may have the authority to alter the common law, there remains something of an irreducible quantum of interests formerly protected by the common law that must remain protected. I am at a loss to explain the source of such interests. Whether they are rooted in a notion of natural law (which, it seems to me, would be awfully close to the very "absolute" rights analysis that the majority says it rejects) or something similar, the majority does not explain.

*Smothers*, for all its faults, at least supplied a point of reference in defining the constitutionally irreducible minimum of rights in terms of common-law claims that existed at the time of the state's founding. 332 Or at 124. The majority, however, does away with that, leaving in its place nothing but a bare reference to "core interests."

It could be argued that the text of Article I, section 10, supplies the "core interests" in declaring that everyone must have remedy by due course of law for injury to "person, property or reputation." Nothing in the constitution, however, bars the legislature from redefining the nature of the "person" or the "property" or the "reputation" interests that are subject to protection.

Consider, for example, the common-law claims of alienation of affection and criminal conversation.[17] Historically, the claims were rooted in the Anglo-Saxon idea

---

[17] The tort of alienation of affection finds its genesis in the early English common-law action of enticement, that is, inducing a woman to leave her husband through fraud, violence, or some other wrongful conduct. *See generally* W. Page Keeton, *et al.*, *Prosser and Keeton on the Law of Torts* § 124 (5th ed 1984). The tort of criminal conversation similarly is rooted in the English claim of seduction, which required that the wife have engaged in adultery, without regard to whether she actually left her husband. *Id.* The torts initially were recognized in this country in 1866, *Heermance v. James*, 47 Barb 120, 127 (NY Gen Term 1866), and ultimately were acknowledged by every state save Louisiana (which viewed marriage as a civil contract). *See generally* Michele Crissman, *Alienation of Affections: An Ancient Tort—But Still Alive in South Dakota*, 48 SD L Rev 518, 520 (2003). Oregon came to recognize both torts. *See, e.g.*, *Saxton v. Barber*, 71 Or 230, 139 P 334 (1914) (alienation of affection); *Pitman v. Bump*, 5 Or 17 (1873) (criminal conversation).

that married women were the property of their husbands. *See generally* Jill Jones, *Fanning an Old Flame: Alienation of Affections and Criminal Conversation Revisited*, 26 Pepperdine L Rev 61, 75 (1998) ("[B]oth alienation of affection and criminal conversation were historically grounded in the property notions that wives were chattel.").[18] In the twentieth century, legislatures across the country—including Oregon's, *see* ORS 31.980 ("There shall be no civil action for alienation of affection."); ORS 31.982 ("There shall be no civil cause of action for criminal conversation.")—abolished the claims entirely. *See generally* Jamie Heard, *The National Trend of Abolishing Actions for Alienation of a Spouse's Affection and Mississippi's Refusal to Follow Suit*, 28 Miss C L Rev 313 (2009). State legislatures, in other words, redefined the nature of "property" interests that, in their judgment, deserve protection through civil actions for damages.[19]

No one doubts the constitutionality of that legislation. This court said as much in *Noonan*. 161 Or at 249 (noting with approval that courts in other states had upheld the constitutionality of legislative abrogation of alienation of affection and like actions). The point is that the constitution, merely by declaring that everyone must have remedy by due course of law for injuries to "person, property or reputation," doesn't tell us what those terms irreducibly mean. To the contrary, at least to some extent, the legislature remains free to define them.

The majority appears to acknowledge the point in suggesting that, even if certain interests otherwise might be regarded as "core," the legislature may constitutionally

---

[18] Blackstone, for instance, noted that a husband has a property interest in the "company, care, or assistance" of his wife. William Blackstone, 3 *Commentaries on the Laws of England* 142-43 (1st ed 1768); *see also Hipp v. DuPont*, 182 NC 9, 108 SE 318, 319 (1921) ("[T]he husband could maintain an action for the injuries sustained by his wife * * * by reason of the fact that the wife was his chattel.").

[19] The "heartbalm" torts of alienation of affection and criminal conversation, by the way, are not the only examples. Quite a number of torts have fallen by the wayside over the last century, including a wife's claim for damages arising out of a husband's alcoholism, the claim of mishandling of a corpse, the tort of insult (separate from defamation), actions against "common scolds," and certain aspects of nuisance law, among others. *See generally* Kyle Graham, *Why Torts Die*, 35 Fla St U L Rev 359, 364-73 (2008).

reevaluate them as having become, in effect, vestigial. But, once again, where the majority finds support for its analysis is unstated. It supplies no references in this court's case law, and I am aware of none. Of particular concern to me is the fact that the majority doesn't explain by what standard the bench and bar—and the legislature, it should not be forgotten—is to evaluate when an interest may constitutionally be reconsidered and moved from being "core" to being of a lesser nature that no longer requires constitutional protection. The majority hints that "the reasons for the legislature's actions can matter," but it offers no clues about what sorts of reasons might matter. The hint sounds suspiciously like substantive due process analysis, under which legislation altering existing rights may be justified—depending on the nature of the rights involved—by a reasonable connection with legitimate state interests. *See, e.g.*, *Washington v. Glucksberg*, 521 US 702, 720-21, 117 S Ct 2258, 138 L Ed 2d 772 (1997) (setting out federal substantive due process analysis); *MacPherson*, 340 Or at 140 (applying same analysis). But, at this point, we can merely guess.

In my view, given the woeful state of the current remedy-clause case law, this court should not be satisfied with tinkering with only one aspect of that law. By overruling only the portion of *Smothers* that limits the remedy to claims existing in 1857, I fear the majority only makes matters worse. In effect, it returns us to the sort of case-by-case incrementalism that got us in trouble in the first place.

This court's existing cases construing the remedy provision of Article I, section 10, cannot be squared with the text of the clause or its historical context. I would overrule those cases and hold that the provision protects against executive and legislative interference with judicial independence and access to the courts, but does not impose a limitation on the otherwise plenary authority of the legislature to determine rights and remedies. It is for that reason that the trial court erred in concluding that the cap on damages at issue in this case violated Article I, section 10. And it is for that reason that I concur in the result in this case as to the disposition of the parties' remedy-clause claim.

**WALTERS, J.,** dissenting.

Together, Article I, section 10, and Article I, section 17, ensure that an individual who suffers personal injury will have legal remedy for that injury, and that a jury will determine the extent of that injury and the monetary sum necessary to restore it. Together, those two provisions place coherent constitutional limitations on legislative action: The remedy clause precludes the legislature from denying remedy for personal injury, and the right to jury trial precludes the legislature from eliminating or interfering with the jury's role in restoring that injury. But those two provisions also do more. They define what we mean when we use the word justice, and they make jurors its defender. Article I, section 10, stems from Lord Coke's interpretation of the Magna Carta and his understanding that justice must be "full, because justice ought not to limp." 359 Or at 200 (translating Edward Coke, *The Second Part of the Institutes of the Laws of England* 55-56 (1797 ed)). Article I, section 17, guarantees a right to a jury trial that is "one of the most important safeguards against tyranny which our law has designed." *Lee v. Madigan*, 358 US 228, 234, 79 S Ct 276, 3 L Ed 2d 260 (1959).

Today, the majority not only deprives the Horton family of the right to the restorative remedy that the jury awarded, it also bargains away and belittles two constitutional provisions designed to guarantee justice for all. I dissent.

I.

The remedy clause guarantees that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." Or Const, Art I, § 10. In this case, no one contests that plaintiff's son suffered injury to his person; the question is whether the legislature violated his right to remedy for that injury when it imposed a cap on his damages. The majority begins its analysis of that question with *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), a case that did not involve a damages cap. In fact, in *Smothers*, the court explicitly reserved the constitutionality of such caps for later decision. *Id.* at 120 n 19. That decision came in *Clarke v. OHSU*, 343 Or 581,

606, 175 P3d 418 (2007), and *Clarke* should have been the starting point for the court's analysis here.

Before I explain how the majority should have used *Clarke* to resolve this case, I want to note my agreement with the majority's clarification of the court's decision in *Smothers*. I agree that the meaning of the remedy clause is not tied to its meaning in 1857. 359 Or at 187. That clarification is important, and it corrects the mistake that the court made in *Howell v. Boyle*, 353 Or 359, 298 P3d 1 (2013). In *Howell*, the court interpreted *Smothers* to require a two-step process to determine whether the remedy clause is violated. *Id*. at 385-86. First, the court said in *Howell*, a court must ascertain the damages that the plaintiff would have received at common law; then, the court must compare those damages to the damages that the plaintiff received at trial. *Id*. at 385-86. If the plaintiff would have received less at common law than the plaintiff received at trial, then, the court explained, capped damages can be considered "fully restorative" of a common-law negligence claim. *Id*. at 386 (internal quotation marks omitted). In reaching that conclusion, the court recognized that "it is exceedingly difficult to determine the state of Oregon law over 150 years ago," but, it reasoned, "that is what *Smothers* requires." *Id*.

If that case-within-a-case analysis is what *Smothers* requires, then it is important to disavow it. And it is equally important to disavow *Howell*. *Howell* was dependent on the same faulty reasoning that the majority identifies in *Smothers*, and, if the majority is correct that *Smothers* must be overruled because that court's conclusion was dependent on faulty reasoning, then *Howell*, too, must be overruled. 359 Or at 183. That leaves us with *Clarke*, a case that the majority in this case does not overrule and that is not dependent on the faulty reasoning present in *Smothers* and *Howell*.

In *Clarke*, this court considered whether the capped damages that the Oregon Tort Claims Act (OTCA) provided were sufficiently restorative to satisfy the requirements of Article I, section 10. 343 Or at 588. The court viewed the plaintiff's economic damages of over $12 million as "representative of the enormous cost of lifetime medical care

currently associated with [the] permanent and severe personal injuries" that defendants had caused, and held that the capped damages available under the OTCA were insufficient and violated the remedy clause. *Id.* at 609-10. That analysis should have compelled the same result here. Plaintiff's economic damages of over $6 million are similarly "representative of the enormous cost of lifetime medical care currently associated with [the] permanent and severe personal injuries" that defendants caused. *Id.* at 609. And the capped damages available to plaintiff in this case are nowhere near capable of restoring those injuries. This court should have held that the limited remedy available to plaintiff was not sufficiently restorative to meet Article I, section 10, requirements.

The majority reasons otherwise. According to the majority, the disavowal of *Smothers* leaves us with all of the decisions in our remedy clause cases except *Smothers*, and the three categories into which the majority says those cases fall. This case, the majority says, falls into the second category—the category in which the legislature does not alter a defendant's duty to exercise reasonable care but limits a plaintiff's remedy for breach of that duty as part of a "comprehensive statutory scheme intended to extend benefits to some persons while adjusting the benefits to others." 359 Or at 221. For that category of cases, the majority opines, providing an "insubstantial remedy for a breach of a recognized duty" may violate the remedy clause. 359 Or at 219. However, the majority explains, when the legislature has sought to "adjust" a person's rights and remedies "as part of a larger statutory scheme that extends benefits to some while limiting benefits to others," a court can consider that "*quid pro quo*" in determining whether the remedy clause is violated. *Id.*

I agree with the majority that, to satisfy Article I, section 10, the remedy that the legislature provides cannot be "insubstantial." By that, I take the majority to mean that the legislative remedy must be substantially restorative. As this court said in *Clarke*, "Article I, section 10, does not eliminate the power of the legislature to vary and modify both the form and the measure of recovery for an injury, as long

as it does not leave the injured party" with a remedy "that is incapable of restoring the right that has been injured." 343 Or at 606 (internal quotation marks omitted). The court arrived at that understanding of the remedy clause by looking at its words and this court's prior cases. When Article I, section 10, was drafted, the word "remedy" meant, among other things "that which counteracts an evil of any kind," and "that which repairs loss or disaster." Noah Webster, *An American Dictionary of the English Language* 837 (1854). And since 1925, this court has held that the right to a remedy precludes the legislature from taking an individual's right to "a good common-law remedy for a private injury committed by a private citizen" and giving that individual a remedy that is "wholly inadequate" to its purpose. *West v. Jaloff*, 113 Or 184, 194-95, 232 P 642 (1925).

The overruling of *Smothers* neither compels nor permits a different conclusion. The words of the remedy clause continue to have substantially the same meaning that they had at common law, *see Webster's Third New Int'l Dictionary* 1920 (unabridged ed 2002) (defining "remedy"), and *West* and *Clarke* are still good law. *West* was decided before *Smothers*; *Clarke* discusses *Smothers*, but does not rely on the *Smothers* analysis that the majority here disavows. *Clarke*, 343 Or at 605-06. Accordingly, the proper remedy clause inquiry continues to be whether a statutory limitation on damages leaves the plaintiff with a remedy that is "incapable of restoring the right that has been injured." *Id*. at 606 (internal quotation marks omitted; quoting *Smothers*, 332 Or at 119-20).

The majority does not reason otherwise. Instead, the majority relies on the second consideration that it finds applicable to this category of cases—the *quid pro quo* that results when the legislature has sought to adjust a person's rights and remedies as "part of a larger statutory scheme that extends benefits to some while limiting benefits to others." 359 Or at 219. Relying on only one case for that proposition, *Hale v. Port of Portland*, 308 Or 508, 523, 783 P2d 506 (1989), the majority concludes that, in this case, the state's constitutionally recognized interest in sovereign immunity justifies the cap on plaintiff's damages. 359 Or at 224.

In *Clarke*, the court did not consider the state's interest in sovereign immunity in its analysis and cited *Hale* only to distinguish it. 343 Or at 608-09. In this case, the majority should have followed suit. As the court explained in *Clarke*, the statute that the court upheld in *Hale* limited the size of the award that a plaintiff could obtain from a municipal defendant, but it did not limit a plaintiff's right to obtain a fully compensatory award from municipal employees.[1] *Id*. Consequently, the plaintiff in *Hale* was entitled to a remedy capable of restoring his injuries, and the court had no cause to hold, and did not hold, that the legislature could deprive an individual of the right to a restorative remedy to extend a benefit to others. *Hale*, 308 Or at 523-24. In *Hale*, the court described the applicable limitation on damages as widening the class of plaintiffs who could recover for injuries against an otherwise immune municipality while at the same time imposing "a counterbalancing" limit on the size of the award that could be recovered. *Id*. at 523. However, that description of the statute did not represent the holding of the case. In fact, what the court said in *Hale* was that "all who had a remedy continue to have one." *Id*. The majority in this case is wrong in departing from the interpretation of *Hale* provided by the unanimous court in *Clarke*.

The majority then compounds that error when it broadly reasons that the legislature may "extend[] an assurance of benefits to some while limiting benefits to others," 359 Or at 224, effecting a "*quid pro quo*," 359 Or at 225. The remedy clause grants an individual right, not a bargaining chip. This court has never held, in this or any other context, that the legislature may bargain away an individual constitutional right for something of benefit to others, and the majority jeopardizes all individual rights by starting down that path.[2]

---

[1] The case that the court in *Hale* cited in support of its conclusion was *Noonan v. City of Portland*, 161 Or 213, 88 P2d 808 (1939), a case in which the court upheld a charter provision that made city employees liable for negligence, but granted immunity to the city itself.

[2] I do not mean to suggest that the legislature is precluded from providing all injured persons with a substituted restorative remedy that is different from the remedy available at common law. What I mean is that the legislature is precluded from providing one injured person with a less than restorative remedy to extend benefits of constitutional dimension to others.

And even if a bargain such as that described in *Hale* were permitted, no such bargain is provided or permitted here. In this case, the OTCA does not provide this plaintiff or this class of plaintiffs with a benefit of constitutional dimension such as that provided in *Hale*. This plaintiff's claim is a claim against a governmental employee.[3] Governmental employees are not entitled to sovereign immunity, and, absent the OTCA, all plaintiffs injured by governmental employees would have claims against those employees for unlimited damages. *See Gearin v. Marion County*, 110 Or 390, 396-97, 223 P 929 (1924) (county employees not entitled to sovereign immunity). The OTCA does not widen the class of plaintiffs entitled to sue that class of defendants. Thus, the constitutional benefit that was described in *Hale*—the widening of the class of plaintiffs who could sue the relevant class of defendants (there, municipalities)—is not present here. *Hale*, 308 Or at 523.

The OTCA also does not provide plaintiffs with a benefit of practical consequence. The OTCA does permit plaintiffs to recover from governmental entities but limits the amount that plaintiffs may recover from those entities. Plaintiffs' common-law right against individual governmental employees is a right to unlimited damages. An exchange of that right for the right, under the OTCA, to seek a more limited remedy from a governmental entity may or may not be of practical value to this class of plaintiffs. For instance, in this case, the state's waiver of immunity and its duty to indemnify defendant did not confer a benefit that plaintiff would not have had but for the OTCA. Like all physicians, defendant here had his own liability insurance. Absent the OTCA, that insurance would have been available to cover the costs of defendant's negligence.[4]

---

[3] Plaintiff's claim at issue on appeal is a claim against a state employee. Plaintiff also brought a claim against OHSU, but the trial court ruled that, because sovereign immunity applies to OHSU, the legislature constitutionally may limit the damages for which OHSU is liable. *See Clarke*, 343 Or at 600 (so holding). Plaintiff's claim against OHSU is not at issue on appeal.

[4] Although the majority labels defendant's transection of blood vessels "inadvertent[],"359 Or at 171, and although defendant's act was certainly not intentional, it is more correct to acknowledge that defendant's act was negligent. The purpose of liability insurance is to ensure that the costs of a tortfeasor's negligence are not borne by the person whom the tortfeasor injures.

Furthermore, a plaintiff's ability to collect a judgment is not a benefit of constitutional dimension and can have no place in the court's constitutional analysis. *See Oregonian Publishing Co. v. O'Leary*, 303 Or 297, 305, 736 P2d 173 (1987) (witness's interest in secrecy is not of constitutional dimension in Article I, section 10, analysis); *Mattson v. Astoria*, 39 Or 577, 580-81, 65 P 1066 (1901) (when plaintiff has claim against individual employee, plaintiff is not wholly without remedy); *Batdorff v. Oregon City*, 53 Or 402, 408-09, 100 P 937 (1909) (same).

The majority does not grapple with those concerns. Instead, the majority focuses on the benefit that the *state* receives in the bargain. The majority explains that the OTCA "accommodates the *state's* constitutionally recognized interest in asserting its sovereign immunity with the *need* to indemnify its employees." 359 Or at 222 (emphasis added). It is true that the state has a constitutional interest in sovereign immunity, but its *choice* to indemnify its employees is a choice of practical, and not of constitutional, significance. The state is immune from suit because it is a sovereign. By design, sovereign immunity does not extend to state employees; state employees, including those who perform important, high-risk functions, are liable for their torts. *See Gearin*, 110 Or at 396 (county employees). Thus, although the state can act only through its agents and employees, the individual liability of state employees is an inherent limitation on the state's immunity. The state may choose to assure its employees that they will be indemnified for their negligence, but it does not *need* to do so. Private employers, by law, are vicariously liable for the torts of their employees. [Minnis v. Oregon Mutual Ins. Co.](), 334 Or 191, 201, 48 P3d 137 (2002). Although the state may wish to compete with private employers by placing itself on the same footing, its voluntary choice to do so is not an interest of constitutional dimension.

The idea that the Oregon Constitution permits the legislature to bargain away a plaintiff's constitutional right to remedy in these circumstances is so repugnant that I wonder whether the majority means to endorse it. Perhaps, instead, what the majority intends to endorse is balancing—

a weighing of the competing individual and state constitutional interests. Balancing may seem more acceptable than bargaining, but it has no greater textual support in Article I, section 10, and it has the same potential to trump and thereby trample constitutional rights. Until this day, a bedrock of our constitutional jurisprudence has been that "a state legislative interest, no matter how important, cannot trump a state constitutional command." *State v. Stoneman*, 323 Or 536, 542, 920 P2d 535 (1996). In *Oregonian Publishing Co.*, 303 Or at 302, this court said that "[s]ection 10 is written in absolute terms; there are no explicit qualifications to its command that justice shall be administered openly." As a result, the court rejected the idea that it was appropriate to balance the secrecy interests of a witness who would be compelled to testify at a hearing against the interests of those who sought an open court. *Id*. at 305. The same is true of section 10's guarantee that "every" person "shall" have remedy for personal injury. That guarantee is written in absolute terms and should not be subject to balancing.

        If that is what the majority intends, then, in its *stare decisis* analysis, the majority should, at the very least, have acknowledged the fundamental change that it is making and provided a firm basis for its departure. And the majority should candidly have explained how the constitutional right to remedy, which this court described in *Gearin*, 110 Or at 396, as "one of the most sacred and essential of all the constitutional guaranties" without which "a free government cannot be maintained or individual liberty be preserved," will be given the weight necessary to ensure that it is not easily overborne by the interests of the day.

        The majority reassures us that its holding in this case is limited to cases in which the OTCA is applicable—cases in which the state has a constitutional interest in sovereign immunity. The majority also expresses no opinion on whether damages caps which do not implicate the state's sovereign immunity and are not a part of the *quid pro quo* that the majority sees in the OTCA would comply with Article I, section 10. 359 Or at 225-26. And even when the OTCA applies, the majority "doubt[s] highly" that the legislature's interest in sovereign immunity would justify a damages cap

that results in a plaintiff receiving a "paltry fraction" of the damages that the plaintiff incurred. 359 Or at 224 n 28.

That handle of hope is helpful, but it does little for plaintiff and her son, Tyson, and those who suffer similar tragic consequences at the hands of governmental employees.[5] And it does little for those who are unable to determine, before a jury renders its verdict, what fraction of damages the statutory cap on damages will represent, and therefore whether or not a defendant's liability will be limited. As the Chief Justice has written,

> "Although balancing provides flexibility to courts in making their determinations, it can result in ad hoc decisions that are unpredictable and that provide little guidance to citizens, government officials, and lower courts."

Thomas A. Balmer & Katherine Thomas, *In the Balance: Thoughts on Balancing and Alternative Approaches in State Constitutional Interpretation*, 76 Alb L Rev 2027, 2046 (2013).

Apparently what the majority envisions in future cases is *post hoc* weighing that will make the validity of statutory limitations dependent on (1) the fraction produced by dividing a plaintiff's limited damages by the damages that the jury assessed and (2) a judicial assessment of the importance of the state's constitutional interest in imposing the limitation. That *post hoc* weighing obviously satisfies a majority of this court, but it is a far cry from the absolute guarantee that Article I, section 10, provides.

And the majority's *post hoc* weighing is not the only way to give effect to the proposition that Article I, section 10, does not guarantee a perfect remedy. In *Clarke*, the court recognized that, although Article I, section 10, places limits on legislative authority, it also permits the exercise of that authority within constitutional bounds. If the legislature were to provide for a restorative, although imperfect, remedy in a way that would be equally restorative to all injured persons, it is possible that its exercise of authority would

---

[5] In this case, Tyson's undisputed past medical costs alone were more than $4 million; Tyson requires ongoing care and, despite receiving payment of the capped amount, Tyson's parents owe $2.6 million for Tyson's past medical care.

be upheld. But a monetary cap on damages does not have the same restorative effect for all persons regardless of the degree of injury, and it therefore does not meet the dictates of Article I, section 10, in instances in which it permits some a perfect remedy and others a pittance.

I recognize the many dilemmas that the state legislature faces and its intention to enact laws for the common good. That is the legislature's job. But it is the court's job to ensure that the legislature's well-intended efforts do not result in the loss of individual rights. A court cannot "'balance' one person's rights with cumulated majoritarian interests" without "fl[ying] in the face of the premise of constitutionally guaranteed individual rights against the state." *State v. Tourtillott*, 289 Or 845, 881, 618 P2d 423 (1980) (Linde J., dissenting). This court's duty is to ensure that the legislature's laudable intent to benefit the many does not trump and trample the rights of the one. We do not fulfill that duty in this case.

## II.

The leading case for the proposition that Article I, section 17, precludes the legislature from eliminating or interfering with the jury's fact-finding function is *Molodyh v. Truck Insurance Exchange*, 304 Or 290, 744 P2d 992 (1987). The majority endorses and does not overrule that case. In *Molodyh*, the court held that Article I, section 17, precludes the legislature from eliminating the jury's fact-finding function by giving an insurer the right to have a panel of three appraisers decide the amount of loss in a contract case, rather than leaving that task to a jury. *Id.* at 295-97. In *Lakin v. Senco Products, Inc.*, 329 Or 62, 82, 987 P2d 463 (1999), this court relied on *Molodyh* and held that Article I, section 17, also precludes the legislature from interfering with the jury's fact-finding function by requiring a court to enter judgment for a pre-determined amount rather than the amount determined by the jury.

Neither *Molodyh* nor *Lakin* limits the legislature's authority to alter or adjust a party's legal claim; both stand for the proposition that, *when a plaintiff has a legal claim*, it is the jury, and not the legislature or persons designated by the legislature, that must decide the facts of that claim.

*Molodyh*, 304 Or at 296-97; *Lakin*, 329 Or at 71. In *Jensen v. Whitlow*, 334 Or 412, 422, 51 P3d 599 (2002), the court explained *Lakin* in precisely those terms:

> "[B]ecause the plaintiffs had the right to bring a civil action to which the right to a jury trial was attached, Article I, section 17, prohibited the legislature from *interfering with or interrupting that right* by imposing a cap on the amount of noneconomic damages that the jury could award."

(Emphasis added.)

To overrule *Lakin*, the majority instead reads that case as holding that Article I, section 17, provides a constitutional right to compensatory damages and precludes the legislature from prescribing the elements of a claim, including recoverable damages. 359 Or at 243-44. To demonstrate that Article I, section 17, does not preclude that law-making authority, the majority cites *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987), and *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), for the proposition that courts have authority to limit the class of persons to whom a defendant owes a duty and to require that recoverable damages be foreseeable. 359 Or at 244-45. From that judicial authority, the majority apparently reasons that the legislature can impose comparable limits. I do not disagree. Subject to constitutional limits other than Article I, section 17, both the court and the legislature have authority to define the elements of a tort claim and to determine the types of damages that are recoverable. But that is not what the legislature did when it adopted the damages cap at issue here. The statute under scrutiny in this case does not change the elements of a common-law claim or determine the types of recoverable damages; it requires that a court enter judgment for an amount of damages different than the amount awarded by a jury. ORS 30.269(3). It is one thing to say, correctly, that the court and the legislature can *change* the common law; it is quite another to say that the legislature can preclude a plaintiff from obtaining the benefit of a jury's award under *existing* common law.

Under the common law as it exists today, a plaintiff who is physically injured by a negligent defendant has a common-law tort claim and may recover damages sufficient

to compensate the plaintiff for the economic and noneconomic losses caused by the defendant's negligence. *See, e.g., Lakin*, 329 Or at 73; *Smitson v. Southern Pac. Company*, 37 Or 74, 95-96, 60 P 907 (1900); *Oliver v. N. P. T. Co.*, 3 Or 84, 88 (1869). Accordingly, in this case, the trial court instructed the jury that "[y]ou must decide the amount of plaintiff's damages"; that "plaintiff must prove economic and non-economic damages by a preponderance of the evidence"; that "[t]he total amount of economic damages may not exceed the sum of $17,678,681"; and that "[t]he amount of non-economic damages may not exceed the sum of $15 million." And, in this case, the jury returned with a verdict for plaintiff in the sum of $12,071,190.38. Article I, section 17, precludes the legislature from interfering with that verdict, which was entered in accordance with existing common law.

That that is true is clear not only from Article I, section 17, but also from Article VII (Amended), section 3, which provides:

> "In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

As the majority correctly recognizes, that section's purpose is "to eliminate, as an incident of a jury trial in this state, the common-law power of a trial court to re-examine the evidence and set aside a verdict *because it was excessive* or in any other respect opposed to the weight of the evidence." 359 Or at 253 (emphasis added; internal quotation marks and citation omitted). That constitutional provision precludes a trial court from instructing a jury to award a plaintiff her economic and noneconomic damages and then, after the verdict is rendered, setting aside the verdict because it exceeds some sum, that, in the court's view, renders it excessive. *Van Lom v. Schneiderman*, 187 Or 89, 95-97, 210 P2d 461 (1949). It also precludes an appellate court from setting aside or modifying a jury's factual determination of damages following a fair trial. *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 523, 873 P2d 413 (1994). In either instance, a court's

nullification of a jury's finding of damages would violate both Article VII (Amended), section 3, and Article I, section 17. And the legislature cannot instruct a court to do what the constitution forbids. Such an instruction constitutes an unlawful interference with the jury's fact-finding function.

A damages cap is not the same as a legal rule that a defendant does not owe a duty to a particular class of plaintiffs or that damages must be foreseeable. A damages cap is nothing more than an arbitrary decision that, although a plaintiff has sustained damages measured according to existing legal principles in an amount assessed by the jury, those damages are excessive and must be reduced.

Courts in other jurisdictions agree and have held that, although a state legislature has authority to make or amend the common law, the constitutional right to jury trial precludes the legislature from interfering with a jury's fact-finding role by reducing a jury's factual determination of damages to a predetermined amount. In *Sofie v. Fibreboard Corp.*, 112 Wash 2d 636, 656, 771 P2d 711, 721-22 (1989), the Washington Supreme Court rested its decision on the word "inviolate" in Article 1, section 21, of the Washington Constitution. The court explained that

> "the plain language of [A]rticle 1, section 21[,] provides the most fundamental guidance: 'The right of trial by jury shall remain inviolate.' The term 'inviolate' connotes deserving of the highest protection. *Webster's Third New International Dictionary* 1190 (1976), defines 'inviolate' as 'free from change or blemish: pure, unbroken *** free from assault or trespass: untouched, intact ***.' Applied to the right to trial by jury, this language indicates that the right must remain the essential component of our legal system that it has always been. For such a right to remain inviolate, it must not diminish over time and must be protected from all assaults to its essential guarantees. In Washington, those guarantees include allowing the jury to determine the amount of damages in a civil case."

*Id*.

The Washington Supreme Court responded to the argument that a damages cap was a permissible exercise of the legislature's law-making power by citing the following passage

from a federal district court as providing "insightful distinctions between what the [l]egislature can and cannot do":

> "Unquestionably, the legislature may pass measures which affect the way a jury determines factual issues. The legislature may prescribe rules of procedure and evidence, create legal presumptions, allocate burdens of proof, and the like. Just as certainly, the legislature may abolish a common law right of action and, if it desires, replace it with a compensation scheme. The legislature may even make rules concerning the type of damages recoverable and the way in which damages are paid. But the legislature may not preempt a jury's findings on a factual issue which has properly been submitted to the jury."

*Id*. at 657, 771 P2d at 722 (internal quotation marks omitted; quoting *Boyd v. Bulala*, 647 F Supp 781, 789-90 (WD Va 1986)). The Washington Supreme Court agreed and expressed the same thought this way:

> "It is entirely within the [l]egislature's power to define parameters of a cause of action and prescribe factors to take into consideration in determining liability. This is fundamentally different from directly predetermining the limits of a jury's fact-finding powers in relevant issues, which offends the constitution."

*Id*. at 666, 771 P2d at 727. A contrary argument, the court explained,

> "ignores the constitutional magnitude of the jury's fact-finding province, including its role to determine damages. [To argue contra is to assert] that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment. Such an argument pays lip service to the form of the jury but robs the institution of its function. This court will not construe constitutional rights in such a manner. As we once stated: 'The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name [***]. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding.'"

*Id*. at 656, 771 P2d at 721 (quoting *State v. Strasburg*, 60 Wash 106, 116, 110 P 1020, 1023 (1910)) (internal quotation marks from *Strasburg* omitted).

This court adopted that analysis in *Lakin* and did so after considering and rejecting the defendant's position that a damages cap was but a declaration of the legal consequences of facts, and not an interference with the jury's authority to decide the facts.[6] 329 Or at 79-80. Before it reached its conclusion, the court also considered cases from other jurisdictions that supported the defendant's view; the court gave those cases its attention but was satisfied that the conclusion that it reached was "supported by the better-reasoned authorities." *Id*. at 81.

Today, those authorities include a number of cases that the *Lakin* court did not have the opportunity to consider. In some of those cases, the courts, like the courts in *Sofie* and *Lakin*, have noted the plain meaning of the word "inviolate."[7] And in one of those cases, the court states succinctly what this court said in *Lakin* and should continue to say: A damages cap "nullifies the jury's findings of fact regarding damages and thereby undermines the jury's basic function." *Atlanta Oculoplastic Surgery, P.C. v Nestlehutt*, 286 Ga 731, 735, 691 SE2d 218 (2010).

I realize that other courts have reached different conclusions, but I point to the cases that support this court's decision in *Lakin* to spotlight the fact that the differing conclusions that courts reach arise from differences about what does or does not constitute a nullification of, or interference with, the jury's fact-finding function, not from differences about the jury's constitutional role as factfinder.

In this case as well, the difference between the majority's analysis and the analysis of the unanimous court in *Lakin* is not found in differences about the text or history of Article I, section 17, and the jury's role as factfinder. Like the majority in this case, the court in *Lakin* cited to Blackstone for the proposition that the jury trial was considered "the glory of the English law." 359 Or at 235 (quoting

---

[6] *See* Petitioner's Opening Brief at 11, *Lakin v. Senco Products, Inc.*, 329 Or 62, 987 P2d 68 (1999) (S044110) ("Juries do not determine the legal consequences of the facts they find.").

[7] Those cases include *Watts v. Lester E. Cox Med. Ctr.*, 376 SW3d 633 (Mo 2012); *Knowles v. United States*, 544 NW2d 183 (SD 1996; and *Moore v. Mobile Infirmary Ass'n*, 592 So 2d 156 (Ala 1991).

*Lakin*, 329 Or at 70). *Lakin* also quoted from *Dimick v. Schiedt*, 293 US 474, 485-86, 55 S Ct 296, 79 L Ed 603 (1935), for the proposition that the right to jury trial is a right to have a jury serve as a fact-finding body:

> "[T]rial by jury has always been, and still is, generally regarded as the normal and preferable *mode of disposing of issues of fact* in civil cases at law as well as in criminal cases. Maintenance of the jury as a *fact-finding body* is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care."

329 Or at 71 (emphasis added; internal quotation marks omitted). Although the majority provides additional history demonstrating that the right to have a jury determine the facts in a civil case was of significance not only to Blackstone and to the Britons but also to the colonists, and that the framers were aware that judges and legislators retained the power to make law, the majority's history goes no further. For instance, that history does not indicate that the drafters of Article I, section 17, or its federal counterpart affirmatively intended to permit damages caps. Damages caps did not exist at common law; they are a modern innovation. Nor does that history indicate that the drafters were affirmatively unconcerned with judicial or legislative encroachment on the jury's fact-finding role, or that they considered that role to be insignificant.

The source that the majority most relies on in its review of the history of the civil right to jury trial is Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn L Rev 639 (1973). In that article, the author examines historical materials in an attempt to determine what the proponents of the Seventh Amendment sought to accomplish by its adoption, and, although recognizing certain methodological constraints, reaches a number of significant conclusions. Specifically, the author concludes that "it is clear that the amendment was meant by its proponents to do more than protect an occasional civil litigant against an oppressive and corrupt federal judge—although it certainly was to perform this function as well." *Id*. at 653. Rather, "[t]here was a substantial sentiment to preserve a

supposed functioning of the jury that would result in ad hoc 'legislative' changes through the medium of the jury's verdict." *Id*. "Juries," the author concludes, "were sought to be thrust into cases to effect a result different from that likely to be obtained by an honest judge sitting without a jury." *Id*. In fact, the author opines, "[t]he effort was quite clearly to require juries to sit in civil cases as a check on what the popular mind might regard as legislative as well as judicial excesses." *Id*.

The majority does not disagree. All that is new in the majority's analysis is this: The *Lakin* court judged the damages cap at issue in that case to be an interference with a jury's factual assessment of damages; the majority in this case considers the imposition of a damages cap to be within the legislature's law-making power. That difference is apparent, but it cannot be explained by the majority's expanded historical analysis.

Nor can it be explained by the majority's discussion of our decisions in cases other than *Lakin*. *Molodyh* precludes legislative interference with the jury's fact-finding function, and *Lakin* is in accord. To the majority's point that [*DeMendoza v. Huffman*](), 334 Or 425, 51 P3d 1232 (2002), a case decided *after Lakin* and that distinguishes *Lakin*, provides a basis for now overruling it, I question whether the majority is wise to give this and future courts that liberal a leash. The rule of *stare decisis* is essential to the public's confidence that the law is more than a reflection of personal preference, and the public's confidence in the law is the fragile foundation on which our system of justice rests.

In relying on *DeMendoza* to overrule *Lakin*, the majority points to its statement that, if a right to receive an award that reflects the jury's determination of the full amount of damages exists, "then it must arise from some source other than Article I, section 17." 359 Or at 229 (internal quotation marks omitted; quoting *DeMendoza*, 334 Or at 447). The majority contends that, in that regard, *DeMendoza* "cannot be fairly reconciled with *Lakin*." 359 Or at 231. But in *DeMendoza*, the court reaffirmed the court's conclusion in *Lakin* that a plaintiff had a right to compensatory damages that arose from a source other than Article I,

section 17. 334 Or at 447. The court explained that the right to receive an award of compensatory damages that reflects a jury's determination of those damages arises from the existing common-law right to compensatory damages together with the right, under Article I, section 17, to have a jury determine the amount of those damages. *Id*. at 446-47. In *DeMendoza*, the court contrasted a plaintiff's right to receive jury-awarded compensatory damages with a plaintiff's right to receive jury-awarded punitive damages and concluded that a plaintiff has no right to the latter. *Id*. at 447. Perhaps the court's reasoning was that Article I, section 10, provides a plaintiff with a right to consequential damages, which are necessary to restore a plaintiff's injury, but not to punitive damages, which are awarded to deter wrongful conduct.[8] Or perhaps the court was incorrect in treating compensatory and punitive damages differently in its Article I, section 17, analysis. But whatever its reasoning, *DeMendoza* and *Lakin* consistently recognize that a plaintiff does have a right to receive jury-awarded compensatory damages. The two cases are not at odds in that regard.

Furthermore, the statute at issue in *DeMendoza*— ORS 18.540—provided that a portion of the damages assessed by a jury would be distributed to the state. In holding that that statute did not violate Article I, section 17, or Article VII (Amended), section 3, the court distinguished not only between punitive and compensatory damages, but also between caps and the distribution scheme found in ORS 18.540. *Id*. at 447-48. The court reasoned that the effect of ORS 18.540 was not to modify a jury's assessment of punitive damages but, instead, to modify the way in which those damages were distributed. *Id*. at 447. The *distribution* of damages, the court said, "is *not* a factual determination that a jury makes." *Id*. (emphasis in original). The court may have been discussing Article VII (Amended), section 3, when it gave that explanation, but its distinction applies equally to Article I, section 17.

---

[8] The majority refuses to so interpret *DeMendoza* because, it says, the court in *Lakin* considered Article I, section 10, irrelevant to its Article I, section 17, analysis. 359 Or at 230. That *Lakin* may not have recognized the relevance of Article I, section 10, in its analysis, however, is no reason to overrule its holding. *DeMendoza* did not do so.

The majority is wrong to conclude that the court's decision in *DeMendoza* "cannot be fairly reconciled with *Lakin*," 359 Or at 231, and the majority aggravates that error by using that standard to overrule *Lakin*. When, in [Couey v. Atkins](), 357 Or 460, 520, 355 P3d 866 (2015), a unanimous court disavowed [Yancy v. Shatzer](), 337 Or 345, 97 P3d 1161 (2004), in favor of [Kellas v. Dept. of Corrections](), 341 Or 471, 145 P3d 139 (2006), it determined that "if *Yancy* was correctly decided, then it would seem necessarily to follow that ORS 14.175 is unconstitutional. But if *Kellas* applies, there would seem to be no constitutional impediment to the legislature conferring the authority to review otherwise moot cases that are capable of repetition, yet evading review." *Couey*, 357 Or at 489. *Yancy* and *Kellas* were diametrically opposed; the same cannot be said for *Lakin* and *DeMendoza*. In *DeMendoza*, the court was well aware of its decision in *Lakin* and reaffirmed and distinguished it. Here, the majority not only fails to follow *Lakin*, it also fails to follow *DeMendoza* and its recognition that a plaintiff has a right to receive an award that reflects the jury's determination of compensatory damages.

Nor can the court's decision in [Hughes v. PeaceHealth](), 344 Or 142, 178 P3d 225 (2008), constitute a basis for overruling *Lakin*. In *Hughes*, the plaintiff brought a statutory claim for wrongful death and challenged the statutory limitation on damages on both remedy clause and jury trial grounds. *Id*. at 145. The majority reasoned that the plaintiff had no right to remedy under Article I, section 10, because, under *Smothers*, the plaintiff had failed to persuade the court that she would have had a wrongful death claim at common law. *Id*. at 152. In this case, the majority overrules *Smothers* and, thus, the premise for the court's decision in *Hughes*. The majority should not give effect to *Hughes* or use it as a basis for overruling *Lakin*. In addition, like the court in *DeMendoza*, the court in *Hughes* distinguished *Lakin*. *Id*. at 154. If the majority is going to give effect to *Hughes*, it also should give effect to the distinction that it drew. In *Hughes*, the court explained that because the plaintiff had no right to recover any damages under Article I, section 10, the plaintiff's right to have a jury determine the amount of his damages was not violated. *Id*. at 155-57. If the court

was correct in that reasoning, its decision does not call the result in *Lakin* into question or compel a different result in this case. In *Lakin*, unlike in *Hughes*, the plaintiff had a right to a remedy under Article I, section 10, and the same is true of plaintiff here. The majority departs from the rule of *stare decisis* when it fails to follow *Lakin*, and it errs in using *Hughes* to do so.

The principle of *stare decisis* does not fulfill its purpose if we reconsider at will the decisions and distinctions of prior courts. Instead, we should assume that our "fully considered prior cases are correctly decided" unless we can say that the constitutional rule at issue "was not formulated either by means of the appropriate paradigm or by some suitable substitute." *State v. Ciancanelli*, 339 Or 282, 290-91, 121 P3d 613 (2005). A majority of the present court may disagree with the result that the unanimous court reached in *Lakin*, but it cannot say that that standard has been met here.

Moreover, the majority did not have to overrule *Lakin* to make clear that the right that Article I, section 17, grants is a procedural right to have a jury decide the facts in a case and not a right to a particular common-law claim or to unlimited damages. It was unnecessary for the majority to erect and topple a straw man to reach that conclusion. And more importantly, the fact that the right to jury trial is a procedural right does not take anything from it. The procedural right to jury trial guarantees that plain people will decide the facts of a case. It is more than a right to have a jury empanelled; it is a right to have a jury perform its fact-finding function without interference.

The court that decided *Molodyh* would not have permitted the legislature to write its way around Article I, section 17, by enacting a law that permitted the parties to an insurance contract to try their case to a jury, but then required the court to enter judgment for the damages determined not by the jury, but by three appraisers. And this court should not permit the legislature to write its way around Article I, section 17, by enacting a law that permits parties to a negligence claim to try their case to a jury, but requires the court to enter judgment

for the damages determined not by the jury, but by the legislature.

Labeling the right to civil jury trial as a procedural right does not diminish its significance in our governmental structure. In *Blakely v. Washington*, 542 US 296, 305-06, 124 S Ct 2531, 159 L Ed 2d 403 (2004), the United States Supreme Court described the role of the jury in a criminal trial as "no mere procedural formality, but a fundamental reservation of power in our constitutional structure."[9] The same is true of the jury's role in civil trials. The framers did not consider the right to civil juries essential only because juries are particularly well suited to the fact-finding function. They also considered juries as playing an essential political role in our democratic system of government. As the anonymous "Federal Farmer" said in one of the author's letters to "The Republican,"

> "The jury trial, especially politically considered, is by far the most important feature in the judicial department in a free country \* \* \*. Juries are constantly and frequently drawn from the body of the people, and freemen of the country; and by holding the jury's right to return a general verdict in all cases sacred, we secure to the people at large, their just and rightful contr[ol] in the judicial department. \* \* \* The body of the people, principally, bear the burdens of the community; they of right ought to have a contr[ol] in its important concerns, both in making [by legislation] and executing [through juries] the laws, otherwise they may, in a short time, be ruined."

---

[9] The court in *Blakely*, 542 US at 306, went on to explain:

"Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. *See* Letter XV by the Federal Farmer (Jan 18, 1788), reprinted in 2 *The Complete Anti-Federalist* 315, 320 (H. Storing ed 1981) (describing the jury as 'secur[ing] to the people at large, their just and rightful contr[ol] in the judicial department'); John Adams, Diary Entry (Feb 12, 1771), reprinted in 2 *Works of John Adams* 252, 253 (C. Adams ed 1850) ('[T]he common people, should have as complete a control \* \* \* in every judgment of a court of judicature' as in the legislature); Letter from Thomas Jefferson to the Abbé Arnoux (July 19, 1789), reprinted in 15 *Papers of Thomas Jefferson* 282, 283 (J. Boyd ed 1958) ('Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative'); *Jones v. United States*, 526 US 227, 244-248, [119 S Ct 1215, 143 L Ed 2d 311] (1999)."

Herbert J. Storing ed., *The Complete Anti-Federalist* Vol 2, 320 (1981).

Thus, as Alexis de Tocqueville explained, "[t]he jury is, above all, a political institution, and it must be regarded in this light in order to be duly appreciated." Alexis de Tocqueville, *Democracy in America* 282 (Phillips Bradley ed 1946) (originally published 1835). De Tocqueville described the civil jury as placing "the real direction of society in the hands of the governed, or of a portion of the governed, and not in that of the government." *Id*. The civil jury system, Blackstone explained, "preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens." William Blackstone, 3 *Commentaries on the Laws of England* 380 (1st ed 1768). It is to jurors—plain people—that we have often looked to defend our constitutional rights "against the importunities of judges and despite prevailing hysteria and prejudices." *Toth v. Quarles*, 350 US 11, 17-19, 76 S Ct 1, 100 L Ed 8 (1955). We lose that strength when we permit interference with that function.

III.

Together Article I, section 10, and Article I, section 17, provide a constitutional structure that is designed to provide justice for all and a means to preserve justice for all. Today, the majority does real damage to that structure and to the real people it is intended to protect. I dissent.

Baldwin, J., joins in this dissenting opinion.